UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CRANBURY BRICK YARD, LLC, | : | |
| | : | |
| Plaintiff, | : | Hon. Brian R. Martinotti |
| | : | |
| v. | : | Civ. Action No. 15-2789(BRM) (LGH) |
| | : | |
| UNITED STATES OF AMERICA, | : | ORAL ARGUMENT REQUESTED |
| et al., | : | Hearing Date:  January 16, 2018 |
| | : | |
| Defendants. | : | Document Electronically Filed |

**UNITED STATES' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

1. Unexcelled Manufacturing Company (or one of its affiliates) handled munitions and manufactured fireworks at the Site from 1942 through the mid-1950s. *See* **Exhibit 9**, Hall to The Chief of Bureau Ordnance, 10/22/1942, CRANBURY-NARACP0000022 (reporting that the first shipment occurred on October 21, 1942); 4/10/1956 aerial photograph (showing no cars in the parking lot), CRANBURY-BRIGHAM-0000002.

2. Unexcelled contracted with the United States military to assemble various munitions during World War II and the Korean War. *See* **Exhibit 10**, Civilian Production Administration, Alphabetical Listing of Major War Supply Contracts, Cumulative, June 1940 through September 1945, Volume 4, CRANBURY-BRIGHAM-0000146 at CRANBURY-BRIGHAM-0000148-49; **Exhibit 11**, Ordnance Ammunition Program, 1 July 1950 - 31 December 1952, Volume VIII, Procurement and Production Activities, GEIS0000113, GEIS0000117.

3. The Site became contaminated with munitions and explosives of concern ("MEC") and other contaminants. *See* **Exhibit 12**, Langan Environmental, Remedial Investigation Report/Remedial Action Work Plan, September 2016 ("September 2016 Remedial Investigation Report"), at 4.

4. On December 24, 2004, the New Jersey Department of Environmental Protection ("NJDEP") issued a Directive and Notice to Insurers finding that Maxxam Group, Inc. ("Maxxam") and Cranbury Development Corporation were liable for cleanup and removal costs at the Site and directing Maxxam and Cranbury Development Corporation to remediate the Site. **Exhibit 13**, NJDEP, Directive and Notice to Insurers, December 24, 2004, ROBERTSON000130 ¶¶ 15, 18.

5. In a deposition of Maxxam Group, Inc. pursuant to Fed. R. Civ. P. 30(b)(6), Maxxam Group, Inc.'s in-house lawyer, Mr. Bernard L. Birkel, testified that Maxxam Group, Inc. changed its name several times over the years: in 1915, it was known as Unexcelled Manufacturing; in 1946, Unexcelled Chemical; in 1966, Unexcelled, Inc.; in 1972, Twin Fair; in 1984, Twin Fair merged with a subsidiary of Simplicity Pattern Company Inc.; and in 1984, Simplicity Pattern changed its name to Maxxam Group, Inc. **Exhibit 1**, Deposition of Bernard L. Birkel, August 11, 2006, 56-64; **Exhibit 20** (Birkel Exhibit 5), at BIRKEL000168.

6. On January 28, 2005, a representative of Maxxam signed an Administrative Consent Order ("2005 Order") with the NJDEP. **Exhibit 14**, NJDEP, Administrative Consent Order, BIRKEL000160. A Cranbury Development Corporation representative also signed the 2005 Order. *Id.*

7. In the 2005 Order, the NJDEP alleged that Maxxam was a "covered" person under CERCLA. *Id.* ¶ 28.

8. The 2005 Order states,

> It is the intent of the [parties] that this Administrative Consent Order constitutes an administrative settlement within the meaning of CERCLA Section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B) and is intended to resolve the liability of [Cranbury Development Corporation] and Maxxam to the State of New Jersey for some or all of a response action as related to the investigation, remediation and Remedial Work described in this Administrative Consent Order at the Site.

> *Id.* ¶ 30.

9. The 2005 Order states,

    It is the intent of the [State], [Cranbury Development Corporation] and Maxxam that this Administrative Consent Order constitutes an administrative settlement within the meaning of . . . 42 U.S.C. § 9613(f)(2) for the purpose of providing protection from contribution actions or claims under CERCLA as a result of releases of hazardous substances at the Site as described in this Administrative Consent Order and Scope of Work.

    *Id.* ¶ 31.

10. The 2005 Order states, "This Administrative Consent Order is, to the greatest extent possible, consistent with and complies with [CERCLA] . . . . The activities conducted pursuant to this [order], if approved by [NJDEP], shall be considered to be consistent with the NCP." *Id.* ¶ 9.

11. In the 2005 Order, New Jersey covenanted not to sue the Order's signatories "under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), with respect to response actions for the investigation, remediation and Remedial Work described in this [Order]." *Id.* ¶ 28.

12. New Jersey's covenant is "conditioned upon . . . satisfactory performance of [the signatories'] obligations under this Administrative Consent Order." *Id.*

13. By signing the 2005 Order, Maxxam and Cranbury Development Corporation agreed to perform a remedial action at the Site and reimburse the NJDEP's oversight costs. *Id.* ¶¶ 11-12, 25.

14. On July 18, 2005, CBY entered into a Purchase and Sale Agreement with Cranbury Development Corporation. **Exhibit 15**, Purchase and Sale Agreement, July 18, 2005, HAZEL000169 at HAZEL000169, 204-205.

15. Under the Purchase and Sale Agreement, CBY agreed to pay $5,500,000 for the Site pending the results of due diligence activities. *Id.* at HAZEL000177.

16. CBY also agreed to reimburse Cranbury Development Corporation for one-half of Cranbury Development Corporation's costs up to one million dollars. *Id.* at ¶ 5.6.3.

3

17. Cranbury Development Corporation executed a Bill of Sale and Assignment transferring title to the Site to CBY on January 11, 2006. **Exhibit 16**, Bill of Sale and Assignment, January 11, 2006, CBY_0004800-804.

18. Redacted pursuant to Local Rule 5.3.

19. Redacted pursuant to Local Rule 5.3.

20. Redacted pursuant to Local Rule 5.3.

21. Redacted pursuant to Local Rule 5.3.

22. Redacted pursuant to Local Rule 5.3.

23. Redacted pursuant to Local Rule 5.3.

24. Redacted pursuant to Local Rule 5.3.

25. Redacted pursuant to Local Rule 5.3.

26. Redacted pursuant to Local Rule 5.3.

27. On January 30, 2006, CBY, Maxxam, and Cranbury Development Corporation entered into an Environmental Indemnity Agreement under which CBY agreed to indemnify Maxxam and Cranbury Development Corporation from "claims of any and every kind whatsoever" with respect to the environmental condition of the Site, including without limitation, "the presence, release, or threatened release of any MEC, MC, Hazardous Material or other Pollution Conditions . . . ." **Exhibit 19**, Environmental Indemnity Agreement, January 30, 2006, ¶ 1. The indemnity was capped at $6 million from the date of closing to the delivery of a No Further Action Letter and $250,000 after the delivery of a No Further Action Letter. The indemnity also excluded Maxxam's litigation against the United States. *Id.* at ¶ 1 (last paragraph).

28. The Environmental Indemnity Agreement required CBY to keep Maxxam informed regarding the environmental conditions on the Site. *Id.* at ¶ 6; *see also* **Exhibit 31**, Email from Maxxam's counsel to CBY's counsel, May 29, 2008

("May 29, 2008 Email"), MGI_0000801 (Redacted pursuant to Local Rule 5.3.); **Exhibit 32**, Letter from Maxxam's counsel to CBY's counsel, January 27, 2009, MGI_0000837 (same).

29. Redacted pursuant to Local Rule 5.3.

30. On January 27, 2006, CBY signed an Amendment to the 2005 Order. **Exhibit 20**, NJDEP, Administrative Consent Order Amendment, February 16, 2006 ("2006 Amendment"), at MAXCRAN0005731.

31. The 2006 Amendment removed Cranbury Development Corporation and its shareholder, Credit Lyonnais Asset Management, from the 2005 Order and replaced them with CBY. *Id.* ¶ 4, *see also* **Exhibit 4**, CBY 30(b)(6) Trans. at 109-110, 112 (stating that the purpose of the Amendment was to add CBY "as a participant in the [Order]"), 180 (stating that CBY "replace[d]" Cranbury Development Corporation); 218 (stating that one of the conditions of the Purchase and Sale Agreement was to assume to obligations of the Cranbury Development Corporation and Credit Lyonnais Asset Management under the 2005 Order, and that CBY did so through the 2006 Amendment).

32. The 2006 Amendment became effective on February 16, 2006, when all parties including the NJDEP had signed it. **Exhibit 20**, 2006 Amendment at MAXCRAN0005728.

33. The costs CBY allegedly has incurred subsequent to the 2006 Amendment's effective date were incurred pursuant to (and hence are related to) the Order.

34. The 2006 Amendment states that the amendment "shall become part of" the 2005 Order, and that the original terms of the Order "shall remain in full force and effect." **Exhibit 20**, 2006 Amendment ¶ 7.

35. Under the 2006 Amendment, CBY and Maxxam are required to comply with the terms of the Order, and are therefore responsible for remediating the Site. *Id.* ¶ 7; *see also* **Exhibit 4**, CBY 30(b)(6) Trans. at 112 (stating that it was CBY's intention to "take over cleanup of the site under the [Order]").

36. Redacted pursuant to Local Rule 5.3.

5

37. On October 22, 2009, CBY obtained an $11 million Site Pollution Incident Legal Liability insurance policy that listed as a named insured "Maxxam Group, Inc. and any and all alleged predecessors of Maxxam Group, Inc., including but not limited to, Unexcelled Manufacturing Company, Inc., Unexcelled Chemical Corporation, Unexcelled, Inc., Twin Fair, Inc., Twin Fair Holdings, Inc., Simplicity Pattern Co., Maxxam Properties, Inc., and Maxxus Properties, Inc." **Exhibit 21**, JCH Environmental Insurance Brokers, Insurance Binder for Site Pollution Incident Legal Liability Select, October 22, 2008, CBY_0023923 at CBY_0023935.

38. The 2009 insurance policy lists as a "scheduled entity" "Maxxam Group, Inc. and any and all alleged predecessors of Maxxam Group, Inc., including but not limited to, Unexcelled Manufacturing Company, Inc., Unexcelled Chemical Corporation, Unexcelled, Inc., Twin Fair, Inc., Twin Fair Holdings, Inc., Simplicity Pattern Co., Maxxam Properties, Inc., and Maxxus Properties, Inc." *Id.* at CBY_0023939.

39. On October 22, 2008, the Honorable Dennis C. Cavanaugh, United States District Court for the District of New Jersey, entered a Settlement Agreement, Consent Decree and Final Judgment ("Consent Decree") in *Maxxam Group, Inc. v. United States*, **Exhibit 22**, No. 05-1834 (DMC). Under the Consent Decree, the United States agreed to pay Maxxam $1,457,500 for past response costs incurred at the Site. *See* No. 05-1834, Docket No. 50 ¶ 8(a).

40. Since 2006, CBY engaged a number of contractors to conduct remediation and development work at the Site. **Exhibit 4**, CBY 30(b)(6) Trans. 186-87. Starting in 2007, Langan Engineering ("Langan") performed non-MEC environmental investigation and remediation activities and provided civil engineering services to support Site development, *id.* at 187, while Munitions Management Group ("MMG") performed MEC-related investigation and remediation activities. *Id.* at 220.

41. Redacted pursuant to Local Rule 5.3.

42. Redacted pursuant to Local Rule 5.3.

43. Redacted pursuant to Local Rule 5.3.

6

44. Redacted pursuant to Local Rule 5.3.

45. Approximately 300 cubic yards of contaminated soil was excavated and stockpiled in response to the underground storage tank incident. **Exhibit 12**, September 2016 Remedial Investigation Report, at 23 (discussing AOC-22), Table 18 at 7 (showing AOC-22 soil sampling results for Total Extractable Petroleum Hydrocarbons ("Total EPH") at 9100 mg/kg, which exceeded the state remediation standards for total EPH of 1700 mg/kg).

46. Redacted pursuant to Local Rule 5.3.

47. Redacted pursuant to Local Rule 5.3.

48. In November 2013, one of CBY's contractors encountered a seven-acre landfill during excavation work. The landfill area contained buried drums, waste containers, asbestos containing material, hazardous substances that exceeded residential and industrial direct contact levels, wastes exceeding hazardous waste screening levels, and solid waste. **Exhibit 23**, MMG Monthly Report, December 2, 2013, CBY_0039976 at CBY_0039977.

49. Soil containing asbestos was screened and sifted at the contractor's screen plant. Due to the presence of asbestos, the screen plant had to be decontaminated. *Id.* at CBY_0039978.

50. Following the discovery of asbestos in the seven-acre landfill, CBY's contractor Langan implemented air monitoring measures, which indicated the presence of asbestos in air samples. **Exhibit 35**, Email from Brian Blum to Joshua Crane, et al., June 25, 2014, CRANBURY-LANGANSUBP0092515 at CRANBURY-LANGANSUBP0092518 (stating that Langan had been monitoring for asbestos since earth work and MEC screening began at the seven-acre landfill) and CRANBURY-LANGANSUBP0092516 (reporting increased asbestos levels); *see also* **Exhibit 24**, AMEC, Interim Remedial Measures Report for MEC Removal Activities, June 2016, CBY_0058741 at CBY_0058860-92, CBY_0058932-34 (asbestos air sampling data).

51. Redacted pursuant to Local Rule 5.3.

52. Redacted pursuant to Local Rule 5.3.

7

53. Volatile organic compounds found in soil and groundwater at the Site included 1, 1, 2-trichloroethane, benzene, toluene, xylene. **Exhibit 12,** September 2016 Remedial Investigation Report, at 25.

54. Redacted pursuant to Local Rule 5.3.

55. Redacted pursuant to Local Rule 5.3.

56. Redacted pursuant to Local Rule 5.3.

57. The MEC recovered from the Site included 20MM high explosive incendiary projectile rounds, M48 trip flares, and M204 grenade fuses. **Exhibit 25**, Langan and MMG, Munitions and Explosives of Concern Remedial Investigation Report, May 15, 2007, CBY_0001125 at CBY_0001273.

58. Munitions constituents associated with these items (several of which are hazardous substances) have been found in Site soils. *See* **Exhibit 12**, September 2016 Remedial Investigation Report, at 25 (listing metals, including barium, chromium, copper, lead, and zinc, found in soil and groundwater at the Site); **Exhibit 26**, DAC-MIDAS Summary of PEP Compounds in an Item, November 15, 2016, CRANBURY-ARMY0011429 (showing barium and lead compounds in 20MM high explosive incendiary projectile rounds), JMC-MIDAS Summary of Compounds in an Item, CRANBURY-ARMY0011763 (showing barium, chromium, copper, lead, and zinc in M48 trip flares), CRANBURY-ARMY0011821 (showing barium compound, lead, and zinc in M204 grenade fuses).

59. CBY has not produced any documents showing that CBY tested the unprotected pile of dirt to determine whether it contained hazardous substances that would be discharged into the environment with infiltrating rainwater or runoff.

60. Steven Ganch, Viridian's Director of Development, estimated that CBY moved approximately one million cubic yards of soil at the Site. **Exhibit 7**, Deposition of Steven Ganch ("Ganch Trans."), November 2, 2016, 79; *see* **Exhibit 12**, September 2016 Remedial Investigation Report, at Drawing 22 (showing location of supplemental barrier).

61. In some areas of the Site, ground elevation changed by as much as twelve feet. CBY's environmental contractor, Langan, stated that "[g]enerally, the northern portion of the Site has been cut and the southern portion of the Site has been filled." **Exhibit 12**, September 2016 Remedial Investigation Report, at 2, Appendix B.

62. CBY has not produced any documents showing that CBY conducted analyses to determine whether placement of contaminated soils under the supplemental barrier would be protective of human health and the environment or whether infiltrating rainwater could move through the buried soils, carry dissolved contamination to shallow groundwater, and then to tributaries. *See, e.g., id.* at 1-89 (summarizing the work at the site to date without any mention of analyses of whether placing contaminated soils under the barrier is protective of human health and the environment), Drawing 22 (showing location of supplemental barrier and proximity to Unnamed Tributaries #1 and #2); *see also* **Exhibit 5**, Blum Trans. 68 (Redacted pursuant to Local Rule 5.3.).

63. CBY did not produce any documents showing that CBY conducted studies to determine whether infiltrating rainwater could move through the buried soils, carry dissolved contamination to shallow groundwater, and then to tributaries.

64. The Site will hold three large warehouses of approximately one million square feet each. **Exhibit 12**, September 2016 Remedial Investigation Report, at 2.

65. Mr. Zoch, CBY's remediation expert, identified the American Society for Testing and Materials ("ASTM") Standard as the relevant standard for the BFPP's "all appropriate inquiries" element. **Exhibit 6**, Deposition of Robert M. Zoch, ("Zoch Trans."), May 19, 2017, 70-72.

66. In his deposition, Mr. Zoch identified two additional documents relevant to CBY's all appropriate inquiry activities—a "CRAWP document," or Conceptual Remedial Action Workplan, and a March 2006 "post-closing document." *Id.* 70-72 (discussing the ASTM Standard), 94-95.

67. The Conceptual Remedial Action Workplan is dated November 2005. It does not mention ASTM Standard E1527 or discuss interviews with prior owners or operators, reviews of historical sources of information, searches for liens, or

searches of government databases. **Exhibit 27**, AECOM Environmental Group, Draft Conceptual Remedial Action Workplan, November 11, 2005, CBY_0021424-21495.

68. The November 2005 Conceptual Remedial Action Work Plan states that "CBY has prepared this Conceptual Remedial Action Work Plan to document site conditions, present investigation results, and present the proposed remediation activities for the various sites and waste types identified as requiring remediation to achieve regulatory site closure that will allow commercial development." *Id.* at CBY_0021428.

69. A Draft Remedial Investigation Report dated March 2006 does not mention ASTM Standard E1527 or discuss interviews with prior owners or operators, review of historical sources of information, or searches for liens. **Exhibit 28**, ENSR Corporation, Draft Remedial Investigation Report, March 31, 2006, CBY_0002120-2159.

70. The March 2006 Draft Remedial Investigation discusses the following government databases or inventories: the New Jersey Landscape Project Database regarding bog turtle habitat, the New Jersey Bureau of Water Allocation regarding well locations, the USGS Water Resources well inventory for New Jersey; and the New Jersey database of Known Contaminated Sites. *Id.* at CBY_0002149, CBY_002136, CBY_0002163.

71. The March 2006 Draft Remedial Investigation report states that the document "provides highlights of the data and observations from previous consultants . . [,] a summary of the URS Corporation material and explosives of concern (MEC) investigation/remediation efforts through December of 2005, and the site investigation conducted by ENSR AECOM (ENSR) in the summer of 2005." *Id.* at CBY_0002120.

72. CBY has not produced any document entitled "Continuing Obligations Plan" or "Continuing Obligations Monitoring and Evaluation Report."

73. Mr. Zoch could not recall any specific documentation describing CBY's compliance with continuing obligations. **Exhibit 6**, Zoch Trans. 95-96.

10

74. In the September 2016 Remedial Investigation Report submitted to NJDEP, Langan stated that "[t]he majority of the sediment and surface water impacts on-Site stem from overland flow from the upland area to the ditches and into the Unnamed Tributary #2 and Hightstown-Cranbury Station Road runoff to Unnamed Tributary #2. Overland flow was mitigated with the grading and drainage improvements. *The potential transport of [Contaminants of Potential Ecological Concern ("COPECs")] to the tributary will be completely eliminated when the supplemental barrier is placed and the wetlands are mitigated."* **Exhibit 12**, September 2016 Remedial Investigation Report, at 76 (emphasis added); *see also id.* at 77, 82.

75. In 2007, Contaminants of Potential Ecological Concern ("COPECs") including metals (arsenic, copper, lead, mercury, selenium, silver and zinc), pesticides (4,4-DDE, 4,4-DDT, 4,4-DDD, dieldrin and heptachlorepoxide), volatile organic compounds (cis-1,2-dichloroethane), and SVOCs (2,6-dinitrotoluene, phenanthrene, di-n-butylphthalate, fluoranthene, pyrene, benzo[a]nthracene, chrysene and benzo[a]pyrene) had been identified in sediment samples at the Site. **Exhibit 29**, Langan and MMG, Remedial Investigation Work Plan, May 4, 2007, at 48; **Exhibit 30**, Langan, Baseline Ecological Evaluation, March 29, 2007, at CBY_0018702.

76. Steven Ganch, Viridian's Director of Development, stated that completion of the "cap," or supplemental barrier, is "market driven" because Viridian would not building buildings on the Site until Viridian had obtained lessees for the buildings. **Exhibit 7**, Ganch Trans. 71-72.

77. Mr. Ganch estimated that the buildings planned for the Site would be completed in three to four years. *Id.*

78. CBY has no employees. It holds title to the Site, is named on the 2006 Amendment, and holds insurance policies related to the Site. **Exhibit 4**, CBY 30(b)(6) Trans. 14, 22-23.

79. CBY Holdings LLC has no employees, though its function is to oversee remediation and development activities at the Site. *Id.*

11

80. CBY was deposed in the Maxxam case on June 20, 2006, pursuant to Fed. R. Civ. P. 30(b)(6).  **Exhibit 3**, Deposition of Steven J. Hazel, June 20, 2006, 7-8, HAZEL000001.

81. Lion Industrial Trust and Viridian Partners LLC formed a partnership in order to fund and conduct CBY's day-to-day business.  **Exhibit 4**, CBY 30(b)(6) Trans. 26-28, 40-42.

82. LIT is related to Clarion Partners such that CBY refers to the two as synonymous.  *Id.* 38, 53.

83. LIT is the senior investor in the LIT/Viridian partnership and provided a majority of the investment.  *Id.* 41-42.

84. Viridian Partners LLC, as the general partner, performed CBY's and CBY Holdings LLC's day-to-day functions from the time CBY purchased the Site until late 2016.  *See id.* at 22-23, 28-29, 36, 41-42*; see also* **Exhibit 7**, Ganch Trans. 19-20.

Respectfully submitted,

        JEFFREY H. WOOD
        Acting Assistant Attorney General
        Environment & Natural Resources Div.

Dated:  November 9, 2017   By:   /s/ Brian H. Lynk
        BRIAN H. LYNK, D.C. Bar No. 459525
        STEPHANIE J. TALBERT
        HEATHER E. GANGE
        Trial Attorney
        U.S. Department of Justice
        Environmental Defense Section
        P.O. Box 7611
        Washington, DC  20044
        Tel: (202) 514-6187
        Fax: (202) 514-8865 (fax)
        Email: brian.lynk@usdoj.gov