**MORGAN, LEWIS & BOCKIUS LLP**
(*A Pennsylvania Limited Liability Partnership*)
John McGahren
Stephanie R. Feingold
Mark A. Fiore
502 Carnegie Center
Princeton, NJ  08540
Tel:  609-919-6681
Fax:  609-919-6701
*Attorneys for Plaintiff Cranbury Brick Yard, LLC*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CRANBURY BRICK YARD, LLC,** | |
| **Plaintiff,** | **Civ. Action No. 15-2789 (BRM) (LHG)** |
| **v.** | |
| **UNITED STATES OF AMERICA, THE UNITED STATES DEPARTMENT OF THE NAVY, and THE UNITED STATES DEPARTMENT OF THE ARMY,** | |
| **Defendants.** | |

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Cranbury Brick Yard, LLC, by and through its undersigned attorneys and pursuant to Fed. R. Civ. P. 56 and L. Civ. R. 56.1, submits this statement of undisputed facts in support of its Motion for Summary Judgment.

1.      Cranbury Brick Yard, LLC ("CBY"), is a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business in Highlands Ranch, Colorado.  *See* CBY_0158238 at CBY_0158239-40 (Ex. 8) (attached hereto as

1

Exhibit 1 to the Certification of Mark A. Fiore filed concurrently herewith ("Fiore Certification")[1]).

2.        The site at issue in this case consists of approximately 395 acres of real property located in the Township of Cranbury, Middlesex County, New Jersey at Block 10, Lot 10 and Block 12, Lot 1 on the tax map of Cranbury, New Jersey (the "Site"). *See* CBY_0005003 at CBY_0005044-46 (Ex. 1).

3.        The Site was utilized as a United States military ordnance assembly and loading facility during portions of the twelve-year period from 1942 to 1954 (the "UMC Cranbury" facility). *See* CBY_0002120 at CBY_0002133 (Ex. 5).

4.        Defendants The United States of America, the United States Department of the Army, and the United States Department of the Navy (collectively, "Defendants", "the Government", or "the United States") required UMC Cranbury to expand existing facilities and construct new facilities at the Site, owned by Defendants, for the manufacture of various products for Defendants' use in the national defense. See Expert Report of Robert M. Zoch at 8-13 (Ex. 3); CBY_0026956 at CBY_0026979 (Ex. 18); MAXCRAN0000247-261 (Ex. 19); MAXCRAN0003421-3425 (Ex. 21).

5.        UMC Cranbury produced munitions at the Site pursuant to various contracts with Defendants. *Id*; *see also* Ex. 18 at CBY_0026979.

6.        An explosion occurred at UMC Cranbury in 1954 and manufacturing operations ceased thereafter. *See* CRANBURY-NAVY000001 at CRANBURY-NAVY000004 (Ex. 2).

7.        In the years following the explosion, machinery and components were removed from the Site, and most of the production buildings were razed to their foundations. *See* Ex. 3,

---

[1] All Exhibits referred to in this Statement of Undisputed Facts are attached to the Fiore Certification and are incorporated herein by reference.

Report of Robert M. Zoch at 18; Aerial photographs of Site dated April 10, 1956 and May 1, 1957 (Report of Randall Grip at Attachment B) (Ex. 140).

8.     The Site remained largely inactive thereafter, with no records of manufacturing activities or pollution-generating activities. *See* Ex. 3 at 18; Ex. 5 at CBY_0002133.

9.     The Site was sold to Cranbury Development Corporation ("CDC") in February 1974. *See* MAXCRAN0001710 at MAXCRAN0001710 (Ex. 4).

10.     The Site was under investigation due to contamination from ordnance production beginning in May 1988. *See* Ex. 5 at CBY_0002133, CBY_0002138-43.

11.     In approximately 2003, CDC's financier, Credit Agricole Asset Management ("CAAM"), hired URS Corporation to conduct studies to determine the nature and extent of unexploded ordnance contamination left over from the manufacturing of ordnance and the July 22, 1954 explosion. *See* Jenkins Dep. 11:14-12:2 (Ex. 6); Ex. 5 at CBY_0002142.

12.     On December 29, 2004, the New Jersey Department of Environmental Protection ("NJDEP") issued a Directive (the "Directive") identifying the Site as a location where there had been discharges of hazardous waste, primarily consisting of Munitions and Explosives of Concern ("MEC") resulting from the 1954 explosion. *See* Ex. 2 at CRANBURY-NAVY000004-05.

13.     The Directive identified as Respondents CDC as the current owner of the Site, Maxxam Group, Inc. ("Maxxam") as a successor corporation to the former owner of the Site (Unexcelled Manufacturing Company, Inc. ("UMC")), and the United States Department of the Navy ("Navy") as an entity that owned and operated the facilities located at the Site during and following World War II. *See* Ex. 2 at CRANBURY-NAVY000004-05.

14.     The Directive found that the Navy held title at the Site to facilities constructed and installed under Contract NOrd (F)-1089 (the "1089 Contract"), entered in April 1942, under which the Navy provided funds for acquisition of plant equipment and facilities for performing tasks for the war effort, including the production of military ordnance. *See* Ex. 2 at CRANBURY-NAVY000005.

15.     The Directive required the Respondents to clean up and remove the discharges at the Site by conducting remedial investigation and remediation of all Munitions and Explosives of Concern ("MEC") at the Site. *See* Ex. 2 at CRANBURY-NAVY000006.

16.     The Navy responded to NJDEP by noting that it does not become actively involved in remedial efforts, and declined to participate in a Site cleanup.  *See* Ex. 3 at 30.

17.     In February 2005, NJDEP entered into an Administrative Consent Order ("ACO") requiring the remaining parties – Maxxam, CDC, and CAAM– to investigate and remediate environmental conditions at the Site. *See* MAXCRAN0001716 at MAXCRAN0001717 (Ex. 7).

18.     The ACO is "to the greatest extent possible, consistent with and complies with [CERCLA] and the National Oil and Hazardous Substance Pollution Contingency Plan (NCP), 40 C.F.R. 300.1, et seq. All activities undertaken . . . pursuant to [the ACO] shall be performed in accordance with the requirements of all applicable federal and state laws and regulations. . . . The activities conducted pursuant to [the ACO], if approved by the Department, shall be considered to be consistent with the NCP." *See* Ex. 7 at MAXCRAN0001717.

19.     The ACO requires Respondents to provide NJDEP with access to the Site for the purpose of monitoring compliance with the ACO. *See* Ex. 7 at MAXCRAN0001726.

20.     The ACO requires Respondents to prepare a Remedial Action Work Plan to address MEC contamination. *See* Ex. 7 at MAXCRAN0001735.

21.     CBY was formed on April 27, 2005.  *See* Ex. 8 at CBY_0158239.

22.     At the time of its formation, the owner of CBY was LIT/Viridan LLC. *See* Lynott Dep. 22:22-23:3 (Ex. 9); CBY_0014439 at CBY_0014443_ (Ex. 141).

23.     ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

24.     The name "Viridian Land Investment Partners, LLC" is used interchangeably with Viridian Partners, LLC (collectively, "Viridian"). *See* Ex. 9, Lynott Dep. 14:17-20.

25.     In January 2006, CBY purchased the Site from CDC. *See* CBY_0004800 at CBY_0004800 (Ex. 10).

26.     NJDEP consented to CDC's transfer of its (and CAAM's) cleanup obligations to CBY via an amendment to the ACO executed in February 2006 ("ACO Amendment"). *See* CBY_0066077 at CBY_0066077 (Ex. 11).

27.     The provisions of the ACO Amendment became a part of the ACO, and CBY was bound to continue to comply with the ACO. *See* Ex. 11 at CBY_0066078.

28.     CBY is currently engaged in cleanup and remediation of the Site pursuant to the ACO and ACO Amendment. *See* CBY_0200812 at CBY_0200822 (Ex. 109).

29.     The primary contaminant of concern at the Site is MEC. *Id*. at CBY_0200821; CBY_0018936 at CBY_0018936-40 (Ex. 143); Ex. 9, Lynott Dep. 171:23-24.

30.     MEC includes unexploded ordnance ("UXO"), discarded military munitions ("DMM"), and munitions constituents ("MC"). *See* Ex. 5 at CBY_0002131.

31.     MEC recovered at the Site during cleanup activities included 20mm high explosive incendiary projectiles, M48 trip flare canisters, M204A1 hand grenade fuzes, AN-M69

incendiary bombs, and M1 Nose Fuzes. *See* CBY_0001125 at CBY_0001160-62, CBY_0001295 (Ex. 12).

32.    CBY has incurred response costs at the Site pursuant to the ACO and ACO Amendment. *See* Expert Report of Raymond F. Dovell, Exhibits 1-18 (Ex. 144): Supplemental Expert Report of Raymond F. Dovell, Exhibits 3-9 (Ex. 14); Dovell Dep. 35:4-9 (Ex. 13).

33.    CBY has incurred response costs through September 30, 2017 totaling $56,394,881. *See* Ex. 14, Supplemental Report of Raymond F. Dovell at 3.

34.    The undisputed portion of CBY's response costs through January 31, 2017 totals $14,842,620.77 according to the United States' expert. *See* Expert Report of Shannon Rusnak at 4 (Ex. 15).

## I.    The United States is Liable Under CERCLA as a Former Owner at the Site

35.    UMC began constructing a military ordnance manufacturing plant for the Navy – UMC Cranbury – at the Site in 1941. *See* MAXCRAN0003512 at MAXCRAN0003513 (Ex. 16).

36.    In February 1942, UMC Cranbury was awarded its first government contract for the production of military ordnance. *See* CRANBURY-BRIGHAM-0000146 at CRANBURY-BRIGHAM-0000148 (Ex. 17).

37.    The February 1942 supply contract, NOs-LL-05813, was for loading and assembly of 20mm high explosive tracer ("HET") type antiaircraft ammunition for the Navy. *See* CBY_0026956 at CBY_0026980 (Ex. 18).

38.    UMC Cranbury entered into the 1089 Contract, a facilities contract for the production of military ordnance, on April 1, 1942, under which the Navy expanded the 20mm ammunition loading facility at the Site. *See* MAXCRAN0000247 at MAXCRAN0000248 (Ex. 19).

6

39.     The purpose of a facilities contract is for the Navy to provide direct funding for the company to acquire such machinery, equipment, and facilities for the prosecution of a supply contract.  *See* Brigham Dep. 142:21-143:3 (Ex. 20); Ex. 19.

40.     The 1089 Contract directed UMC Cranbury to install or construct the machinery, equipment, facilities services and appurtenances identified by Appendix A to the 1089 Contract (collectively, "the Department-owned facilities") for a total cost of $150,000. *See* Ex. 19 at MAXCRAN0000247-48.

41.     The phrase "Department-owned facilities" in the 1089 Contract implies ownership by the Navy. *Id.*; *see also* Ex. 20, Brigham Dep. 139:21-140:19.

42.     Under terms of the 1089 Contract, title to all manufacturing facilities installed pursuant to the contract, including future additions and improvements thereto, vested solely with the United States. *See* Ex. 19 at MAXCRAN0000251.

43.     The 1089 Contract was recorded in the chain of title to the land at the Site in order to put all third parties on notice of the Government's interest in the Department-owned facilities. *Id.* at MAXCRAN0000256.

44.     Plant construction under the 1089 Contract was substantially completed by September 1942. *See* MAXCRAN0003421 at MAXCRAN0003424 (Ex. 21).

45.     UMC Cranbury installed machinery, equipment, and facilities pursuant to the 1089 Contract using direct funding from the Navy. Ex. 19; *see also* Ex. 20, Brigham Dep. 142:16-143:3.

46.     Title to all machinery, equipment, and facilities installed pursuant to the 1089 Contract passed to the Navy. Ex. 19; *see also* Ex. 20, Brigham Dep. 146:7-21.

47.     UMC Cranbury entered into a second facilities contract with the Government, Contract DA-NOrd (F) – 1269, but no copy has been located. *See* Ex. 18 at CBY_0026979; Ex. 20, Brigham Dep. 137:8-11, 138:12-16.

48.     UMC Cranbury continued to manufacture, assemble, and load munitions for the Government until July 1945. *See* Ex. 3, Zoch Report at 11; Ex. 17 at CRANBURY-BRIGHAM-0000148.

49.     UMC Cranbury's Government contracts totaled nearly $7 million between 1942 and 1945. *See* Ex. 17 at CRANBURY-BRIGHAM-0000148.

50.     UMC Cranbury produced upwards of 26,000,000 rounds of 20mm ammunition, as well as incendiary pellets, incendiary bombs, and fuzes, between 1942 and 1945. *See* Ex. 16 at MAXCRAN0003513; Ex. 17 at CRANBURY-BRIGHAM-0000148.

51.     There are no records of Government production at UMC Cranbury after May 1945 until early 1948 when the Army Chemical Corps caused reactivation of plant operations through issuance of a series of contracts for UCC to manufacture electric ignition fuzes. *See* Ex. 3, Zoch Report at 12; Ex. 18 at CBY_0026981.

52.     UMC Cranbury continued producing munitions pursuant to Government contracts until the plant closed sometime after July 1954. *See* MAXCRAN0002387 at MAXCRAN0002387 (Ex. 145); *see also* Ex. 3, Zoch Report at 17.

**A.     Specific Equipment Installation Pursuant to the 1089 Contract**

53.     Pursuant to the 1089 Contract, the Naval Inspector of Ordnance approved and paid for the installation of a 40 HP Vacuum System for handling dust manufactured by Allen-Billmyre Corp., including a Type FB Spark Proof Construction Exhauster and a Dust Separator,

on November 26, 1943. *See* MAXCRAN0003301 (Ex. 22); Ex. 72, Linehan Dep. September 2016 206:1-220-24.

54.     Pursuant to the 1089 Contract, the Naval Inspector of Ordnance approved and paid for the installation of pipe and fittings used in connection with the Allen-Billmyre Vacuum system on November 26, 1943. Ex. 72, Linehan Dep. September 2016 206:1- 220-24; *see also* MAXCRAN0003302 at MAXCRAN0003302-03 (Ex. 23).

55.     Pursuant to the 1089 Contract, the Naval Inspector of Ordnance approved and paid for installation charges on the vacuum line referenced in Exs. 22 and 23 on November 26, 1943. Ex. 72, Linehan Dep. September 2016 206:1- 220-24; *see also* MAXCRAN0003304 at MAXCRAN0003304-08 (Ex. 24); MAXCRAN0003309 at MAXCRAN0003309 (Ex. 25).

56.     The Allen-Billmyre vacuum system referenced in Exs. 22, 23, and 24 was related to the collection of tetryl dust.  Ex. 72, Linehan Dep. September 2016 206:1-220-24; *see also* Ex. 20, Brigham Dep. 154:23-155:4, 157:16-158:9.

57.     A dust collection system can be characterized as an air pollution control system. *See* N.J.A.C. 5:23-1.4 ("Manufacturing, production, and process equipment means all equipment employed in a system of operations for the explicit purpose of the production of a product [including] [a]ir pollution equipment, such as scrubbers") (Ex. 146).

58.     The vacuum system referenced in Exs. 22, 23, and 24 was involved with the disposal of hazardous waste, which is inherent in any industrial process. *See* Ex. 20, Brigham Dep. 252:13-22.

59.     Title to the vacuum system referenced in Exs. 22, 23, and 24 present at UMC Cranbury passed to the Navy. *See* Ex. 19 at MAXCRAN0000251; Ex. 20, Brigham Dep. 146:7-21.

60.     Pursuant to the 1089 Contract, the Naval Inspector of Ordnance approved and paid for installation charges of 12 copper tetryl dust collectors on November 27, 1943. *See* MAXCRAN0003357 at MAXCRAN0003357-58 (Ex. 26).

61.     The copper tetryl dust collectors collected tetryl dust produced during the manufacture of ordnance at UMC Cranbury. *See* Ex. 19 at MAXCRAN0000251; Ex. 26 at MAXCRAN0003357-58; Ex. 20, Brigham Dep. 151:2-153:7.

62.     Title to the copper tetryl dust collectors present at UMC Cranbury passed to the Navy pursuant to the 1089 Contract and they were therefore owned by the Navy. *See* Ex. 19 at MAXCRAN0000251; Ex. 26 at MAXCRAN0003357-58; Ex. 20, Brigham Dep. 146:7-21, 151:7-11.

63.     The Naval Inspector of Ordnance approved and paid for the installation of six tetryl facing machines on November 27, 1943. *See* MAXCRAN0003364 at MAXCRAN0003364-67 (Ex. 27).

64.     Title to the six tetryl facing machines present at UMC Cranbury passed to the Navy. *See* Ex. 19 at MAXCRAN0000251; Ex. 27, MAXCRAN0003364-67; Ex. 20, Brigham Dep. 146:7-21.

65.     The Naval Inspector of Ordnance approved and paid for the installation of two Detroit Rex Degreasing Tanks and Equipment on November 27, 1943. *See* MAXCRAN0003360 at MAXCRAN0003360-62 (Ex. 28).

66.     Title to the two Detroit Rex Degreasing Tanks and Equipment present at UMC Cranbury passed to the Navy. *See* Ex. 19 at MAXCRAN0000251; Ex. 28 at MAXCRAN0003360-62; Ex. 20, Brigham Dep. 146:7-21.

67.    The United States took title to additional equipment ("Government-owned equipment") installed at UMC Cranbury pursuant to the 1089 Contract (*see* Ex. 19 at MAXCRAN0000251; Ex. 20, Brigham Dep. 99:24-100:2, 146:7-21) including the following:

a.    Wooden tables and stools (MAXCRAN0003129 at MAXCRAN0003129-31 (Ex. 29), MAXCRAN0003132 at MAXCRAN0003132 (Ex. 30));

b.    Shadowgraph scales (MAXCRAN0003269 at MAXCRAN0003269-70 (Ex. 31), MAXCRAN0003271 at MAXCRAN0003271 (Ex. 32));

c.    Volumetric smokeless powder weighing machines (MAXCRAN0003272 at MAXCRAN0003272-74 (Ex. 33); MAXCRAN0003275 at MAXCRAN000327 (Ex. 34);

d.    Pelleting presses (MAXCRAN0003276 at MAXCRAN0003276-79 (Ex. 35), MAXCRAN0003280 at MAXCRAN0003280 (Ex. 36));

e.    Air magazine tightening machines (MAXCRAN0003281 at MAXCRAN0003281-83 (Ex. 37), MAXCRAN0003284 at MAXCRAN0003284 (Ex. 38));

f.    Semi-automatic fuze tighteners (MAXCRAN0003285 at MAXCRAN0003285-88 (Ex. 39), MAXCRAN0003289 at MAXCRAN0003289 (Ex. 40));

g.    Cartridge case marking machines (MAXCRAN0003290 at MAXCRAN0003290-92 (Ex. 41), MAXCRAN0003293 at MAXCRAN0003293 (Ex. 42));

h.    Spray paint machine – compressor (MAXCRAN0003294 at MAXCRAN0003294-97 (Ex. 43));

> i.      Automatic spray finishing machine (MAXCRAN0003298 at MAXCRAN0003298-99 (Ex. 44), MAXCRAN0003300 at MAXCRAN0003300 (Ex. 45));
>
> j.      Electric heat control oven (MAXCRAN0003327 at MAXCRAN0003327-28 (Ex. 46); MAXCRAN0003329 (Ex. 47));
>
> k.      Fuze magazine Veo Dial Crimping Presses (MAXCRAN0003310 at MAXCRAN0003310-12 (Ex. 48); MAXCRAN0003313 (Ex. 49));
>
> l.      Rotary marking machine with explosion proof motor (MAXCRAN0003314 at MAXCRAN0003314 (Ex. 50); MAXCRAN0003315 (Ex. 51)); and
>
> m.      Morris 5-Gallon copper steam jacketed kettles (MAXCRAN0003369 at MAXCRAN0003369-70 (Ex. 52); MAXCRAN0003371 at MAXCRAN0003371 (Ex. 53)).

68.     There was likely additional equipment installed pursuant to the 1089 Contract other than what the existing documentation suggests. *See* Ex. 20, Brigham Dep. 147:2-148:21.

69.     The Government owned x-ray machines at UMC Cranbury during the Korean War. *See* Ex. 20, Brigham Dep. 246:23-247:6; NARA-SL0000031 at NARA-SL0000031 (Ex. 147).

## B.      Government-owned components and raw materials

70.     The government owned components and raw materials, which it furnished to UMC Cranbury during World War II. *See* MAXCRAN0008856 at MAXCRAN0008857 (Ex. 54).

71.    Government-owned materials furnished by the Navy to UMC Cranbury for the manufacture of 20mm ammunition included ammunition boxes, primed cartridge cases, detonators, Fuzes – magazines, Fuzes – body and closing discs, Paper tubes, Projectiles plugs HET, Propellant Powder # 3, and Tetryl C.E. Grde 1. *See* MAXCRAN0008856 at MAXCRAN0008857 (Ex. 54).

72.    The Government-owned propellant powder furnished by the Navy to UMC Cranbury was the explosive charge that would cause the initial discharge of the ammunition out of the weapon. *Id.; see also* Ex. 20, Brigham Dep. 181:16-20.

73.    The Government-owned tetryl furnished by the Navy to UMC Cranbury was explosive material. *See* Ex. 20, Brigham Dep. 181:21-24; Ex. 54 at MAXCRAN0008857.

74.    The Navy delivered 1,000,000 cartridges per month to UMC Cranbury to support the production of 20mm ammunition for the first quarter of 1943 at a projected rate of 3,000,000 rounds of ammunition per month. *See* CRANBURY-NARACP0002012 at CRANBURY-NARACP0002013 (Ex. 55).

75.    There were also government owned component parts and raw materials present at UMC Cranbury during the Korean War. *See* Ex. 20, Brigham Dep. 248:17-22.

76.    The Navy awarded Contract NOrd-11741 to UMC Cranbury on May 10, 1951 for the manufacture of Mark 117 rocket igniters. *See* MAXCRAN0002902 at MAXCRAN0002902 (Ex. 56).

77.    UMC requested 4,000 Metal Shipping Containers "which are to be furnished by the Navy" for the production of Mark 117 Rocket Igniters on Contract NOrd-11741 on October 9, 1952. *See* MAXCRAN0002998 at MAXCRAN0002998 (Ex. 57).

78.     The shipping containers were owned by the government. *See* Ex. 20, Brigham Dep. 254:19-255:2; Ex. 57.

79.     The shipping containers likely contained government-owned black powder. *See* Ex. 20, Brigham Dep. 254:19-255:2; Ex. 57.

80.     The Navy drafted an Amendment to Contract NOrd-11741 with UMC Cranbury for the purpose of providing that "the Government shall furnish to the Contractor for use in the performance of this contract 10,000 pounds of FFFG Black Powder." *See* MAXCRAN0003042 at MAXCRAN0003043 (Ex. 58).

81.     A reference to "Government property" on a shipping document prepared by the government implies government ownership of the property being shipped. *See* Ex. 20, Brigham Dep. 255:12-256:9.

82.     Government property consisting of 22,000 pounds of potassium perchlorate, grade A was shipped to UMC Cranbury on July 13, 1953. *See* NARA-SL0000122 at NARA-SL0000122 (Ex. 59).

83.     Potassium perchlorate is a constituent of the M204A1 hand grenade fuze. *See* CRANBURY-ARMY0009149 at CRANBURY-ARMY0009149 (Ex. 148).

84.     Potassium perchlorate is a hazardous substance under the New Jersey Right to Know Act. *See* Potassium Perchlorate Hazardous Substance Fact Sheet at 1 (Ex. 149).

85.     Government property consisting of 100,000 pounds of barium nitrate Class D 140 – 40 Microns was shipped to UMC Cranbury on August 12, 1953. *See* NARA-SL0000123 at NARA-SL0000123 (Ex. 60).

86.     Barium nitrate is a constituent of the M120 photoflash bomb. *See* NARA-SL0000063 at NARA-SL0000063 (Ex. 150);

14

87.     Barium is a hazardous substance. *See* 40 C.F.R. § 302.4; Expert Report of Robert Morhard at 7, 36, 56 (Ex. 151).

88.     Early site soil sampling detected elevated levels of barium at the Site. *See* CBY_0021424 at CBY_0021435-36, CBY_0021470 (Ex. 82).

89.     Barium was identified as a constituent that exceeded the standards for soil in remedial submissions. *See* Ex. 109 at CBY_0200843.

90.     Government property consisting of 20,400 pounds of Aluminum Powder, Type C was shipped to UMC Cranbury from Raritan Arsenal, Metuchen, fNew Jersey. *See* NARA-SL0000124 at NARA-SL0000124 (Ex. 61).

91.     300,000 pounds of Aluminum Powder were sent to New York Ordnance District c/o Unexcelled Chemical Corp., Cranbury, New Jersey on October 8, 1953. *See* NARA-SL0000131 at NARA-SL0000131 (Ex. 62).

92.     Aluminum powder is a constituent of the M120 photoflash bomb. *See* NARA-SL0000063 at NARA-SL0000063 (Ex. 150).

93.     Aluminum is a hazardous substance under the New Jersey Right to Know Act and aluminum powder is characterized as a flammable solid and a dangerous fire hazard. *See* Aluminum Hazardous Substance Fact Sheet at 1 (Ex. 152).

94.     Trichloroethylene (TCE) was routinely used in ordnance operations for degreasing. *See* Linehan Dep. February 2017 202:11-17 (Ex. 74).

95.     TCE is a hazardous substance. *See* 40 C.F.R. § 302.4.

96.     TCE was detected at elevated levels in remedial submissions.  *See* Ex. 109 at CBY_0200871.

97.     Several shipments of Government property consisting of Bomb, Photoflash, M120 MPTS were shipped to UMC Cranbury in November and December 1953. *See* NARA-SL0000144 at NARA-SL0000144 (Ex. 63), CRANBURY-NARASL001222 at CRANBURY-NARASL001222 (Ex. 64).

98.     UMC Cranbury was engaged in the production of M120 photoflash bombs, M204A1 hand grenade fuzes, M49 flare trips, and M48 flare trips in 1953 when the shipments of Government property were received for use in the production of the aforementioned items. *See* NARA-SL0000163 at NARA-SL0000164-68 (Ex. 65).

99.     Excess material after completion of contracts consisting of Black Powder, Grade A-1, A-4, A-5, and Black Powder, Fuze, Type 1 were sent from UMC Cranbury to Picatinny Arsenal via a Picatinny Truck in September 1954 at the Government's direction. *See* CRANBURY-NARASL001329 at CRANBURY-NARASL001329 (Ex. 66).

**C.      Napalm bomb ownership**

100.     UMC Cranbury was awarded two contracts covering loading and assembly of fuze clusters, and packing of the AN-M69 incendiary bomb in 1945. *See* CRANBURY-NARACP0001967 at CRANBURY-NARACP0001968 (Ex. 67).

101.     Hundreds of thousands of incendiary bombs were supplied by the Government and loaded, assembled, fuzed, clustered, and packed under the two contracts for a total cost exceeding $1 million. *See* Ex. 67 at CRANBURY-NARACP0001968; Ex. 6, Jenkins Dep. 129:7-18.

102.     The AN-M69 incendiary bombs are also referred to as napalm bombs. *See* Ex. 6, Jenkins Dep. 24:13-19.

16

103. UMC Cranbury's work on the AN-M69 incendiary bombs can be classified as refurbishing. *See* Ex. 6, Jenkins Dep. 24:13-19.

104. This meant that napalm bombs were brought from an outside storage facility to UMC Cranbury where they were partially dismantled, the napalm fill sock in the rear of the bomb was replaced with a fresh one, and the napalm bombs were resealed. *See* Ex. 6, Jenkins Dep. 129:7-18.

105. The napalm bombs renovated pursuant to these government contracts were government owned. *See* Ex. 20, Brigham Dep. 250:20-251:2, Ex. 6, Jenkins Dep. 129:25-130:9.

106. Nearly 600 government-owned AN-M69 napalm bombs were recovered during Site cleanup activities. *See* CBY_0001125 at CBY_0001369, CBY_0001160 (Ex. 12); Ex. 143 at CBY_0018939.

107. Hundreds of government-owned napalm bombs were uncovered in a burial trench during Site cleanup activities. *See* Ex. 6, Jenkins Dep. 130:11-132:7.

108. During historical operations, there was an attempt to dispose of the napalm bombs by burying and then burning them. *See* Ex. 6, Jenkins Dep. 130:11-132:7.

**D.    Rejected M204A1 fuze ownership**

109. UMC was awarded contract DA-30-069-ORD-210 for the manufacture of the M204A1 Hand Grenade Fuze in December 1950. *See* MAXCRAN0003183 at MAXCRAN0003183 (Ex. 68); NARA-SL0000163 at NARASL0000166 (Ex. 65).

110. Numerous secondary change orders or SCOs were issued by the ordnance inspector in 1951 and 1952 to correct deficiencies in the design or manufacturing specifications of this device. *See, e.g.,* CRANBURY-ARMY0009638 at CRANBURY-ARMY0009639 (Ex. 69).

17

111.    Various production problems resulted in the rejection of many production lots of the M204A1 device. *See* NARA-SL0000047 at NARA-SL0000047 (Ex. 70).

112.    At least 440,991 M204A1 fuzes manufactured at UMC Cranbury were rejected by the Government as of December 1953. *See* NARA-SL0000163 at NARA-SL0000165 (Ex. 65).

113.    In testimony before Congress in July 1953, L. Gary Clemente, a vice-president of UMC, testified that about 450,000 – 500,000 total fuzes produced by UMC Cranbury pursuant to Government specifications were rejected by the Government. *See* MAXCRAN0003880 at MAXCRAN0003916 (Ex. 71).

114.    The United States admitted that this constituted a "high number of rejections." *See* Linehan Dep. September 2016 110:24-111:14 (Ex. 72).

115.    In testimony before Congress in July 1953, L. Gary Clemente, a vice-president of UMC testified that hundreds of thousands of rejected fuzes were kept locked up in a separate warehouse at UMC Cranbury. *See* Ex. 71 at MAXCRAN0003919.

116.    In testimony before Congress in July 1953, L. Gary Clemente, a vice-president of UMC testified that the locked warehouse storing hundreds of thousands of rejected fuzes was only accessible to a Government inspector, and that personnel from UMC Cranbury "[could not] get in there." *See* Ex. 71 at MAXCRAN0003919.

**E.     July 22, 1954 Explosion**

117.    An explosion occurred at UMC Cranbury on July 22, 1954. *See* NARA-SL0000229 at NARA-SL0000229 (Ex. 73).

118.    The explosion originated in a building in which were stored rejected government owned M204A1 grenade fuzes, as acknowledged by the United States' 30(b)(6) witness, Daniel Linehan. *See* Ex. 73 at NARA-SL0000229; Linehan Dep. February 2017 282:1-6 (Ex. 74).

119.    Building 0-19, the adjacent open shed, and testing tunnels were completely destroyed, and two adjacent buildings were collapsed from the force of the blow. *See* NARA-SL0000231  at NARA-SL0000231-32 (Ex. 75).

120.    The United States' expert admits that government-owned rejected fuzes were involved in the July 22, 1954 explosion. *See* Ex. 20, Brigham Dep. 259:16-22, 262:19-23.

121.    The explosion littered the Site with munitions and killed two workers, injuring several others. *See* Ex. 12 at CBY_0001147.

122.    M48 and M49 trip flares, M204A1 hand grenade fuzes, a flare shell, and a 20mm shell were strewn over the area in an exploded state. *See* Ex. 75 at NARA-SL0000231.

123.    An Army contingent from Fort Dix arrived at UMC Cranbury within two hours of the explosion and removed hand grenades, napalm bomb fuzes, and explosives from UMC Cranbury following the July 22, 1954 explosion. *See* Ex. 20, Brigham Dep. 266:6-8, 267:4-23; Ex. 145 at MAXCRAN0002387.

124.    Later cleanup activities at the Site identified widespread contamination attributed to the explosion, and munitions items located in the area included AN/M-69 Bomb bodies, flares, 20mm projectiles, M204 Grenade Fuzes, M1 Firing Devices, Illumination Land Mines, and other various fuzes. *See* Ex. 12 at CBY_0001159.

125.    Several burial areas were also identified within the explosion area, including a burial trench that contained nearly 600 napalm bombs and approximately 2,000 fuzes. *See* Ex. 12 at CBY_0001160.

126.    The explosion area and the burial areas were collectively designated as Zone B, which had the most concentrated level of MEC at the Site. *See* Ex. 92, Pastorick Dep. 240:2-7; Ex. 12 at CBY_0001148.

19

127.    Some operations at UMC Cranbury continued at least through November 1954.
*See* Ex. 20, Brigham Dep. 268:2-11; NARA-SL0000235 at NARA-SL0000235 (Ex. 153).

128.    Government personnel were present at UMC Cranbury at least through November
1954. *See* Ex. 20, Brigham Dep. 269:14-17; Ex. 153 at NARA-SL0000235.

129.    UMC Cranbury permanently shut down at some point following the July 1954
explosion. *See* Zoch Dep. 65:2-10 (Ex. 76); Ex. 2 at CRANBURY-NAVY000004.

**F.      Drum ownership**

130.    In June 1953, the Inspector of Naval Material wrote to the Commanding Officer,
Naval Ammunition Depot requesting disposition instructions in connection with the disposal of
400 government-furnished metal drums at UMC Cranbury associated with Contract NOrd-
11741. *See* MAXCRANDOJ0000105 at MAXCRANDOJ0000105 (Ex. 77).

131.    In July 1953, the Commanding Officer, Naval Ammunition Depot requested that
the Chief of the Bureau of Ordnance provide disposition instructions for 400 government-
furnished "black powder drums" at UMC Cranbury associated with Contract NOrd-11741. *See*
MAXCRANDOJ0000103 at MAXCRANDOJ0000103 (Ex. 78).

132.    In August 1953, the Inspector of Naval Material informed the Chief of the Bureau
of Ordnance that the 400 government-furnished black powder drums at UMC Cranbury
associated with Contract NOrd-11741 were "now in unserviceable condition due to the fact that
they have been stored outside" and disposition instructions were requested. *See* MAX0003781
(Ex. 79).

133.    In January 1955, the Chief of the Bureau of Ordnance wrote to the Inspector of
Naval Material indicating that the 400 government-furnished black powder drums at UMC
Cranbury associated with Contract NOrd-11741 "should be referred directly to the Supervising

20

Inspector of Naval Material, New York for disposal in accordance with applicable portions of the Material Inspection Services, Administration Manual, Part C, Chapter C8." *See* MAXCRAN0003088 at MAXCRAN0003088 (Ex. 80).

134.    In February 1955, the Inspector of Naval Material wrote to the Chief, Bureau of Ordnance noting that, "a representative of this activity visited subject contractor's plant to have necessary forms prepared for disposition of 400 unserviceable drums." *See* MAXCRAN0002870 at MAXCRAN0002870 (Ex. 81).

135.    The Inspector of Naval Material indicated that a Resident Inspector of the Army Ordnance Inspection Service advised that "On examining the drums they were found to contain residual black powder and were immediately taken to an isolated area and disposed of." *See* Ex. 81 at MAXCRAN0002870.

136.    The Inspector of Naval Material indicated that if the drums were disposed of in accordance with current regulations, "the drums would have to be thoroughly cleaned by washing out the explosive powder, the cost of which would exceed by far any reimbursement that would be obtained by selling as scrap." *See* Ex. 81 at MAXCRAN0002870.

137.    The area in which the government-furnished black powder drums were disposed was within the Site. *See* Ex. 76, Zoch Dep. 151:5-152:8.

138.    In August 2001, 5-gallon drums that were partially buried were removed from the Site. *See* Ex. 82 at CBY_0021434.

## II.    The United States is Liable Under CERCLA as an Arranger at the Site

### A.    Government Ownership of waste disposal equipment and hazardous materials

139.     Dust collection systems are paramount in all explosive operations because dust can be explosive. *See* Ex. 72, Linehan Dep. September 2016 207:23-208:2.

140.     Vacuum lines were used at UMC Cranbury to collect explosive dust created by the manufacturing process. *See* Ex. 72, Linehan Dep. September 2016 207:16-208:8.

141.     The vacuum lines used at UMC Cranbury to collect explosive dust created by the manufacturing process were government-owned. *See supra, at* ¶ ¶ 52-57.

142.     Government-owned copper tetryl dust collectors were installed to collect tetryl dust at UMC Cranbury. *See* Ex. 20, Brigham Dep. 151:2-153:7; Ex. 26 at MAXCRAN0003357-58.

143.     Napalm bombs were buried at the site. *See* Ex. 6, Jenkins Dep. 132:3-7; Ex. 143 at CBY_0018939.

144.     The napalm bombs found buried at the Site were uncovered in a burial trench. *See* Ex. 6, Jenkins Dep. 129:11-22; Ex. 67 at CRANBURY-NARACP0001968.

145.     The napalm bombs found buried at the Site were government-owned. *See* Ex. 6, Jenkins Dep. 129:11-22; Ex. 20, Brigham Dep. 250:20-251:2; Ex. 67 at CRANBURY-NARACP0001968.

146.     Government-owned black powder was used at UMC Cranbury for ordnance production. *See* Ex. 66 at CRANBURY-NARASL001329.

147.     Black powder is a hazardous substance. *See* Ex. 72, Linehan Dep. September 2016 88:20-89:8.

148.     The Navy supplied Government-owned primer caps to UMC Cranbury. *See* Ex. 72, Linehan Dep. September 2016 270:14-271:8; MAXCRAN0002820 at MAXCRAN0002820-24 (Ex. 154).

149.    The primer caps contained lead azide or some sort of initiating explosive. Ex. 72, Linehan Dep. September 2016 270:20-24.

150.    Lead azide is highly explosive. Ex. 72, Linehan Dep. September 2016 91:1-9.

151.     Lead is a hazardous substance. *See* 40 C.F.R. § 302.4.

152.    Lead was identified as a constituent that exceeded the standards for groundwater in remedial submissions. *See* Ex. 109 at CBY_0200843.

153.    Government-owned tetryl was used at UMC Cranbury for ordnance production. *See* Ex. 54 at MAXCRAN0008857.

154.    Tetryl is an initiating explosive which is akin to lead azide. Ex. 72, Linehan Dep. September 2016 222:13-22.

155.    Tetryl was found at the Site during cleanup activities in shallow groundwater beneath a pile of ordnance pieces. *See* Ex. 5 at CBY_0002148; Ex. 82 at CBY_0021487.

156.    PETN was used at UMC Cranbury for production of M204A1 hand grenade fuzes. *See* CRANBURY-ARMY0009393 at CRANBURY-ARMY0009394. (Ex. 83).

157.    The government approved the use of different specifications of PETN for production of the M204A1 hand grenade fuze during the production process. *See* Ex. 74, Linehan Dep. February 2017 167:6-14.

158.    PETN is an initiating explosive. Ex. 72, Linehan Dep. September 2016 90:21-23.

159.    The UMC Cranbury ordnance production operations required explosion-proof equipment. Ex. 72, Linehan Dep. September 2016 252:3-8.

**B.      Government control over and involvement in the disposal of hazardous waste**

160.    Government regulations regarding hazardous waste disposal procedures would have been required to be followed at UMC Cranbury. *See* Redmond Dep 113:24-114:10 (Ex. 84).

161.    The government regulations that would have been required to be followed at UMC Cranbury with respect to hazardous waste disposal procedures would have included engineering pamphlets, engineering manuals, Department of Defense manuals, and Department of Defense orders or instructions. *See* Ex. 84, Redmond Dep 113:24-114:10; *see also* Ex. 151 at 96-98.

162.    The O. O. Form No. 7224 - Ordnance Safety Manual issued by U.S. Army Office of the Chief of Ordnance in 1941 required specific procedures for the disposal of wastes resulting from the production of military ordnance. *See* CRANBURY-ARMY0003194 at CRANBURY-ARMY0003261-67 (Ex. 85).

163.    The O. O. Form No. 7224 - Ordnance Safety Manual issued by U.S. Army Office of the Chief of Ordnance in 1945 required specific procedures for the disposal of wastes resulting from the production of military ordnance. *See* USAR02833 at USAR02957-69 (Ex. 86).

164.    The ORD M 7-224 Ordnance Safety Manual issued by U.S. Army Ordnance Corps. in 1951 required specific procedures for the disposal of wastes resulting from the production of military ordnance. *See* CRANBURY-LC0001917 at CRANBURY-LC0002216-31. (Ex. 87).

165.    UMC Cranbury would have followed government regulations or procedures to conduct open burning operations of hazardous waste materials at the Site. *See* Ex. 84, Redmond Dep. 108:11-14.

166.    There was evidence of a burning ground related to historical ordnance manufacturing located at the Site. Ex. 12 at CBY_0001149; *See* Ex. 6, Jenkins Dep. 131:20-132:23.

167.    A trench and seepage pit were likely used for disposal of energetic materials by washdown during historical ordnance manufacturing operations at UMC Cranbury. *See* Ex. 76, Zoch Dep. 124:9-12.

168.    The National Bureau for Industrial Protection was a Government-sponsored Agency that furnished expert inspection report services with recommendations for the protection of war production plants and stockpiles of critical materials against losses caused by fire, explosion, sabotage, accident and power failure to the War Department, Navy Department, Reconstruction Finance Corporation, War Production Board and Office of Civilian Defense to aid in preventing interruption of war production efforts.  The Bureau's staff acted as technical advisors and consultants on problem solving involving various phases of such protection to these and other interested Government departments and agencies.  *See* A History of the National Bureau for Industrial Protection (Ex. 158).

169.    A National Bureau for Industrial Protection report issued in June 1944 noted that their recommendation to UMC Cranbury of "Revision of degreasing to eliminate toxic exposure" was complete. *See* CRANBURY-NARACP0001427 at CRANBURY-NARACP0001432 (Ex. 88).

170.    A National Bureau for Industrial Protection report issued in June 1944 noted that their recommendation to UMC Cranbury of "Revision of spray-painting to eliminate fire and toxic hazards" was complete. *See* Ex. 88 at CRANBURY-NARACP0001432.

171.    A National Bureau for Industrial Protection report issued in June 1944 noted that their recommendation to UMC Cranbury of "Provision of threshold static-discharge plates" was in process. *See* Ex. 88 at CRANBURY-NARACP0001432.

172.    A National Bureau for Industrial Protection report issued in June 1944 noted that tetryl was the principal raw material in UMC Cranbury's production of 20mm ammunition. *See* Ex. 88 at CRANBURY-NARACP0001432.

C.    **The Government possessed knowledge that the ordnance production process at the Site would result in the release of hazardous waste**

173.    The generation of waste is an inevitable consequence of explosives manufacturing operations. *See* Ex. 84, Redmond Dep. 97:17-20.

174.    With the manufacturing of munitions, there is always a waste stream produced that must be destroyed on-site, and the primary means available during historical operations at UMC Cranbury was by open burning and open detonation of off-specification energetic materials. *See* Ex. 84, Redmond Dep. 95:21-97:16.

175.    Operations conducted at UMC Cranbury to dispose of energetic materials included burning operations, open detonation operations, and burial areas, all of which contributed to MEC contamination at the Site. *See* Report of Harold Redmond at 14 (Ex. 89).

176.    The United States was aware that that the generation of waste was inevitable as a result of UMC Cranbury's explosive manufacturing operations, including specific knowledge of a burn pit and a Government-owned vacuum system associated with waste disposal. *See* Ex. 20, Brigham Dep. 252:13-22.

177.    The government supplied the government-owned vacuum system at UMC Cranbury because it was necessary for the disposal of waste. *See* Exs. 22, 23, and 24; Ex. 20, Brigham Dep. 252:13-22.

178.    The Office of the Chief of Ordnance, Safety and Security Branch was informed by the War Department, New York Ordnance District of a fire that occurred at UMC Cranbury involving explosion of pellets in the Stokes Press used in the manufacture of 20mm ammunition in September 1943. *See* CRANBURY-NARACP0001937 at CRANBURY-NARACP0001937 (Ex. 90).

179.    The Office of the Chief of Ordnance, Safety and Security Branch was informed by the War Department, Office of the Chief of Ordnance, Safety and Security Branch of fire that occurred at UMC Cranbury involving a cartridge case shattering while being discharged in breakdown block in September 1943. *See* CRANBURY-NARACP0001939 at CRANBURY-NARACP0001939 (Ex. 91).

180.    A memo written by a Government representative noted that the July 22, 1954 explosion at the UMC Cranbury originated in a building located "in the burning area." *See* Ex. 75 at NARA-SL0000231.

181.    The Government set the policies for waste disposal by statute for facilities that produced munitions for the government with government oversight. *See* Ex. 84, Redmond Dep. 99:4-100:1.

182.    UMC Cranbury was bound to follow policies such as the following: "When preparing for disposal, the materials must be carefully placed on the ground along with dunnage to create a fire that will consume all of the materials." Ex. 84, Redmond Dep. 103:4-104:14; Ex. 89, Report of Harold Redmond at 14.

183.    The Government was aware of potential toxic exposure at UMC as of June 1944. *See* Ex. 74, Linehan Dep. February 2017 203:7-14.

## III.    Cranbury Brick Yard, LLC Is a Bona Fide Prospective Purchaser Under CERCLA

184.   CBY purchased the Site on January 11, 2006. *See* Ex. 1 at CBY_0005004.

185.   The Site was under investigation prior to CBY's purchase, with initial investigative work beginning in May 1988. *See* Ex. 5 at CBY_0002133, CBY_0002138-43.

186.   The primary contaminant of concern at the Site is MEC. *See* Ex. 9, Lynott Dep. 171:23-24.

187.   MEC includes UXO, DMM, and munitions constituents MC. *See* Ex. 5 at CBY_0002131.

188.   MEC recovered at the Site during cleanup activities included 20mm high explosive incendiary projectiles, M48 trip flare canisters, M204A1 hand grenade fuzes, AN-M69 incendiary bombs, and M1 Nose Fuzes. *See* Ex. 12 at CBY_0001160-62, CBY_0001295.

### A.   Disposal Prior to Acquisition

189.   CBY did not contribute to the MEC contamination at the Site. *See* Ex. 6, Jenkins Dep. 143:7-16; Ex. 12 at CBY_0001147.

190.   The MEC contamination at the Site is attributable to explosive manufacturing operations. *See* Ex. 84, Redmond Dep. 94:22-95:15.

191.   The sources that contributed to the MEC contamination at the Site included open burning, open detonation, burial of live munitions and unexpected explosion. *See* Ex. 84, Redmond Dep. 84:23-85:7.

192.   Following the cessation of ordnance manufacturing operations at the Site, there was very little activity at the Site until the initiation of cleanup activities. *See* Ex. 12 at CBY_0001147.

193.    NJDEP's oversight contractor Jim Pastorick testified that no hazardous substances, pollutants, or contaminants were released at the Site after its acquisition by CBY in January 2006. *See* Pastorick Dep. 56:20-22, 271:17-272:9 (Ex. 92).

B.    **All Appropriate Inquiries**

194.    All appropriate inquiries ("AAI") constitute a threshold requirement that a BFPP that must be completed prior to site purchase. *See* CRANBURY-MCLANE-000157 at CRANBURY-MCLANE-000160 (Ex. 93).

195.    As a purchaser prior to November 1, 2006, CBY was entitled to rely on the procedures provided in ASTM E1527-2000, entitled "Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process," or the earlier standard cited by Congress in the Brownfields Amendments, ASTM E1527-97. *See* 68 FR 24888 (Ex. 94).

196.    CBY relied on ASTM E1527-2000 for its AAI. *See generally* Exs. 5 and 82, Ex. 76, Zoch Dep. 71:11-15.

197.    ASTM E1527-2000 provides <u>no</u> specific criteria for AAI. *See* ASTM E1527-2000 at 181 (Ex. 95).

198.    ASTM E1527-2000 provides that for AAI, the "level of inquiry will depend on the circumstances and the underlying facts. Since the facts are almost always different, the level of inquiry must change with them." *See* Ex. 95 at 181.

199.    ASTM E1527-2000 provides that "The minimum level of appropriate inquiry under Superfund, therefore, ranges from no specialized inquiry to conducting an intrusive Phase II ESA." *See* Ex. 95 at 182.

200.    ASTM E1527-2000 provides that it is "designed as the minimum level of inquiry to satisfy the practice from which a party to a real estate transaction should proceed, recognizing

that some parties to some commercial real estate transactions may wish to proceed by beginning with a Phase I or a Phase II ESA." *See* Ex. 95 at 182. Viridian, acting on behalf of CBY, contracted with IRG Environmental, LLC ("IRG") to perform due diligence activities at the Site in approximately May 2005. *See* CBY_0021555 at CBY_0021562 (Ex. 96).

201.    Pursuant to its contract with Viridian, IRG collected and reviewed existing data related to the Project to assess the environmental risk situation, evaluated the existence of data gaps, explained the necessity for additional investigation, and estimated the costs of additional investigation. *See* CBY_0021502 at CBY_0021502 (Ex. 97).

202.    On June 22, 2005, IRG entered into a contract for technical evaluation and due diligence support for the Site with AECOM Environmental Group ("AECOM"). *See* Ex. 96 at CBY_0021555.

203.    AECOM's tasks under the contract included providing technical support to evaluate the proposed interim remedial investigation; preparing a critical evaluation of proposed scope and make recommendations for future actions; and providing technical support as needed during the due diligence period including support during negotiations with NJDEP. *See* Ex. 96 at CBY_0021562.

204.    AECOM evaluated previous Site investigations including: Visual Site Reconnaissance Survey – PMK Group 1997, Phase 1 Environmental Site Assessment – Alaimo Engineering 1998, Soil Sampling – Atlantic Technology 1988, Soil Sampling – PMK Group 1997, Phase II Site Investigation – MCIA Consultants 1998, Drainage Swale Sediment Sampling – MCIA Consultants 1998, Soil Sampling – MCIA Consultants 1998, Ground Water Sampling – MCIA Consultants 1998, URS Investigations – 2005. *See* CBY_0021526 at CBY_0021528-35 (Ex. 98).

205.     CBY itself or through its representatives reviewed the Site's prior environmental investigations. *See* Ex. 9, Lynott Dep. 223:8-11.

206.     Before CBY purchased the Site, AECOM performed an environmental investigation of the property on behalf of CBY in August and September 2005, including a visual site reconnaissance, wetlands delineation, excavating test pits in mounded and suspect areas to evaluate their contents and sampling native soils, collecting soil and sediment samples from previously identified AOCs or from areas identified during the visual survey, and installing piezometers to validate groundwater flow direction and collecting samples to evaluate groundwater quality beneath AOCs. *See* Ex. 82 at CBY_0021431-32.

207.     Based upon its findings, AECOM prepared a Conceptual Remedial Action Work Plan in November 2005 to document Site conditions, present investigation results, and present proposed remediation activities required to achieve regulatory site closure that would allow for commercial site development. *See* Ex. 82 at CBY_0021428.

208.     NJDEP found the remedial concept put forth in the Conceptual Remedial Action Work Plan acceptable. *See* CBY_0135759 at CBY_0135760 (Ex. 99).

209.     CBY performed a title search of the Site prior to purchase. *See* Ex. 9, Lynott Dep. 223:13-15.

### C.     CBY Provided All Legally Required Notices

210.     EPA guidance provides that the prong requiring a party to provide all legally required notices was meant to "ensure that EPA and other appropriate entities are made aware of hazardous substance releases in a timely manner. 'Legally required notices' may include those required under federal, state, and local laws. . . . The bona fide prospective purchaser [has] the burden of ascertaining what notices are legally required in a given instance and of complying

31

with those notice requirements." *See* Ex. 93 (CRANBURY-MCLANE-000157) at CRANBURY-MCLANE-000170.

211.    CBY submitted a Remedial Investigation Report to NJDEP on March 27, 2006, shortly after its purchase of the Site and its entrance into the ACO Amendment. The Remedial Investigation Report identified for NJDEP the nature and extent of the MEC and chemical contamination at the Site. *See* Ex. 5 at CBY_0002122.

212.    The Remedial Investigation Report identified for NJDEP the extent of MEC and non-MEC contamination at the Site. *See* Ex. 5 at CBY_0002151-59.

213.    The Remedial Investigation Report presented a site description and summary of historical information, a summary of early field investigations, an overview of MEC investigations conducted by URS Corporation, AECOM site investigation data, a technical overview of all data collected, and findings and recommendations. *See* Ex. 5 at CBY_0002132.

214.    NJDEP was notified concerning any further discoveries of hazardous substances including one notification to the NJDEP discharge hotline as testified to by CBY's LSRP. *See* Blum Dep. 104:16-24 (Ex. 100).

215.    CBY submitted a Wetland Mitigation Plan for Site Remediation Activities to NJDEP in December 2007. *See* CBY_0018719 at CBY_0018719 (Ex. 101).

216.    The Wetland Mitigation Plan for Site Remediation Activities was prepared to fully compensate for the proposed permanent impacts to Wetlands and State open waters associated with completed and planned site remediation activities at the Site and estimated that 48 acres of wetlands would be permanently impacted from remedial investigation and remedial actions including the construction of a supplemental barrier to remediate/isolate MEC. *See* Ex. 101 at CBY_0018720-21.

217.   CBY engaged in discussions with NJDEP and submitted revisions to the Wetland Mitigation Plan for Site Remediation Activities to NJDEP in 2010, 2011, and 2012. *See* CBY_0018635 at CBY_0018639-44 (Ex. 102).

218.   The 2012 Revised Wetland Mitigation Plan was formulated to create new wetlands and restore and enhance existing wetlands onsite to compensate for the loss of approximately 42 acres of forested wetlands and 2 acres of wetlands ditches resulting from approved remediation activities. *See* Ex. 102 at CBY_0018642.

219.   Cranbury Township was provided updates on the project including a summary transmitted via email on August 11, 2014. *See* CBY_0068007 at CBY_0068008-09 (Ex. 103).

**D.   CBY Took All Reasonable Steps (Appropriate Care) Regarding Releases at the Site**

220.   CBY's pre-purchase investigations did not identify any continuing releases other than site distribution of MEC as a result of people walking the Site. *See* Ex. 5 at CBY_0002149.

221.   The Site was completely fenced to prevent access by trespassers. *See* Ex. 92, Pastorick Dep. 151:13-18.

222.   The fence was largely effective in keeping out trespassers, and the general public did not go on to the Site. *See* Ex. 9, Lynott Dep. 173:17-174:2.

223.   CBY engaged contractors to complete cleanup activities at the Site. *See* Ex. 6, Jenkins Dep. 143:17-144:9.

224.   CBY's contractors engaged in cleanup activities at the Site exercised due care. *See* Ex. 6, Jenkins Dep. 143:17-144:9.

225.   CBY's contractors exercised the same due care exercised when working on Army Corps of Engineers projects. *See* Ex. 6, Jenkins Dep. 143:17-144:9.

226.    Work at the Site proceeded according to the NJDEP-approved work plans including a Quality Assurance Project Plan and a Health and Safety Plan. *See* Ex. 12 at CBY_0001220; CBY_0013640 (Ex. 155).

227.    CBY contracted with Diamond Materials, LLC for demolition, remediation, grading, utility and wetland mitigation work at the Site in April 2013. *See* CBY_0019749 at CBY_0019749, CBY_0019755 (Ex. 104).

228.    

229.

230.    Contacting the NJDEP discharge hotline to report a spill is a regulatory requirement. *See* Ganch Dep. 182:17-22 (Ex. 107).

231.    The July 2013 notification to the NJDEP discharge hotline is the only confirmed discharge notification that has been filed by CBY at the Site. *See* Blum Dep. 104:20-24 (Ex. 100).

232.

233.   Cranbury Township prohibits earth from being moved on or off a site, regardless of the time span to accomplish such activity. *See* Cranbury Township Ordinance at Chapter 150, Section 62 (Ex. 108).

234.   As such, the Cranbury Township ordinance did not allow for soil to be removed from the Site. *See* Ex. 106, McLane Dep. 187:23-188:2; Ex. 108.

235.   

236.   

237.   This proposed course of action was implemented. *See* Ex. 100, Blum Dep. 101:18-102:24.

238.   Immediate remedial action took place to isolate the tank and contaminated soil. *See* Ex, 109 at CBY_0200841.

239.   Approximately 300 cubic yards of material were excavated and stockpiled at the Site. *See* Ex, 109 at CBY_0200841; Ex. 106, McLane Dep. 190:16-19.

240.   Sampling of the sidewalls and bottom of the excavation was conducted in accordance with N.J.A.C. 7:14B. *See* Ex, 109 at CBY_0200841; Ex. 106, McLane Dep. 190:20-191:2.

241.   The UST was existing on the Site prior to acquisition by CBY. *See* Ex. 106, McLane Dep. 191:3-10.

242.     A 7 acre unpermitted landfill containing asbestos-containing material was encountered at the Site on November 1, 2013. *See* CBY_0039976 at CBY_0039977, CBY_0039984 (Ex. 110).

243.     After discovery of the landfill, all work temporarily ceased in the area. *See* Ex. 106, McLane Dep. 194:1-4.

244.     Materials associated with the landfill were confirmed by CBY contractor Munitions Management Group ("MMG") to contain asbestos-containing material. *See* Ex. 110 at CBY_0039977-78.

245.     A specialized contractor, Reactive & Explosives Materials Training Corporation (REMTC), was engaged by Diamond Materials to complete MEC remediation activities at the Site in May 2014. *See* CBY_0037228 at CBY_0037230 (Ex. 111).

246.     REMTC mobilized to the Site and began full MEC clearance and remediation activities in the 7-acre area on May 19, 2014. *See* Ex. 111 at CBY_0037231.

247.     CBY's environmental contractor, Langan Engineering and Environmental Services ("Langan"), implemented an air monitoring operation from the start of REMTC's onsite activities to address concerns with friable asbestos and the generation of airborne particles. *See* Ex. 111 at CBY_0037231.

248.     ██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

249.     No friable/airborne-asbestos particles were identified over the course of REMTC's field work. *See* Ex. 111 at CBY_0037231.

250.



251.

252.

253.    The 7-acre area with its materials inside it was present at the Site prior to acquisition by CBY. *See* Ex. 106, McLane Dep. 193:1-7.

254.    Eric Edwardson is an employee of AMEC, a contractor at the Site overseeing MEC remediation work. *See* Ex. 107, Ganch Dep. 187:13-17.

255.



256.

257.    The "sifting operation" is in reference to an operation that involved digging up dirt that was highly impacted by MEC and bringing it to a conveyor belt where a magnet sifts out anything that is metal. *See* Ex. 107, Ganch Dep. 190:14-20.

258.    At the Site, if piles of dirt contained media with issues on it, the LSRP would get involved immediately. *See* Ex. 107, Ganch Dep. 192:17-25.

259.    Piles of dirt that were stockpiled and waiting to get sift that did not contain media with issues on it are not a danger to human health and safety. *See* Ex. 107, Ganch Dep. 193:3-5.

260.     Piles of dirt that were stockpiled and did not contain media with issues on it were handled by Eric Edwardson. *See* Ex. 107, Ganch Dep. 192:17-193:2.

261.     Eric Edwardson was likely concerned with this specific pile of dirt that was stockpiled because "if it sits out there and gets wet from the rain, then sifting that material takes longer." *See* Ex. 107, Ganch Dep. 193:3-8.

**E.      CBY Provided Cooperation, Assistance and Access**

262.     CBY regularly met with NJDEP throughout the course of the Site cleanup. *See* Ex. 6, Jenkins Dep. 144:23-24.

263.     CBY and its contractors met with NJDEP representatives Ann Charles and Greg Zalaskus on January 31, 2007. *See* UXOPro000221 at UXOPro000221-30 (Ex. 115).

264.     CBY and its contractors met with NJDEP representatives Ann Charles and Greg Zalaskus on March 9, 2007. *See* CBY_0031082 at CBY_0031082-88 (Ex. 116).

265.     CBY, its contractors, and its counsel met with NJDEP representatives Steve Maybury, Greg Zalaskus, Ann Charles, Christopher Jones, and Paul DeMoro, as well as NJDEP consultants Gene Barber and Mary Franquemont on February 3, 2009. *See* UXOPro001342 at UXOPro001342-49 (Ex. 117).

266.     CBY, its contractors, and its counsel met with NJDEP representatives Marilyn Lennon, Irene Kropp, Suzanne Dietrick, Susan Lockwood, and JoDale Legg on October 13, 2011. *See* CBY_0063896 at CBY_0063896 (Ex. 118).

267.     CBY provided NJDEP notifications concerning findings at the Site throughout the course of the cleanup. *See* Ex. 6, Jenkins Dep. 144:18-22.

268.     CBY notified NJDEP on April 25, 2013 that it would begin construction of the wetland mitigation project on or about June 15, 2013. *See* CBY_0020068 at CBY_0020068 (Ex. 119).

269.     CBY gave NJDEP full access to the Site throughout the course of the cleanup as required by the ACO. *See* Ex. 6, Jenkins Dep. 144:25-145:2; Ex. 7 at MAXCRAN0001726.

270.     NJDEP representative Greg Zalaskus visited the Site on September 5, 2014 and completed an instrument aided visual inspection of the proposed clean fill area. *See* CBY_0018946 (Ex. 120).

271.     CBY cooperated with NJDEP throughout the course of the cleanup. *See* Ex. 6, Jenkins Dep. 145:14-20; *see supra*, at Ex. 7, Ex. 11.

272.     CBY's cooperation included doing what NJDEP asked them to do, revising cleanup plans to meet NJDEP's requirements, and responding to requests for information. *See* Ex. 6, Jenkins Dep. 145:22-146:25.

### F.     CBY Complied with Land Use Restrictions and Institutional Controls

273.     CBY submitted its Munitions and Explosives of Concern Remedial Investigation Report/Remedial Action Selection Report/Remedial Action Workplan ("MEC RAWP") to NJDEP on May 15, 2007. *See* Ex. 12.

274.     The MEC RAWP states that deed notice requirements were to be fully developed and that a deed notice will discuss potential residual MEC hazards, the supplemental barrier, restrictions for intrusive work and UXO support requirements. *See* Ex. 12 at CBY_0001219.

275.     The MEC RAWP states that the MEC investigation and remedial work will require the removal the vegetation and placement of a supplemental barrier over wetland areas, and that these anticipated wetland impacts would need to be mitigated through the creation,

restoration, or enhancement of other wetland areas in accordance with the NJDEP Land Use Regulation Program, Freshwater Wetlands Permit application. *See* Ex. 12 at CBY_0001219.

276.    CBY submitted its Remedial Investigation Work Plan ("RIWP") addressing other environmental investigation and remediation to NJDEP on May 4, 2007. *See* CRANBURY-TOWNSHIP001382 at CRANBURY-TOWNSHIP001382 (Ex. 121).

277.    CBY submitted a Munitions and Explosives of Concern Remedial Investigation Report/Remedial Action Selection Report/Remedial Action Workplan Addendum ("MEC RAWP Addendum") to NJDEP on March 20, 2009. *See* CBY_0000865 at CBY_0000865 (Ex. 122).

278.    NJDEP reviewed the MEC RAWP, MEC RAWP Addendum, and RIWP and determined that the submittals were in compliance with the Technical Requirements for Site Remediation N.J.A.C. 7:26E and other applicable requirements on April 21, 2009. *See* CBY_0000001 at CBY_0000001 (Ex. 123).

279.    NJDEP approved the MEC RAWP, MEC RAWP Addendum, and RIWP as of April 21, 2009. *See* Ex. 123 at CBY_0000001.

280.    Defendants' expert Charles McLane testified that NJDEP found that these documents were compliant with New Jersey technical requirements. *See* Ex. 106, McLane Dep. 142:7-13.

281.    NJDEP informed CBY that the remediation effort as defined in the MEC RAWP could proceed with appropriate permits. *See* Ex. 123 at CBY_0000001.

282.    CBY's attorney wrote to NJDEP on August 26, 2011 noting that CBY had not received any correspondence from NJDEP suggesting non-compliance or violation issues throughout its ownership of the Site. *See* CBY_0018706 at CBY_0018706 (Ex. 124).

283.    After vertical construction is completed, the LSRP will draft a Remedial Action Report and a Remedial Action Permit application, which will confirm that the engineering controls (capping) are completed, and that CBY will execute an institutional control in the form of a deed notice. *See* CBY_0047769 at CBY_0047769 (Ex. 125).

284.    CBY granted a Conservation and Maintenance Agreement to the Delaware and Raritan Canal Commission of the State of New Jersey in February 2015. *See* CBY_0021957 at CBY_0021957 (Ex. 126).

285.    CBY granted a Conservation Easement Agreement to the Delaware and Raritan Canal Commission of the State of New Jersey in February 2015. *See* CBY_0021880 at CBY_0021880 (Ex. 127).

286.    The NJDEP Office of Dredging and Sediment Technology approved CBY's application for an Individual Freshwater Wetlands Permit and Individual Flood Hazard Area Permit/Flood Hazard Area Verification ("Wetlands Permit") on January 28, 2013. *See* CBY_0021005 at CBY_0021005 (Ex. 128).

287.    The Wetlands Permit includes land use restrictions which CBY must comply with. *See* Ex. 128 at CBY_0021012-21.

### G.    CBY Complied with Information Requests and Administrative Subpoenas

288.    There have been no requests for information under CERCLA § 104(e)(2) directed to CBY. *See* Ex. 3, Zoch Report at 74.

289.    CBY responded to requests for information from NJDEP any time that NJDEP asked for information. *See* Ex. 6, Jenkins Dep. 146:21-25.

290.    NJDEP issued a Notice of Deficiency to CBY on August 8, 2008. *See* CBY_0054373 at CBY_0054373 (Ex. 129).

41

291.    CBY responded to NJDEP's August 8, 2008 Notice of Deficiency on December 29, 2008. *See* CBY_0011340 at CBY_0011340 (Ex. 130).

292.    The Notice of Deficiency was resolved through the MEC RAWP Addendum which was approved by NJDEP on April 21, 2009. *See* Ex. 123 at CBY_0000001.

293.    NJDEP's Division of Land Use Regulation wrote to CBY on September 3, 2010 requesting information. *See* CBY_0018900 at CBY_0018900 (Ex. 131).

294.    CBY responded to the NJDEP Division of Land Use Regulation request for information on October 12, 2010. *See* Ex. 131 at CBY_0018900.

295.    On August 10, 2010, the United States Environmental Protection Agency ("EPA") wrote to NJDEP and objected to the issuance of wetland permit for the Site. *See* CBY_0018896 at CBY_0018896 (Ex. 132).

296.    CBY cooperated with EPA by submitting additional information to EPA and participating in discussions with EPA and NJDEP staff in order to resolve EPA's objection. *See* Ex. 132 at CBY_0018896.

297.    For example, on July 18, 2011, CBY prepared a technical response to a letter issued by EPA on May 19, 2011. *See* CBY_0018889 at CBY_0018889 (Ex. 139).

298.    In August 2011, EPA wrote to NJDEP and indicated that "[b]ased on [EPA's] review of additional information submitted by [CBY], as well as discussions with [CBY] and [NJDEP] staff, [EPA] withdraws its prior objection to issuance of a wetland permit for the Cranbury Brick Yard project." *See* Ex. 132 at CBY_0018896.

### H.    No Affiliation

299.    CBY has no corporate relationship with any of the prior owners of the Site. *See* Hazel Dep. 243:18-20 (Ex. 133); *see generally* Ex. 7; 11.

300. ███████████████████████████████████████████████

█████████████████████████████████

301. ██████████████████████████████████████████████████

███████████████████

302.     CBY and Lion Industrial Properties, L.P. entered into an Environmental

Indemnity Agreement with CDC, CAAM, and Maxxam on January 30, 2006. *See* CBY_0004945

(Ex. 136).

## IV.     CBY Conducted a Cleanup Consistent With the National Contingency Plan Which Resulted in a CERCLA Quality Cleanup

303.     CBY's contractors followed Army Corps of Engineers procedures when

completing Site cleanup. *See* Ex. 6, Jenkins Dep. 141:24-142:7.

304.     The remedy at the Site consisted of removal of MEC and placing an impermeable

layer on top to separate site users from any potential remaining hazards. *See* Ex. 92, Pastorick

Dep. 82:1-10; Ex. 12 at CBY_0001163.

305.     The impermeable layer is also referred to and is used interchangeably with

supplemental barrier or cap. *See* Ex. 137, Burrow Dep. 42:10-13; Ex. 92, Pastorick Dep. 82:1-4.

306.     The cap includes, in some areas of the Site, heavy concrete slabs from

warehouses.  *See* Ex. 92, Pastorick Dep. 82:1-10.

307.     The cap was designed to prevent harm from any munitions that could have

possibly been left at the Site after rigorous search, screening, and removal of MEC. *See* Ex. 100,

Blum Dep. 66:14-25.

308.     The cap was accordingly designed to serve as a buffer of protection against any

potential remaining hazards, although the risk of hazard was de minimis because CBY's

contractors "removed everything they could" and "did a good job." *See* Ex. 92, Pastorick Dep. 82:6-10, 83:7-9.

309.    The cap was also designed to address non-MEC contaminants of concern that remained in place. *See* Ex. 100, Blum Dep. 67:9-19.

310.    The cap consists of at least 2 feet of clean fill, with some areas of the Site containing concrete or pavement over the top of the clean fill. *See* Ex. 92, Pastorick Dep. 228:5-229:6.

311.    The cap was designed so that when completed, it will achieve the requirements for the Site for no further action. *See* Ex. 92, Pastorick Dep. 161:3-16.

312.    MMG sought input from the Army Corps of Engineers in designing the cap with respect to the appropriate steps to take to remediate the MEC on site. *See* Burrow Dep. 125:11-22 (Ex. 137).

313.    The remediation of MEC in the wetlands at the Site was part of the site remediation as a whole. *See* Ex. 9, Lynott Dep. 219:25-220:7; Ex. 12 at CBY_0001170.

314.    The wetlands at the Site were degraded by the presence of MEC. *See* Ex. 9, Lynott Dep. 219:25-220:7; Ex. 102 at CBY_0018639.

315.    NJDEP, the Army Corps of Engineers, and EPA were involved in consultation with respect to the impact on the wetlands. *See* Ex. 137, Burrow Dep. 130:6-16.

316.    New Jersey's Site Remediation program uses Licensed Site Remediation Professionals (LSRPs) to supervise site remediation in the state of New Jersey in order increase the pace of remediation, decrease the threat of contamination to public health and safety and of the environment, and return underutilized properties to productive use quickly. *See* Site Remediation Program (Ex. 156).

317.     The LSRP is authorized to act on behalf of NJDEP. *See id.,* Ex. 100, Blum Dep. 158:25-159:7.

318.     Brian Blum of Langan served as the LSRP at the Site. *See* Ex. 100, Blum Dep. 13:10-19.

319.     Brian Blum's role as LSRP was to ensure that investigation and remediation were done in compliance with New Jersey's rules and regulations governing sites in the remediation program.  *See* Ex. 100, Blum Dep. 13:10-19.

320.     As LSRP, Brian Blum and Langan complied with LSRP guidance, reviewed all documents, ensured that NJDEP requirements were met, and made sure that the basic procedures were in accordance with Corps of Engineers requirements. *See* Ex. 92, Pastorick Dep. 131:20-132:19.

321.     As LSRP, Brian Blum closed 20 of 26 Areas of Concern with a Response Action Outcome (RAO) as of October 2016. *See* Ex. 100, Blum Dep. 26:20-27:7.

322.     An RAO is a written determination by a licensed site remediation professional that the site was remediated in accordance with all applicable statutes, rules and guidance. *See* N.J.A.C. 7:26C-1.3 (Ex. 157).

323.     CBY proposed the use of the Triad Approach at a meeting with representatives of NJDEP to increase efficiency. *See* CBY_0033057 at CBY_0033057 (Ex. 138).

324.     CBY then incorporated the Triad Approach, a dynamic approach where investigation and remediation activities are conducted concurrently, as documented in the MEC RAWP. *See* Ex. 12 at CBY_0001174-76.

325.    The MEC RAWP was accordingly equivalent to an RI (remedial investigation) and FS (feasibility study) (collectively, "RI/FS") which was completed in substantial compliance with CERCLA. *See* Ex. 92, Pastorick Dep. 169:3-15.

326.    Because there is no acceptable level of exposure to MEC, some shortcuts can be appropriately taken from the FS evaluation as compared to evaluation of other forms of environmental contamination. *See* Ex. 92, Pastorick Dep. 171:17-172:11.

327.    The MEC RAWP was prepared in accordance with N.J.A.C. 7:26E, which are the technical requirements for site remediation, as well as N.J.A.C. 7:26C, which provides the administrative aspects of the rules of the site remediation program. *See* Ex. 100, Blum Dep. 57:2-23.

328.    Langan also reviewed approximately 20 technical guidance documents that must be reviewed for all site remediation in New Jersey. *See* Ex. 100, Blum Dep. 57:10-16.

329.    CBY provided notice to neighboring landowners to notify them of work near their property. *See* Ex. 133, Hazel Dep. 240:3-24.

330.    CBY participated in several public meetings relating to site plan approval with Cranbury Township. *See* Ex. 107, Ganch Dep. 206:11-20.

331.    At these public meetings, public participants had the opportunity to ask questions. *See* Ex. 137, Burrow Dep. 52:11-53:6.

332.    CBY responded to public comments through written responses and responses at public forums. *See* Ex. 107, Ganch Dep. 208:5-12.

333.    CBY published notices in newspapers when statutorily required to do so. *See* Ex. 107, Ganch Dep. 208:13-209:4.

334.    MMG only located military explosives and ordnances at the Site by MMG, and

never located anything that could be classified as fireworks. *See* Ex. 6, Jenkins Dep. 141:5-14.

Dated: November 9, 2017                         MORGAN, LEWIS & BOCKIUS LLP

                                                /s/ *Mark A. Fiore*
                                                John McGahren
                                                Stephanie R. Feingold
                                                Mark A. Fiore
                                                502 Carnegie Center
                                                Princeton, NJ 08540
                                                Tel: +1.609.919.6600
                                                Fax: +1.609.919.6701
                                                john.mcgahren@morganlewis.com
                                                stephanie.feingold@morganlewis.com
                                                mark.fiore@morganlewis.com
                                                *Attorneys for Plaintiff Cranbury Brick Yard, LLC*