# EXHIBIT 6

1        **DEPOSITION OF DONALD JOSEPH JENKINS**

2                    August 8, 2016

3

4          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY

5     ------------------------------------
      CRANBURY BRICK YARD, LLC,              )
6                                            )
             Plaintiff,                      )
7                                            )
      vs.                                    ) CIVIL CASE NO.
8                                            ) 15-2789(PGS)
      UNITED STATES OF AMERICA, et al.,      ) (LGH)
9                                            )
             Defendants.                     )
10    ------------------------------------

11

12    **APPEARANCES:**

13                  **FOR THE PLAINTIFF:**

14                  JOHN MCGAHREN, ESQ.
                    Morgan, Lewis & Bockius LLP
15                  502 Carnegie Center
                    Princeton, New Jersey  08540-6241
16
                    **FOR THE DEFENDANTS**
17
                    BRIAN H. LYNK, ESQ.
18                  U.S. Department of Justice
                    Environment & Natural Resources Division
19                  P.O. Box 23986
                    Washington, D.C. 20026-3986
20
      **ALSO PRESENT:** Mark A. Kauffman, Jr., Manager
21                  McLane Environmental

22    **PRESENT VIA**
      **TELEPHONE:**   Charles McLane, McLane Environmental
23                  Stephanie Talbert, McLane Environmental

24

25

─────── **Gibson Court Reporting** ───────
          **865-546-7477**

1       Q.      Do you recall who first contacted you

2   about doing work at the Cranbury site?

3       A.      I believe it was a referral from another

4   office, but it was Adam Meek with -- I cannot remember

5   the name of the law firm he was with at the time.  I'm

6   sure John McGahren remembers, maybe.

7                MR. MCGAHREN:  I'm not here to be

8           deposed.  Not yet.

9                THE WITNESS:  And they were -- to the

10          best of my recollection, they were representing

11          Credit Lyonnais Asset Management, who owned the

12          property at the time.

13  BY MR. LYNK:

14      Q.      And so in general, what was the nature of

15  what you were asked to do at the outset of your

16  involvement at the site?

17      A.      I believe that if my recollections are

18  correct, Credit Lyonnais had attempted to sell the

19  property, and the New Jersey Department of

20  Environmental Protection stepped in and required some

21  environmental studies before they sold the property --

22  in particular, with the focus on munitions.

23                So we were hired to conduct some studies to

24  try to determine the nature and extent of the unexploded

25  ordnance contamination left over from the manufacturing

Donald Joseph Jenkins (8/8/16)                               Page 12

1    of the unexploded ordnance and an explosion that occurred

2    I believe in 1954.

3         Q.      And was there anything at that time -- or

4    let's say in 2003, did you ever put anything in writing

5    that was basically setting out what the mission would

6    be of URS at the site?

7         A.      I don't recall.  I know that at some

8    point we wrote work plans.  I'm sure there are emails.

9    I'm sure we had a scope of work in the contract.  But I

10   don't recall.

11              And I need to go back.  I think I

12   misspoke on the timeline.  MMG started January the 1st,

13   2006, so I was with URS from February of 2002 until

14   December of 2005.

15        Q.      Okay.  And then with MMG from January

16   1st, 2006, continuing to the present?

17        A.      Correct.  Thank you.

18        Q.      Thanks for clarifying.

19              MR. LYNK:  Let's mark these exhibits.

20              (Exhibit Nos. 1 and 2 marked)

21   BY MR. LYNK:

22        Q.      Don, you had mentioned that you had

23   prepared some work plans while you were at URS

24   pertaining to the Cranbury site.  So you may not need

25   to go through these page by page, but in general I want

1       Q.      And basically, what did you learn from

2   it, from reviewing that?

3       A.      We knew that there had been an explosion,

4   didn't know where.  So part of what we had done during

5   the conceptual site model development was run some --

6   some transects, trying to determine, if possible, where

7   the explosion occurred.

8               We weren't able to -- I think I recall

9   that we thought we knew where the explosion occurred

10  until we saw the photograph; and then of course, you

11  know, that put us in the right spot.  I think we were

12  off quite a ways.

13              But in the photograph, the plane is behind

14  two specific buildings that the foundations and remnants

15  of were still on site and very easily identifiable, these

16  buildings, because of some particular attributes;

17  specifically napalm tanks behind the buildings, because

18  that's where the AM-N69 napalm bombs were filled.  They

19  were refurbished in those two buildings.

20              So the location of those two buildings were

21  known.  It was known what the buildings were for, and

22  then the photograph behind them showing the explosion

23  site made it very easy to triangulate.

24      Q.      Do you remember whether there was a date

25  given on the photograph?

Donald Joseph Jenkins (8/8/16)                          Page 129

1    into them, and those channels are filled with black

2    powder so that you can turn the wafers to set a

3    specific time that you want before the piece of

4    ordnance fires.

5              But we found pieces and parts to one of

6    those fuses, completely by chance.

7         Q.      Earlier in your testimony, you found --

8    today, you testimony today you talked about

9    refurbishing the napalm bombs.  What does that involve?

10        A.      That involves -- as far as I could

11   discover, that involved someone bringing in napalm

12   bombs from a storage facility, the AM-N69 napalm bomb

13   from an outside storage facility.  When I say

14   "outside," I mean off-site storage facility.  Bring

15   them to Cranbury, and then dismantle, partially

16   dismantling them and replacing the napalm fill sock in

17   the rear of the bomb, replacing that sock with a fresh

18   one, and then resealing it and sending it back out.

19        Q.      So how did you become aware of the fact

20   that napalm bombs were being refurbished at the site?

21        A.      We originally thought that they were

22   being manufactured, and then at some point in the

23   investigation we found -- I think that we found a

24   contract from the War Department for the refurbishment.

25        Q.      Did that indicate that the napalm bombs

1    were owned by the United States that were being

2    refurbished, that contract you saw?

3                    MR. LYNK:  Object to the form.

4                    THE WITNESS:  I would assume so.  It's

5            just an assumption.  But they -- as far as I can

6            recall, it was a contract from the War Department

7            for Unexcelled Chemical Corporation to refurbish

8            napalm bombs that -- that that were to be

9            delivered to the Cranbury site.

10   **BY MR. MCGAHREN:**

11           Q.      Did you find any other evidence of

12   refurbishment of napalm bombs at the site, physical

13   evidence?

14           A.      We did.  We found -- actually, we didn't

15   find it.  Well, let me back up.  We found several

16   AM-N69 napalm bombs out in the burning ground area.

17   And then in the time that ENSR and ENSR/AECOM were

18   working out there they uncovered a burial trench, and I

19   believe they recovered somewhere around 300, maybe

20   more, AM-N69 napalm bombs that had been -- that had

21   been put into the trench.  And then they attempted to

22   burn -- burn the bombs.

23           Q.      When you say "they," who do you mean?

24           A.      The timeline that -- that we established

25   is based on a lot of assumptions, but when the -- at

```
1    some point we assumed it was after the explosion.

2    Cranbury -- or the Unexcelled Chemical Corporation did

3    not have a permit from the Department of Labor.  The

4    Department of Labor at that time was who permitted the

5    storage and use of high explosives in the United

6    States.  They did not have a permit to store or use

7    high explosives at the site.

8              And when the explosion occurred, there was

9    evidence that they were trying their best to get rid

10   of -- in other words, they were still caught with -- with

11   quite a bit of high explosives stored in an open storage

12   area.

13             So the assumption is that somewhere during

14   that timeframe those AM-N69 bombs were buried and they

15   tried to dispose of them in the same way.  And the reason

16   that I assume that is because everywhere else I've got

17   onesies, twosies, here and there, kick-outs from a shot

18   from the -- what we called the burning ground, which was

19   an open burn, open detonation area.

20        Q.        Let me ask you a question about that.

21   Were burning grounds commonly used in accordance with

22   military specifications in the timeframe this facility

23   was operating?

24        A.        They were.

25        Q.        And you found evidence of a burning
```

Donald Joseph Jenkins (8/8/16)                    Page 132

1    ground at the site?

2         A.    We did.

3         Q.    Did you find any other ordnance buried at

4    depth in that location?

5         A.    To my knowledge, the only ordnance that

6    was buried with the intention of burying it were the

7    AM-N69 napalm bombs.

8              The items that we found subsurface, in some

9    cases I believe up to four to five feet, were in the main

10   portion of the burning ground, which -- and I believe

11   that it was over a period of time where it was used to

12   dispose of off-spec munitions, that they had just been

13   pounded into the ground over time.

14        Q.    Would that four- to five-feet depth meet

15   military specs prevailing at the time for disposition

16   of ordnance?

17             MR. LYNK:  Object to the form.

18             THE WITNESS:  Like I said, I don't think

19        they were buried.  I think they went out with a

20        shovel.  It was over time, the kick-outs from the

21        demolition of the ordnance operations; instead of

22        kicking out, they were kicked down over time and

23        just pushed.

24   BY MR. MCGAHREN:

25        Q.    Had you had any experience with Greg

```
 1   comments and findings on what ordnance was found?

 2        A.      It was not.

 3        Q.      Whose team?  Whose team was that?

 4        A.      That is ENSR/AECOM.

 5        Q.      Just in looking at those two tables of

 6   what was found, do you see anything in those tables

 7   that is what we would call fireworks?  Or did you ever

 8   find fireworks at the site?

 9        A.      No, no.  I never found anything that

10   could be classified as fireworks.

11        Q.      What you found was military explosives

12   and ordnance, correct?

13        A.      That's correct, with proper

14   nomenclatures.

15        Q.      You followed a lot of procedures at the

16   site, and I'm referring you to that same -- same

17   document, J4, to Bates Stamp 1421, CBY_00001421.

18        A.      Okay.  Yes.

19        Q.      What is that document?

20        A.      This is the Corps of Engineers' "Basic

21   Safety Concepts and Consideration for Ordnance

22   Explosives Operations," which was a standard inclusion

23   for all UXO clearance work plans.

24        Q.      Okay.  So you were following Corps of

25   Engineers' procedures in doing the work at this site,
```

 1   correct?

 2         A.      Correct.

 3         Q.      And is the Corps of Engineers a signator

 4   to the MEC HA document in Exhibit 12?

 5         A.      I think it was developed between the

 6   Corps, EPA, and the Department of Interior, I believe.

 7   Or I think.

 8         Q.      Let me refer you to the acknowledgments

 9   on the second page of Jenkins 12.  Do you see the Corps

10   being part of the technical working group for that

11   document?

12         A.      I do.

13         Q.      So is it fair to say the Corps signed off

14   on the MEC HA document, as well?

15         A.      Yes, it is.

16         Q.      Now, the DEP doesn't have separate

17   ordnance regulations, do they?

18         A.      No.  At the time, they didn't believe

19   that they regulated ordnance.

20         Q.      Okay.  Are you aware of any states that

21   do?

22         A.      No, no.  There may be, but I'm not aware

23   of them.

24         Q.      What about California?

25         A.      I don't know.

1          Q.       Are you familiar with the Fort Ord

2     cleanup?

3          A.       Yes, I know what it was.

4          Q.       Do you know if California requires the

5     parties to put 14 feet of cover on top of UXO?

6          A.       I don't know.

7          Q.       To your knowledge, was all the MEC that

8     was found at the site disposed of before Cranbury Brick

9     Yard took ownership of the same?

10         A.       Clarify "disposed of."

11         Q.       Meaning did Cranbury Brick Yard have

12    anything to do with the fact that there was MEC on this

13    site?

14         A.       Not to my knowledge.

15         Q.       So they were cleaning it up, correct?

16         A.       That's correct.

17         Q.       Do you know if they exercised due care,

18    based on your knowledge and experience, in doing that

19    cleanup?

20                  MR. LYNK:  Object to the form.

21                  THE WITNESS:  Well, considering that MMG

22         was -- MMG and then TLI was tasked with cleaning

23         up the MEC, I can say that we -- what was the term

24         you used?

25    BY MR. MCGAHREN:

Donald Joseph Jenkins (8/8/16)                           Page 144

1          Q.      Due care.

2          A.      We exhibited due care.

3          Q.      Did you exercise the same due care that

4    you exercise when you work on Corps of Engineers

5    project?

6          A.      Yes, I did.

7          Q.      And you've worked on Corps of Engineers

8    projects?

9          A.      Yes, we have.

10         Q.      Are you currently working on any Corps of

11   Engineers projects?

12         A.      Yes.

13         Q.      Which one?

14         A.      We are in the Pueblo Chemical Depot in

15   Pueblo, Colorado.  We are at the Utah Test and Training

16   Range, south of Salt Lake City, Utah.  We are at Camp

17   Hale, Colorado, all for the Corps.

18         Q.      Do you know if Cranbury Brick Yard,

19   during the course of the MEC cleanup, was providing

20   notifications and communications to DEP concerning its

21   finding at the site?

22         A.      Yes.

23         Q.      Were they meeting regularly with the DEP?

24         A.      Yes.

25         Q.      Did they give DEP full access to the

1    site?

2         A.      Yes.

3         Q.      Did you personally witness DEP officials

4    on site?

5         A.      No, because I had left -- received a

6    phone call from Greg Zalaskus saying "I can't believe

7    you left before I got here."

8         Q.      But you are aware that the DEP was given

9    access to the site, correct?

10        A.      That's correct.  I spoke with our senior

11   UXO supervisor whenever Greg came on site, just so he

12   could give me a rundown of the conversation if anything

13   came to light.

14        Q.      Based on, you know, your more than a

15   decade of working on this site, did Cranbury Brick Yard

16   cooperate with DEP from the moment they got involved on

17   this site?

18             MR. LYNK:  Object to the form.

19             THE WITNESS:  I don't know of any time

20        they were uncooperative.

21   BY MR. MCGAHREN:

22        Q.      Did they do what the DEP asked them to

23   do?

24        A.      As far as I'm aware, yes.

25        Q.      Did they revise the cleanup at any time

1    to meet the DEP's requirements?

2         A.        I believe they did, yes.

3         Q.        Do you know if Cranbury Brick Yard

4    implemented any engineering or institutional controls

5    at the site to prevent exposure to hazards at the site?

6         A.        I believe that that was the case for the

7    stream corridor, I think.  And I've not seen it, but I

8    think I've been told that there's a fence surrounding

9    the stream corridor as a hazard control.  And I don't

10   have any direct knowledge concerning land use control

11   or any type of institutional controls.

12        Q.        Do you know if Cranbury Brick Yard

13   responded to requests for information from the DEP or

14   town officials?

15        A.        I don't have any knowledge.

16        Q.        Well, you did go to meetings at the DEP,

17   correct?

18        A.        Yes, I did.  Yes, I did.  I was thinking

19   more in terms of an official request for information

20   type of thing.

21        Q.        So to your knowledge, Cranbury Brick Yard

22   did respond to requests for information from the DEP,

23   correct?

24        A.        Any time that the DEP asked for any

25   information, yes, we responded.

1              C E R T I F I C A T E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4          I, Rhonda S. Sansom, RPR, CRR, CRC, Licensed

5    Court Reporter, do hereby certify that I reported in

6    machine shorthand the deposition of **DONALD JOSEPH**

7    **JENKINS**, called as a witness at the instance of the

8    Defendant; that the said witness was duly sworn by me;

9    that the reading and subscribing of the deposition by

10   the witness was not waived; that the foregoing pages

11   were transcribed under my personal supervision and

12   constitute a true and accurate record of the deposition

13   of said witness.

14          I further certify that I am not an attorney or

15   counsel of any of the parties, nor an employee or

16   relative of any attorney or counsel connected with the

17   action, nor financially interested in the action.

18          Witness my signature this the 9th day of

19   August, 2016.

20

21          _____

22          Rhonda S. Sansom, RPR, CRR, CRC
            Tennessee LCR# 0685
23          Expiration Date:  06/30/2018

24          Illinois Licensed Certified
            Shorthand Reporter,
            No. 084.004823
25          Expiration Date:  5/31/2017

—**Gibson Court Reporting** —

# EXHIBIT 7

Master File Number # 00087852
Program Interest Number # G000061684

IN THE MATTER OF THE
UNEXCELLED CHEMICAL SITE        :       ADMINISTRATIVE CONSENT
AND                              :                ORDER
CRANBURY DEVELOPMENT CORPORATION :
MAXXAM GROUP, INC.               :
Respondents

   This Administrative Consent Order is issued pursuant to the authority vested in the Commissioner of the New Jersey Department of Environmental Protection (hereinafter "the Department" or "DEP") by N.J.S.A. 13:1D-1 through -19, the Solid Waste Management Act, N.J.S.A. 13:1E-1 through -91, and the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq., and the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq., and duly delegated to the Assistant Director, Division of Remediation Support, Oversight Resources Allocation Element, pursuant to N.J.S.A. 13:1B-4.

## FINDINGS

   1. The Unexcelled Chemical Site is located on Brickyard Road, also known as Block 10, Lot 10 and Block 12, lot 1 on the tax maps of the Township of Cranbury, Middlesex County (hereinafter "Site") which is the subject of this Administrative Consent Order.

   2. Credit Agricole Asset Management (CAAM), (hereinafter "CAAM") is the successor through merger of then existing Credit Agricole Asset Management and Credit Lyonnais Asset Management (CLAM). CAAM is an asset management company with its corporate offices located in Paris, France. CLAM Finance is a subsidiary of CAAM and a shareholder of Cranbury Development Corporation (CDC), the owner of the Site. In a separate agreement not subject to this ACO, CLAM Finance has agreed to lend to CDC the funds required to pay all costs incurred by CDC pursuant to this ACO. CAAM is the party executing the Administrative Consent Order as a guarantor for CLAM Finance, solely with respect to matters addressed in this Administrative Consent Order.

   3. CDC is a New Jersey Corporation, which acquired the Site in February 1974 and is the current owner of the Site.

   4. Unexcelled Chemical Corporation a/k/a Unexcelled Manufacturing ("UCC") operated a munitions manufacturing facility at the Site from 1930 through 1954, when an explosion and fire caused UCC to cease operations; (b) UCC produced pyrotechnics and military weapons at the Site, including signal flares, fireworks, grenade fuses, napalm bombs and 20 mm high explosive

MAXCRAN0001716

projectiles and chemical products; and (c) after UCC ceased operations, the facility was demolished and abandoned.

5. Unexcelled Manufacturing Company, Inc. was incorporated in the State of New York in February 1915. The company changed its name to Unexcelled Chemical Corporation in May 1946. The name was changed to Unexcelled, Inc. in 1967 and then to Twin Fair, Inc. in 1972. Twin Fair, Inc. merged with and became a subsidiary of Simplicity Pattern, Inc. in March 1984. Simplicity Pattern, Inc. became known as MAXXAM Group, Inc in June 1984. MAXXAM Group, Inc. merged with a Delaware Corporation with the same name in or about 1985 with MAXXAM Group, Inc. of Delaware being the surviving corporation.

6. MAXXAM Group, Inc. is a Delaware Corporation with its corporate offices located at 1330 Post Oak Boulevard, Suite 2000, Houston, Texas 77056 (hereinafter "Maxxam" or "Respondent").

7. CDC has not used the Site for any commercial purposes other than limited amounts of tree farming and has been actively attempting to sell the Site since the late 1970's. In connection with an offer to purchase the Site by the County of Middlesex to build a park, Respondents performed a preliminary assessment between 2001 and 2003. Based on the preliminary assessment, which was submitted to the Department, the Department ordered CDC to inspect the Site for munitions and explosives of concern ("MEC"). In response to the Department's order, CDC implemented a Conceptual Site Model Development investigation of the Site in April 2004, which identified MEC at the Site.

8. By entering this Administrative Consent Order, Respondents neither admit to nor deny any fact, fault or liability under any statute or regulation concerning the condition of the Site nor waive any rights or defenses with regard to the site except as specifically provided in this Administrative Consent Order.

9. This Administrative Consent Order is, to the greatest extent possible, consistent with and complies with the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.§9601, et seq., and the National Oil and Hazardous Substance Pollution Contingency Plan (NCP), 40 C.F.R. §300.1, et seq. All activities undertaken by CDC and Maxxam pursuant to this Administrative Consent Order shall be performed in accordance with the requirements of all applicable federal and state laws and regulations. CDC and Maxxam must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the Scope of Work. The activities conducted pursuant to this Administrative Consent Order, if approved by the Department, shall be considered to be consistent with the NCP.

10. The scope of the investigation and remediation required by this Administrative Consent Order will include MEC and MEC associated materials and other constituents of concern potentially present at the Site, consistent with the attached Scope of Work.

## ORDER

2

MAXCRAN0001717

## I.   Remedial Work to be Completed

11. Within one hundred twenty (120) calendar days after execution of this Administrative Consent Order or as otherwise approved in writing by the Department, CDC and Maxxam agree to begin implementing the attached Scope of Work in accordance with N.J.A.C. 7:26E where applicable, including an implementation schedule.

## II.   Additional Remedial Investigation and Remedial Action

12. If at any time that this Administrative Consent Order is in effect the Department determines that the prevailing standards in N.J.A.C. 7:26E are not being achieved or that additional remediation is required to protect the public health and safety and the environment, CDC and Maxxam agree to conduct such additional remediation as the Department directs.

## III.   Progress Reports

13. CDC and Maxxam agree to submit quarterly progress reports which detail the status of CDC and Maxxam's compliance with this Administrative Consent Order to the Department in accordance with N.J.A.C. 7:26E-6.6(b). CDC and Maxxam agree to submit the first progress report on or before the last calendar day of the fourth calendar month following the effective date of this Administrative Consent Order. CDC and Maxxam agree to submit a progress report thereafter on or before the last calendar day of the month following the next three calendar months being reported. CDC and Maxxam may request that the Department allow progress reports be submitted semi-annually or annually.

## IV.   Project Coordination

14. CDC and Maxxam agree to submit to the Department all documents required by this Administrative Consent Order, including correspondence relating to force majeure issues, by delivery with an acknowledgement of receipt from the Department. The date that the Department receives such documents will be the date the Department uses to determine CDC and Maxxam's compliance with the requirements of this Administrative Consent Order and the applicability of penalties and any other remedies available to the Department.

15. Within fourteen (14) calendar days after the effective date of this Administrative Consent Order, CDC and Maxxam agree to submit to the Department the names, titles, addresses and telephone numbers of the individuals who shall be CDC and Maxxam's technical contacts for the Department for all matters concerning this Administrative Consent Order and CDC and Maxxam agree that the persons listed below are CDC and Maxxam's agents for the purpose of service for all matters concerning this Administrative Consent Order. In the event the Department determines that a meeting concerning the remediation of the site is necessary, the Department

3

MAXCRAN0001718

will provide notification to these agents of the date, time and place of such meeting.  CDC and Maxxam agree to ensure that the agents are available for and participates in such meeting.

For CDC:                              For Maxxam:
Adam M. Meek                         John McGahren
Katten Muchin Zavis Rosenman        Latham & Watkins LLP
525 West Monroe Street              One Newark Center
Chicago, Illinois 60661             Newark, NJ 07101
(312) 902-5391                      (973) 639-7194

16. Within seven (7) calendar days after the effective date of this Administrative Consent Order the Department will identify the individual who will be the Department's contact for all matters concerning this Administrative Consent Order. Unless the Department otherwise directs in writing, CDC and Maxxam agree to submit all payments and copies of all documents required by this Administrative Consent Order to the Department's contact.

17. CDC and Maxxam agree to notify, both verbally and in writing, the Department's contact person identified pursuant to Paragraph 16, above, at least fourteen (14) calendar days prior to the initiation of any field activities at the Site which are implemented pursuant to this Administrative Consent Order.

18. The Department will consider a written request for an extension of time to perform any requirement in this Administrative Consent Order, provided that CDC and Maxxam submit any extension request to the Department at least fourteen (14) calendar days prior to any applicable deadline to which the extension request refers.

VII.   Remediation Funding Source and Remediation Funding Source Surcharge

19. CAAM agrees to establish and maintain for the duration of this Administrative Consent Order a remediation funding source in an amount equal to the Department-approved estimate of the remediation costs related to compliance with this Administrative Consent Order, including all operation, maintenance and monitoring costs of all engineering and institutional controls, pursuant to N.J.A.C. 7:26E-8, used to remediate the Site, pursuant to N.J.A.C. 7:26C-7. CAAM agrees that the initial remediation funding source amount is $ 1,500,000.00. Should CAAM fail to establish the remediation funding source as required, upon notification from the Department, CDC and Maxxam shall establish a remediation funding source for the site as discussed above.

20. CAAM agrees to pay an annual remediation funding source surcharge if required to do so pursuant to N.J.A.C. 7:26C-7.8.  The Department agrees that no annual remediation funding source surcharge will be required as long as CAAM utilizes the Self-Guarantee as a funding source.

VIII.   Project Cost Review

4

MAXCRAN0001719

21. Beginning three hundred sixty-five (365) calendar days after the effective date of this Administrative Consent Order, and annually thereafter on the same calendar day, CAAM agrees to submit to the Department a detailed review of all remediation costs expended by the Respondents to comply with this Administrative Consent Order, including:

    a) A detailed summary of all monies spent to date pursuant to this Administrative Consent Order;

    b) The detailed estimated remediation costs required to comply with this Administrative Consent Order, including all operation, maintenance and monitoring costs; and

    c) The reason for any changes from the previously submitted cost review.

22. At any time after CAAM submits the first cost review pursuant to the preceding paragraph CAAM may request the Department's approval to reduce the amount of the remediation funding source to reflect the remaining remediation costs necessary to comply with obligations under this Administrative Consent Order. If the Department grants written approval to such a request, CAAM may amend the amount of the then existing remediation funding source consistent with that approval.

23. If the estimated costs of meeting CDC's and Maxxam's obligations in this Administrative Consent Order at any time increase to an amount greater than the remediation funding source, CAAM agrees to within forty-five (45) calendar days after receipt of written notice of the Department's determination, increase the amount of the then existing remediation funding source or provide an additional remediation funding source such that the total amount equals the Department's approved estimated cost.

24. If CDC and Maxxam implement a remedial action at the site that includes institutional and/or engineering controls pursuant to N.J.A.C. 7:26E-8, CAAM agrees to maintain a remediation funding source, pursuant to N.J.A.C. 7:26C-7, in an amount that is sufficient to pay for the operation, maintenance and monitoring of the engineering and institutional controls.

IX.    <u>Oversight Cost Reimbursement</u>

25. Within sixty (60) calendar days after receipt from the Department of a written summary of the Department's oversight costs, including all accrued interest incurred pursuant to paragraph 27, determined pursuant to N.J.A.C. 7:26C-9.3, CDC and Maxxam agree to submit to the Department a cashier's or certified check payable to the "Treasurer, State of New Jersey" and submitted with DEP Form 062A, for the full amount of the Department's oversight costs, for the period being charged.

26. CDC and Maxxam agree that its agreement here to pay the Department's oversight costs will continue after the Department's termination of this Administrative Consent Order as provided herein for those oversight costs that have accrued prior to that termination.

27. CDC and Maxxam also agree to pay interest on the unpaid balance of oversight costs, beginning at the end of the sixty (60) calendar day period established in the preceding paragraph,

MAXCRAN0001720

at the rate established by Rule 4:42 of the current edition of the Rules Governing the Courts of the State of New Jersey.

## Partial Settlement of CERCLA Liability

28. The Department alleges that CDC and Maxxam are covered persons as defined in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and that CDC and Maxxam are liable to the State of New Jersey under CERCLA Section 107(a) for response actions related to the investigation, remediation and Remedial Work described in this Administrative Consent Order. In consideration of CDC and Maxxam entering into this Administrative Consent Order and agreeing to be bound by its terms, the Department, on behalf of the State of New Jersey covenants not to sue CDC and Maxxam under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) with respect to response actions for the investigation, remediation and Remedial Work described in this Administrative Consent Order, provided, however, that the Department does not release CDC and Maxxam from any liabilities or obligations CDC and Maxxam may have pursuant to any other authority, nor does the Department waive any of its rights or remedies pursuant thereto. This covenant is conditioned upon CDC's and Maxxam's satisfactory performance of their obligations under this Administrative Consent Order.

29. The Department and CDC and Maxxam agree that this Administrative Consent Order and any settlement of liability included herein is made without any admission of liability for any purpose as to any matter arising out of the transactions or occurrences alleged in this Administrative Consent Order.

30. It is the intent of the Department, CDC and Maxxam that this Administrative Consent Order constitutes an administrative settlement within the meaning of CERCLA Section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B) and is intended to resolve the liability of CDC and Maxxam to the State of New Jersey for some or all of a response action as related to the investigation, remediation and Remedial Work described in this Administrative Consent Order at the Site. Any rights that CDC and Maxxam may have to obtain contribution or otherwise recover costs or damages from persons not party to this Administrative Consent Order are preserved, including, without limitation, the right to seek contribution from any person who is not party to this administrative settlement under CERCLA Section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B) based on this administrative settlement.

## Contribution Protection

31. It is the intent of the Department, CDC and Maxxam that this Administrative Consent Order constitutes an administrative settlement within the meaning of CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2) for the purpose of providing protection from contribution actions or claims under CERCLA as a result of releases of hazardous substances at the Site as described in this Administrative Consent Order and Scope of Work.

6

## Reservation of Rights

32. The Department reserves the right to unilaterally terminate this Administrative Consent Order in the event that the Department determines that CDC and Maxxam have violated the terms of this Administrative Consent Order. Before the Department unilaterally terminates this Administrative Consent Order, the Department will notify CDC and Maxxam in writing of the obligation(s) which they have not performed, and CDC and Maxxam shall have forty-five (45) calendar days after receipt of such notice to perform such obligation(s).

33. Nothing in this Administrative Consent Order precludes the Department from seeking civil or civil administrative penalties or any other legal or equitable relief against Respondents for violations of this Administrative Consent Order. In any such action brought by the Department under this Administrative Consent Order for injunctive relief, civil, or civil administrative penalties, Respondents may raise, among other defenses, a defense that Respondents failed to comply with a decision of the Department, made pursuant to this Administrative Consent Order, on the basis that the Department's decision was arbitrary, capricious or unreasonable. If the Respondents are successful in establishing such a defense based on the administrative record, Respondents shall not be liable for penalties for failure to comply with that particular requirement of the Administrative Consent Order. Although Respondents may raise such defenses in any action initiated by the Department for injunctive relief, Respondents hereby agree not to otherwise seek review of any decision made or to be made by the Department pursuant to this Administrative Consent Order and under no circumstances shall Respondents initiate any action or proceeding challenging any decision made or to be made by the Department pursuant to this Administrative Consent Order.

34. This Administrative Consent Order shall not be construed to affect or waive the claims of federal or State natural resources trustees against any person for damages or injury to, destruction of, or loss of natural resources, unless expressly provided herein, and then only to the extent expressly provided herein.

35. Except as otherwise stated in this Administrative Consent Order, nothing herein shall be construed as limiting any legal, equitable or administrative remedies which CDC and Maxxam may have under any applicable law or regulation. In any enforcement action the Department initiates pursuant to this Administrative Consent Order, Respondents reserve any defenses which the Spill Compensation and Control Act, *Matter of Kimber Petroleum Corp.*, 110 N.J. 69 (1988) or their amendments, supplements and progeny allow.

36. Except as otherwise set forth herein, by the execution of this Administrative Consent Order the Department does not release CDC and Maxxam from any liabilities or obligations CDC and Maxxam may have pursuant to any other authority, nor does the Department waive any of its rights or remedies pursuant thereto.

X.     Force Majeure

MAXCRAN0001722

37. If any event specified in the following paragraph occurs which CDC and Maxxam believe or should believe will or may cause delay in the compliance or cause non-compliance with any provision of this Administrative Consent Order, CDC and Maxxam agree to notify the Department in writing within ten (10) calendar days of the start of delay or knowledge of the anticipated delay, as appropriate, referencing this paragraph and describing the anticipated length of the delay, the precise cause or causes of the delay, any measure taken or to be taken to minimize the delay, and the time required to take any such measures to minimize the delay. CDC and Maxxam agree to take all necessary action to prevent or minimize any such delay.

38. The Department will extend in writing the time for performance for a period no longer than the delay resulting from such circumstances as determined by the Department only if:

a) CDC and Maxxam have complied with the notice requirements of the preceding paragraph;

b) Any delay or anticipated delay has been or will be caused by fire, flood, riot, strike or other circumstances beyond the control of CDC and Maxxam; and

c) CDC and Maxxam has taken all reasonably necessary action to prevent or minimize any such delay.

39. The burden of proving that any delay is caused by circumstances beyond the control of CDC and Maxxam and the length of any such delay attributable to those circumstances shall rest with CDC and Maxxam.

40. "Force Majeure" shall not include the following:

a) Delay in an interim requirement with respect to the attainment of subsequent requirements;

b) Increases in the cost or expenses incurred by CDC and Maxxam in fulfilling the requirements of this Administrative Consent Order;

c) Contractor's breach, unless CDC and Maxxam demonstrates that such breach falls within the above paragraphs; and

d) Failure to obtain access required to implement this Administrative Consent Order, unless denied by a court of competent jurisdiction.

## XI.    Penalties

41. CDC and Maxxam agree to pay penalties for its violations of this Administrative Consent Order and for its violations of a deed notice or declaration of environmental restriction that is part of a remedial action implemented pursuant to the order, according to the amounts and conditions in this section.

8

42. Respondents agree:

a) That each violation of any requirement, condition or deadline in this Administrative Consent Order constitutes an additional, separate, and distinct violation to which penalties apply;

b) That each day that a violation continues constitutes an additional, separate, and distinct violation to which penalties apply;

c) That CDC and Maxxam will pay interest, at the rate set forth in the New Jersey Court Rules, R. 4:42-11(a)i, on any unpaid penalty pursuant to this Administrative Consent Order commencing on the first day after it has agreed to pay a penalty pursuant to this Administrative Consent Order;

d) That nothing in this Administrative Consent Order shall prevent the simultaneous accrual of separate penalties for separate violations of this Administrative Consent Order;

e) That the payment of a penalty pursuant to this Administrative Consent Order does not alter CDC and Maxxam's responsibility to complete any requirement of this Administrative Order; and

f) To regard payments of penalties pursuant to this Administrative Consent Order as payments of civil or civil administrative penalties pursuant to the Spill Compensation And Control Act, N.J.S.A. 58:10-23.11 through - 23.14.

43. CDC and Maxxam agree to pay a penalty for all violations of this Administrative Consent Order beginning on the first calendar day following the day the noncompliance begins and continually thereafter until the final day of correction of the noncompliance, in the following amounts:

| Calendar Days After Due Date | Penalty |
| --- | --- |
| 1 – 7 days | $ 500 per calendar day |
| 8 – 14 days | $ 1,000 per calendar day |
| 15 days and over | $ 2,500 per calendar day |

44. The Department will provide the Respondents with written notice of each violation, including a description of the conditions of this Administrative Consent Order that CDC and Maxxam have violated, the date that CDC and Maxxam were to have completed each task, the duration of the violation, and the amount of the penalty that is due and owing pursuant to Paragraph 39, above.

45. CDC and Maxxam agree to pay each penalty required by this Administrative Consent Order by cashier's check or certified check payable to the "Treasurer, State of New Jersey," accompanied by DEP Form 062A and a letter referencing this Administrative Consent Order and

9

MAXCRAN0001724

the violations for which CLAM is submitting the payment within 30 calendar days after its receipt of a penalty payment demand from the Department pursuant to Paragraph 40, above.

46. Respondents agree that nothing herein shall limit the Department's ability, upon CDC and Maxxam's failure to pay a penalty pursuant to this Administrative Consent Order, to pursue civil or civil administrative penalties or take any other enforcement action for any violations of this Administrative Consent Order.

47. CDC and Maxxam agree to pay a penalty in the amount of the economic benefit (in dollars) which CDC and Maxxam have realized as a result of not complying, or by delaying compliance, with the requirements of this Administrative Consent Order, including the following:

a) The amount of savings realized from avoided capital or noncapital costs resulting from the violation;

b) The return earned or that may be earned on the amount of the avoided costs;

c) All benefits accruing to the violator as a result of a competitive market advantage enjoyed by reason of the violation; and

d) All other benefits resulting from the violation.

48. CDC and Maxxam agree that the Department will consider the following factors in determining a penalty for economic benefit:

a) The amount of capital investments required, and whether they are one-time or recurring;

b) The amount of one-time nondepreciable expenditures;

c) The amount of annual expenses;

d) The useful life of capital;

e) Applicable tax, inflation and discount rates;

f) The amount of low interest financing, the low interest rate, and the corporate debt rate; and

g) Any other factors relevant to economic benefit.

49. If the total economic benefit was derived from more than one violation, CDC and Maxxam agree that the Department may apportion the total economic benefit amount among the violations from which it was derived so as to increase each civil administrative penalty assessment to an amount no greater than $50,000 per violation.

MAXCRAN0001725

## XII.   Dispute Resolution

50. In the event a conflict arises between the Respondents and the Department, the Respondents may institute the Department's dispute resolution process at N.J.A.C. 7:26C-1.4.

## General Provisions

51. In addition to the Department's statutory and regulatory rights to enter and inspect, CDC and Maxxam agree to allow the Department and its authorized representatives access to all areas of the Site CDC and Maxxam have access to, at all times, for the purpose of monitoring the Respondents compliance with this Administrative Consent Order and/or to perform any remedial activities CDC and Maxxam fail to perform as required by this Administrative Consent Order. Provided that such access does not present a threat to public safety or the safety of Respondents' representatives and contractors at the Site. The respondents agree that their agreement here to provide the Department with access will continue after the Department's termination of this Administrative Consent Order pursuant to Paragraph 32, above. If the Department seeks access to the Site for itself and/or its authorized representatives, the Department agrees (I) to provide reasonable advance notice to the Respondents prior to entry on the Site, (ii) to observe all reasonable safety precautions regarding MEC and MC that Respondents may require while at the Site, and (iii) to allow the Respondent's representatives or contractors to accompany the Department at the Site, providing that the Respondent's representatives or contractors can be present at the Site without unreasonably delaying the Department's access to the Site.

52. CDC and Maxxam agree to not construe any informal advice, guidance, suggestions, or comments by the Department, or by persons acting on behalf of the Department, as relieving CDC and Maxxam of their obligations to obtain written approvals as required herein.

53. CDC and Maxxam agree to provide a copy of this Administrative Consent Order to each contractor and subcontractor retained to perform the work required by this Administrative Consent Order and agree to condition all contracts and subcontracts entered for the performance of such work upon compliance with the terms and conditions of this Administrative Consent Order. CDC and Maxxam agree to be responsible to the Department for ensuring that its contractors and subcontractors perform the work herein in accordance with this Administrative Consent Order.

54. Nothing in this Administrative Consent Order relieves CDC and Maxxam, as owner of the Site, from complying with all other applicable laws and regulations. Compliance with the terms of this Administrative Consent Order shall not excuse CDC and Maxxam from obtaining and complying with any applicable federal, state or local permits, statutes, regulations and/or orders while carrying out the obligations imposed by this Administrative Consent Order. This Administrative Consent Order shall not preclude the Department from requiring that CDC and Maxxam obtain and comply with any permits, and/or orders issued by the Department under the authority of the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq., the Solid Waste Management Act, N.J.S.A. 13:1 E-1 et seq., and the Spill Compensation and Control Ac N.J.S.A.

11

58:10:23.11 et seq., for the matters covered herein. The terms and conditions of any such permit shall not be preempted by the terms and conditions of this Administrative Consent Order if the terms and conditions of any such permit are more stringent than the terms and conditions of this Administrative Consent Order. Should any of the measures to be taken pursuant to this Administrative Consent Order during the remediation of any ground water and surface water pollution result in a new or modified discharge as defined in the New Jersey Pollutant Discharge Elimination System ("NJPDES") regulations, N.J.A.C. 7:14A-1 et seq., then CDC and Maxxam agree to obtain a NJPDES permit or permit modification from the Department prior to commencement of the activity.

55. All work plans, schedules, and other documents required by this Administrative Consent Order and approved in writing by the Department are incorporated herein and made a part hereof.

56. Upon the receipt of a written request from the Department, the Respondents agree to submit to the Department all data and information, including technical records and contractual documents, concerning contamination at the Site, including raw sampling and monitoring data, in the Respondents' possession or control, whether or not such data and information, including technical records and contractual documents, were developed pursuant to this Administrative Consent Order. The Respondents reserve their right to assert a privilege regarding such documents, but agree not to assert any confidentiality or privilege claim with respect to any data related to site conditions, sampling or monitoring.

57. CDC and Maxxam agree to comply with this Administrative Consent Order, which shall be fully enforceable as an Order in the New Jersey Superior Court pursuant to the Department's statutory authority.

58. No modification or waiver of this Administrative Consent Order shall be valid except by written amendment to this Administrative Consent Order duly executed by CDC and Maxxam and the Department. Any amendment to this Administrative Consent Order shall be executed by the Department and the Respondents. The Department reserves the right to require the resolution of any outstanding violations of the rules of this prior to executing any such amendment.

59. The Respondents waive their rights to an administrative hearing concerning the entry of this Administrative Consent Order.

60. This Administrative Consent Order shall be governed and interpreted under the laws of the State of New Jersey.

61. If any provision of this Administrative Consent Order or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Administrative Consent Order or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each provision of this Administrative Consent Order shall be valid and enforced to the fullest extent permitted by law.

12

MAXCRAN0001727

62. This Administrative Consent Order represents the entire integrated agreement between the Department and the Respondents concerning the site subject to this Administrative Consent Order and supersedes all prior negotiations, representations or agreements, either written or oral, unless otherwise specifically provided herein.

63. Within thirty (30) calendar days after the effective date of this Administrative Consent Order, CDC and Maxxam agree to record a copy of this Administrative Consent Order with the County Clerk, Middlesex County, State of New Jersey and agree to provide the Department with written verification of compliance with this paragraph which shall include a copy of this Administrative Consent Order stamped "Filed" by the County Clerk.

64. This Administrative Consent Order shall be binding, jointly and severally, on each party, its successors, assignees and any trustee in bankruptcy or receiver appointed pursuant to a proceeding in law or equity. No change in the ownership or corporate status of any party or of the Site shall alter any party's responsibilities under this Administrative Consent Order.

65. The Respondents agree to preserve, during the pendency of this Administrative Consent Order and for a minimum of ten (10) years after its termination, all data and information, including technical records, potential evidentiary documentation and contractual documents, in its possession or in the possession of Respondents' divisions, employees, agents, accountants, contractors, or attorneys that relate in any way to the contamination at the site, despite any document retention policy to the contrary. After this ten year period, CDC and Maxxam may make a written request to the Department to discard any such documents. Such a request shall be accompanied by a description of the documents involved, including the name of each document, date, name and title of the sender and receiver and a statement of contents. Upon receipt of written approval by the Department, CDC and Maxxam may discard only those documents that the Department does not require to be preserved for a longer period. Upon receipt of a written request by the Department, CDC and Maxxam agree to submit to the Department all data and information, including technical records and contractual documents or copies of the same. CDC and Maxxam reserve whatever rights they may have, if any, to assert any privilege regarding such data or information, however, CDC and Maxxam agree not to assert any privilege or confidentiality claims with respect to any date related to site conditions, sampling, or monitoring.

66. CDC and Maxxam agree to provide to the Department written notice of the dissolution of their corporate or partnership identity, the liquidation of the majority of their assets or the closure, termination or transfer of operations in accordance with the schedule set forth at N.J.A.C. 7:26B-3.2 prior to such action. Upon such notice, CDC and Maxxam agree to submit a cost review pursuant to this Administrative Consent Order to the Department. CDC and Maxxam agree to also provide written notice to the Department of a filing of a petition for bankruptcy no later than the first business day after such filing. These requirements shall be in addition to any other statutory requirements arising from the dissolution of corporate or partnership identity, the liquidation of the majority of assets, or the closure, termination or transfer of operations. Upon receipt of notice of dissolution of corporate identity, liquidation of assets or filing of a petition for bankruptcy, the Department may request and, within fourteen (14) calendar days of the Department's written request, the Respondents agree to obtain and submit to the Department additional remediation funding source pursuant to this Administrative Consent Order.

13

67. If CDC and Maxxam implement a remedial action at the Site that includes institutional and/or engineering controls pursuant to N.J.A.C. 7:26E-8, this Administrative Consent Order shall remain in full force and effect including the requirements to maintain a remediation funding source, and to pay an annual 1% surcharge of the total amount of the remediation funding source. This Administrative Consent Order shall otherwise be terminated pursuant to paragraph 68 below.

68. If CDC and Maxxam remediate contaminated soil at the Site to the Department's unrestricted use soil standard and any other contaminated media to the applicable remediation standard, the requirements of this Administrative Consent Order shall be deemed satisfied upon the receipt by CDC and Maxxam of written notice from the Department stating that CDC and Maxxam have completed the remediation required by this Administrative Consent Order in accordance with N.J.A.C. 7:26E and have satisfied all financial obligations imposed by this Administrative Consent Order and therefore CDC and Maxxam do not need to continue to maintain a remediation funding source nor pay the annual 1 % surcharge, and that no further action is necessary at the Site. The written notice shall also state that the Administrative Consent Order is thereby terminated. Such written notice shall not relieve CDC and Maxxam from the obligation to conduct future investigation or remediation activities pursuant to Federal, State or local laws for matters not addressed by this Administrative Consent Order.

69. The Respondents may assert a claim of confidentiality for any information submitted by CDC and Maxxam pursuant to this Administrative Consent Order, by following the Department's procedures in N.J.A.C. 7:26B-7.

70. The Respondents agree to submit to the Department, along with two original copies of the Administrative Consent Order, signed by the Respondents, documentary evidence, such as a corporate resolution or a certification by a corporate officer, that the signatory has the authority to bind the Respondents to the terms of this Administrative Consent Order, and proof that the remediation funding source has been established pursuant to N.J.A.C. 7:26C-7.7.

71. This Administrative Consent Order shall be effective upon the execution of this Administrative Consent Order by the Department and the Respondents.


NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION


Date: 2/3/05            BY: _____

                            Ronald T. Corcory, Assistant Director
                            Oversight Resources Allocation Element


14

CRANBURY DEVELOPMENT CORPORATION

Date_____        BY: _____
                              Signature

                         _____
                         Print Full Name Signed Above

                         _____
                         Title


CREDIT AGRICOLE ASSET MANAGEMENT (CAAM)
(as guarantor for CLAM Finance)

Date_____        BY: _____
                              Signature

                         _____
                         Print Full Name Signed Above

                         _____
                         Title


                         MAXXAM Group, Inc.

Date 28 January, 2005    BY: _____
                              Signature

                         J. Kent Friedman
                         Print Full Name Signed Above

                         _____
                         Title

15

MAXCRAN0001730

as a corporate resolution or a certification by a corporate officer, that the signatory has the authority to bind the Respondents to the terms of this Administrative Consent Order, and proof that the remediation funding source has been established pursuant to N.J.A.C. 7:26C-7.7.

71. This Administrative Consent Order shall be effective upon the execution of this Administrative Consent Order by the Department and the Respondents.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION

Date: 8/2/05          BY: _____
                          Ronald T. Corcory, Assistant Director
                          Oversight Resources Allocation Element

CRANBURY DEVELOPMENT CORPORATION

Date 01/27/2005       BY: _____
                          Signature

                          Alan KUENTZ
                          _____
                          Print Full Name Signed Above

                          President
                          _____
                          Title

CREDIT AGRICOLE ASSET MANAGEMENT (CAAM)
(as guarantor for CLAM Finance)

Date 24/01/2005       BY: _____
                          Signature

                          Thisy COSTE
                          _____
                          Print Full Name Signed Above

                          chairman / Co
                          _____
                          Title

14

MAXCRAN0001731

## Scope of Work

### MEC/MC and other Chemical Constituents
### Inspections and Related Services
### Former Unexcelled Chemical Corporation Property
### Cranbury Township, New Jersey

### I.  Introduction/Background

This document describes the scope of work (SOW) regarding the Munitions and Explosives of Concern (MEC) and Munitions Constituents (MC), as well as Chemical Constituents (CC) not related to MEC/MC, associated with the former Unexcelled Chemical Corporation (UCC) property in Cranbury Township, New Jersey (Site).

### II.  Results of Prior Investigations

Based on the July 2003 Conceptual Site Model Development (CSMD) Report prepared for the New Jersey Department of Environmental Protection (NJDEP) by URS, 14 areas of concern (AOCs) were identified as containing or potentially containing MEC/MC. AOC-1 (Burning Ground) and AOC-2 (Explosion Site) were partially addressed during a July-August field effort to remove confirmed MEC from the ground surface. Four additional source areas have been identified as possibly containing CC and will be addressed in this SOW.

### III.  Scope of Work

- To facilitate the investigation and characterization of the source areas, for purposes of this SOW the Site has been delineated into three main areas, A, B, and C, each of which will be investigated using a different approach appropriate for the suspected conditions in that area.

  o  Area A comprises approximately 147 acres in the northern portion of the Site.[1] This area is heavily wooded and has been so throughout the time period that aerial photos exist (including the years of operation by UCC). Within the wooded area there were cleared areas (some of which still exist) that were associated with farming activity. Based on historical record reviews that include the aerial photographs, there is no reason to believe that MEC contamination exists in Area A. Relying on historical information to logically exclude an area is the same process currently being employed throughout the DoD to address potential Military Munitions Response sites. However, as discussed below, URS has proposed a limited investigation in Area A as a precautionary measure.

  o  Area B comprises approximately 40 acres in the eastern portion of the Site, and consists of 144 (100 ft x 100 ft) grids that were surface cleared of MEC July - August 2004. Area B was used by UCC for incineration and possibly burial of MEC materials (Burning Ground) and also includes the location of AOC-2 (Explosion Site) where an accidental explosion occurred in July, 1954. Near surface MEC contamination is known to be present throughout Area B, as determined by limited intrusive investigation conducted by URS. One landfill and 3 burial areas[2] have been identified within the boundaries of Area B. At least one

significant contiguous anomaly is associated with the landfill. The other three burial areas were identified during the CSMD investigation utilizing an EM-61 magnetometer. Three areas have been identified in Area B that were used as disposal areas for what appears to be small insect repellant bottles. One additional potential source area in Area B contains a number of 55-gallon drums, with unknown contents, protruding from the ground surface.

o  Area C comprises approximately 207 acres in the southern portion of the Site. This area was used by UCC for plant operations including manufacture and storage and contains the demolished remains of the plant buildings (rubble) as well as roadways and assumed underground utilities. Area C also contains 7 horseshoe mounds and one burial area. A horseshoe mound is an above ground bermed area in the approximate shape of a horseshoe. It is assumed that the berms initially were used to separate explosives while in storage (i.e., to provide fragmentation barrier). However, after the July 1954 explosion these berms were backfilled with debris and covered with additional dirt. As part of the CSMD, each of the berms was surveyed by URS using an EM-61 and contiguous anomalies were identified for each. The EM-61 also identified a contiguous anomaly at the burial area. In addition, URS has recently identified two buildings in Area C formerly used to manufacture napalm bombs.

• The following services will be performed regarding the MEC/MC/CC issues at the Site:

o  Evaluation of Site Investigation Reports

   ▪ The respondents will conduct an evaluation of existing site reports to identify overlap of CC sources with sources targeted under this investigation, as well as to identify known CC.

   ▪ This evaluation will also serve to identify source areas that have been addressed by previous contractors.

o  Area A

   ▪ The Respondents will conduct a visual inspection to search for potential burial areas at clearings (both current and historical clearings identified in aerial photographs), roads, and structures, as well as a 50 ft buffer area where Area A borders Area C.

   ▪ The clearings will be located and a surveyor will set inspection grids covering all areas to be inspected. The grids will be visually inspected for disturbed surfaces indicative of a burial area.

   ▪ If potential burial areas are located, the areas will be surveyed using an EM-61 to determine the presence of metal.

   ▪ If anomalies are present, Phase I sampling will be conducted (discussed below under MC/CC Characterization and Evaluation).

2

- Should analysis indicate that MC/CC are not present, limited test excavations will be conducted to determine the contents of the burial areas.

- Should analysis indicate the presence of MC, Phase II sampling, further investigation for MEC and subsequent removal (if sources are identified) will be conducted. Should analysis indicate the presence of CC, Phase II sampling and evaluation will be conducted. Remediation of CC will be addressed after the evaluation has been completed.

o Area B

- To address the known burial areas and landfill within Area B, a safety buffer zone of an appropriate width will be established around each of the source areas and a MEC removal to one foot below ground surface (bgs) will be completed in the safety buffer zone. This clearance will allow for subsurface sampling to proceed while employing only anomaly avoidance techniques. Following the subsurface clearance, Phase I sampling will be conducted. Should analysis indicate the presence of MC, Phase II sampling, further investigation for MEC and subsequent removal (if sources are identified) will be conducted. Should analysis indicate the presence of CC, Phase II sampling and evaluation will be conducted. Remediation of CC will be addressed after the evaluation has been completed.

- The Respondents will complete a subsurface MEC removal throughout Area B as soon as weather and ground conditions permit. The subsurface removal will be conducted to depth in the immediate vicinity of the Burning Ground, Explosion Site, or any burial areas found to contain MEC, and to a depth of one ft below ground surface in the remainder of Area B.

o Area C

- To address the known source areas within Area C, Phase I sampling will be conducted.

  - Should analysis indicate that MC/CC are not present, limited test excavations will be employed to determine the contents of the burial areas.

  - Should analysis indicate the presence of MC, Phase II sampling, further investigation for MEC, and subsequent removal (if sources are identified) will be conducted. Should analysis indicate the presence of CC, Phase II sampling and evaluation will be conducted. Remediation of CC will be addressed after the evaluation has been completed.

- Information concerning the facility's manufacturing processes is still being gathered. Two buildings in Area C have been identified as being involved in the manufacturing of AN/M-69 napalm bombs. To address these former building sites, Phase I sampling will be conducted.

3

MAXCRAN0001734

o   MC/CC Characterization and Evaluation

- MC characterization and evaluation will be conducted pursuant to N.J.A.C. 7:26B (Technical Requirements for Site Remediation). It is anticipated that two phases of the MC/CC characterization investigation will be performed to focus the characterization effort.

- MC/CC Characterization

  - Phase I of the MC/CC characterization investigation will involve surface and subsurface soil sampling and sediment, surface water, and groundwater sampling at known and potential source areas in Areas A, B, and C, with the objective of identifying contaminants of potential concern (COPCs).

  - Phase II of the MC/CC characterization investigation will involve more comprehensive soil sampling and will only be performed if COPCs are identified. The objective of the Phase II investigation is to collect additional data to evaluate potential impacts of MC/CC in soil, sediment, surface water and groundwater.

- MC/CC Evaluation

  - The results of the MC/CC Phase I sampling and analysis will be evaluated based upon NJDEP non-residential land use criteria. For evaluating potential impacts to soils, the evaluation will consist of comparing analytical data from surface and subsurface soil to NJDEP Soil Cleanup Criteria. For evaluating potential impacts to groundwater, the evaluation will consist of comparing analytical data from groundwater to New Jersey groundwater Maximum Concentration Levels (MCLs). The evaluation will be used to reduce or eliminate areas of potential concern and may be used to eliminate chemicals from further evaluation.

o   Work Plans and Implementation of Work

  The Respondents will prepare the required work plans for performing the MEC/MC and CC investigation and the MEC clearance work discussed above and will submit the work plans to the NJDEP for review and approval.

- Separately or in conjunction with submittal of the work plans, the Respondents will also obtain the necessary permits and approvals for conducting the proposed work at the property.

- After obtaining the necessary permits and approvals, the Respondents will conduct the visual inspection in Area A, the MC/MEC and CC investigations in Areas A (if required), B, and C, and, when weather permits, the subsurface MEC removal in Area B.

- After completing the work elements listed above, a report will be prepared summarizing techniques used, findings, conclusions, and recommendations.

4

MAXCRAN0001735

1    Total area of the Site is approximately 394 acres.
2    A single burial area is defined as comprising one or more contiguous anomalies.

5

MAXCRAN0001736

# EXHIBIT 8

**OPERATING AGREEMENT**

**OF**

**CRANBURY BRICK YARD LLC**

**a Delaware Limited Liability Company**

**Effective as April 27, 2005**

CBY_0158238

# OPERATING AGREEMENT
## OF
## CRANBURY BRICK YARD LLC

THIS OPERATING AGREEMENT of CRANBURY BRICK YARD LLC, a Delaware limited liability company, is made and entered into effective as of April 27, 2005, by and between CBY Holdings LLC as the sole Manager of the Company and CBY Holdings LLC as the sole Member of the Company.

## RECITALS

WHEREAS, the Certificate of Formation for the Company were filed with the Secretary of State of the State of Delaware on April 27, 2005; and

WHEREAS, the Company was formed to transact any legal and lawful business for which limited liability companies may be organized pursuant to the Act; and

WHEREAS, the Manager and Member desire to enter into this Agreement to establish operating provisions for the Company and to establish the rights and limitations associated with the Member's membership interest in the Company.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Definitions.  The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

1.1    Act. "Act" shall mean the Delaware Limited Liability Company Act, 6 Del.C. sections 18-101 et seq., (2004) as amended.

1.2    Agreement.  "Agreement" shall mean this Operating Agreement of the Company, as originally executed and as amended from time to time.

1.3    Certificate of Formation. "Certificate of Formation" shall mean the Certificate of Formation of the Company, as filed and effective on April 27, 2005, with the Secretary of State of the State of Delaware as originally filed and as amended from time to time.

1.4    Company.  "Company" shall mean CRANBURY BRICK YARD LLC, a Delaware limited liability company.

1.5    Manager.  "Manager" shall mean the manager of the Company. Specifically, "Manager" shall mean CBY Holdings LLC and any duly elected or designated successor.

1

1.6    <u>Member</u>. "Member" shall mean the CBY Holdings LLC.

1.7    <u>Person</u>. "Person" shall mean any individual or entity, and the devisees, heirs, executors, administrators, legal representatives, successors, and assigns of such Person where the context so permits.

2.    <u>Formation of Company</u>.

2.1    <u>Formation</u>. The Company is organized pursuant to the Act and the Certificate of Formation.

2.2    <u>Name</u>. The name of the Company is CRANBURY BRICK YARD LLC.

2.3    <u>Principal Office</u>. The principal office of the Company initially shall be at 1745 Shea Center Drive, Suite 190, Highlands Ranch, CO 80129, but the Manager, in its, his or her sole discretion, may keep and maintain offices of the Company wherever the business of the Company may require.

2.4    <u>Registered Agent and Office</u>. The Company shall continuously maintain in the State of Delaware a registered office and a registered agent whose business office is identical with the registered office. The initial registered office and the initial registered agent are specified in the original Certificate of Formation. The Company may change its registered office, its registered agent, or both, upon filing a statement as specified by law in the office of the Secretary of State of the State of Delaware.

2.5    <u>Duration</u>. The Company shall commence upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware and shall continue until the Company is dissolved in accordance with either the provisions of this Agreement or the Act. An amendment to this Agreement, signed by Members who purport to be a majority of the Members of the Company at any time, shall be conclusive and no person or entity need inquire as to their authority to act.

2.6    <u>Powers</u>. The Company shall have all of the powers of a limited liability company as set forth in the Act.

3.    <u>Membership Provisions</u>.

3.1    <u>Sole Member</u>. CBY Holdings LLC is the sole Member of the Company and has contributed property to the Company to form the Company, which property is identified in the books and records of the Company. The Member may contribute additional property to the Company as the Member and the Manager may agree.

3.2    <u>Admission of New Members</u>. A Person may be admitted as a new member only with the approval of the Member. A new member shall be required to consent in writing to the provisions of this Agreement, as modified to reflect the admission of the new member.

2

      3.3    <u>Limited Liability of Member</u>.  As provided in the Act, the Member shall not be obligated personally under a judgment, decree, or order of court, or in any other manner, for a debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise, solely by reason of being the Member of the Company.

      3.4    <u>Meetings of Member</u>.  Meetings of the Member may be held at such place, either within or without the State of Delaware, as may be determined by the Member.

      3.5    <u>Action of Member without a Meeting</u>.  Action required or permitted to be taken at a Member meeting may be taken without a meeting if the action is evidenced by written consent describing the action taken, signed by the Member.  Action so taken shall be effective as the date of the signature of the Member thereon unless the consent specifies a different effective date in which case the action shall be effective as of the different effective date.

    4.    <u>Tax Treatment</u>.

    For U.S. federal and all applicable state tax income purposes and pursuant to the regulations under Section 7701 of the Internal Revenue Code of 1986, as amended, the Company shall be a disregarded entity, such that the income, gain, loss or deduction of the Company shall be realized directly by the Member.

    5.    <u>Distributions from Operations</u>.

      5.1    <u>Distribution Policy</u>.  Subject to the limitations set forth in Section 5.2, the Manager may, from time to time, cause the Company to make distributions to the Member in amounts that the Manager, in its, his or her sole discretion, determines to be appropriate.

      5.2    <u>Limits of Distributions</u>.  As provided in the Act, the Company shall not make distributions to the Member to the extent that, after giving effect to the distribution, all of the liabilities of the Company, other than liabilities to the Member on account of its ownership of the Company and liabilities for which the recourse of creditors is limited to specific property of the Company, would exceed the fair value of the assets of the Company; <u>provided</u>, <u>however</u>, that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the Company only to the extent that the fair value of that property exceeds that liability.

    6.    <u>Rights and Duties of Manager</u>.

      6.1    <u>Management</u>.  The business and affairs of the Company shall be managed by its Manager.  The Manager shall direct, manage and control the business of the Company to the best of its, his or her ability.  The Manager shall have full and complete authority, power, and discretion to manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The Manager may appoint one or more officers of the Company to serve at the Manager's direction and may delegate to such officers any of the powers of

3

the Manager set forth in this Section 6. Officers shall serve until their successors are duly appointed. Each of said offices may be held by any natural person eighteen (18) years of age or older. The same individual may simultaneously hold more than one office in the Company. An officer may resign at any time by giving written notice of resignation to the Company. A resignation of an officer is effective when the notice is received by the Company, unless the notice specifies a later effective date. The Manager may remove any officer, at any time, with or without cause.

6.2     <u>Number, Tenure and Qualifications</u>. The Company shall initially have one Manager, who shall be CBY Holdings LLC. The Manager shall hold office until its, his or her resignation or removal under this Agreement. Any new manager shall be elected by the affirmative written vote of the Member. The Manager need not be a Member of the Company.

6.3     <u>Certain Powers of Manager</u>. Without limiting the generality of Section 6.1, the Manager shall have power and authority, on behalf of the Company:

6.3.1     To receive, buy, sell, exchange, trade, and otherwise deal in real property, personal property, securities, and other property of the Company with any Person as the Manager may determine. The fact that the Manager or the Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

6.3.2     To borrow money for the Company from banks, other lending institutions, the Member, or other Person on such terms as the Manager determines appropriate, and in connection therewith, to hypothecate, encumber, and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

6.3.3     To purchase liability and other insurance to protect the Company's property and business;

6.3.4     To hold and own any Company real or personal property in the name of the Company;

6.3.5     To invest any Company funds temporarily (by way of example, but not limitation) in time deposits, short-term governmental obligations, commercial paper, or other investments;

6.3.6     To sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan so long as such disposition is not in violation of or a cause of a default under any agreement to which the Company may be bound;

6.3.7     To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Manager, to the business of the Company;

4

6.3.8    To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

6.3.9    To be reimbursed for expenses actually incurred for the benefit of the Company;

6.3.10    To enter into any and all other agreements on behalf of the Company, with any other person for any purpose, in such forms as the Manager may approve;

6.3.11    To file and to revoke such elections as are authorized by the Internal Revenue Code of 1986, as amended; and

6.3.12    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

6.4    <u>Liability for Certain Acts</u>.  The Manager shall perform its, his or her duties as Manager in good faith, in a manner it, he or she reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager that so performs the duties as Manager shall not have any liability by reason of being or having been a Manager of the Company.  The Manager does not, in any way, guarantee the return of the Member's capital contributions or a profit for the Member from the operations of the Company.  The Manager shall not be liable to the Company or to the Member for any loss or damage sustained by the Company or the Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

6.5    <u>Manager and Member Have No Exclusive Duty to Company</u>.  The Manager shall not be required to manage the Company as its, his or her sole and exclusive function and the Manager and the Member may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor the Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or of the Member or to the income or proceeds derived therefrom.  Other than for activities specifically prohibited herein, neither the Manager nor the Member shall incur liability to the Company or to the Member as a result of engaging in any other business or venture.

6.6    <u>Resignation</u>.  Any Manager of the Company may resign at any time by giving written notice to the Member.  The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

6.7    <u>Removal</u>.  At a meeting called expressly for that purpose, a Manager may be removed at any time, with or without cause, by the affirmative vote of the Member. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5

CBY_0158243

6.8     Vacancies.    Any vacancy occurring for any reason shall be filled by the affirmative written vote of the Member. A Manager elected to fill a vacancy shall be elected for the unexpired period from such election until the next annual meeting of Members and shall hold office until the next annual meeting of Members and until its, his or her successor shall be elected and shall qualify or until its, his or her earlier death, resignation or removal.

6.9     Compensation.    The compensation of the Manager shall be fixed by the affirmative written vote of Member.   No Manager shall be prevented from receiving such compensation by reason of the fact that he, she or it is also a Member of the Company.

7.     Indemnification.

7.1     Indemnity of the Manager, Employees and Other Agents.    To the maximum extent permitted by law, the Company shall indemnify the Manager and make advances for expenses to the maximum extent permitted by law and the Company shall indemnify its employees, officers and other agents who are not Managers to the fullest extent permitted by law, provided that such indemnification in any given situation is approved by the Member; and provided further that the liability in any given situation does not arise from an act or omission which constitutes: (1) a breach of fiduciary duty owed to the Company or to the Member, (2) an intentional tort, or (3) intentional criminal acts.  This indemnification shall include the payment by the Company of the Manager's, employee's, officer's or agent's reasonable attorneys fees, costs and other expenses necessary to defend any legal claims or proceedings related to the indemnified liability or alleged liability.  The Company may advance to any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he, she or it is or was a Manager, employee, officer or other agent of the Company, or is or was serving at the request of the Company as a manager of another company or director of another corporation, partnership, joint venture, trust or other enterprise, prior to the final disposition of the proceeding, promptly following request therefore, all expenses incurred by any Manager, employee, officer or other agent in connection with such proceeding upon receipt of an undertaking by or on behalf of such Person to repay said amounts if it should be determined ultimately that such Person is not entitled to be indemnified hereunder or otherwise.  Without the necessity of entering into an express contract, all rights to indemnification and advances hereunder shall be deemed to be contractual rights and be effective to the same extent and as if provided for in a contract between the Company and the Manager, employee, officer or other agent.  Any right to indemnification or advances granted hereunder shall be enforceable by or on behalf of the Person holding such right in any court of competent jurisdiction if (i) the claim for indemnification or advances is denied, in whole or in part, or (ii) no disposition of such claim is made within ninety (90) days of request therefore, the claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting his, her or its claim.  The failure of the Company (including its Manager, independent legal counsel or its Member) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he, she or it has met the applicable standard of conduct set forth in the Act or any other applicable law shall not be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct.  In any suit brought by any Manager, employee, officer or other agent to enforce a right to

6

CBY_0158244

indemnification or to an advancement of expenses hereunder, the burden of proving that the such Manager, employee, officer or other agent is not entitled to be indemnified, or to such advancement of expenses, hereunder or otherwise shall be on the Company. The rights conferred on any Person hereunder shall not be exclusive of any other right which such Person may have or hereafter acquire under any applicable statute, agreement, vote of the Member or otherwise, both as to action in his, her or its official capacity and as to action in another capacity while holding office. The Company is specifically authorized to enter into individual contracts with any or all of its Manager, officers, employees, or agents respecting indemnification and advances, to the fullest extent not prohibited by the Act or any other applicable law. The rights conferred on any Person under this Section 7 shall continue as to a Person who has ceased to be a Manager, employee, officer or other agent and shall inure to the benefit of the heirs, executors, administrators, legal representatives, successors, and assigns of such a Person. To the fullest extent permitted by the Act or any other applicable law, the Company, upon approval by the Manager, may purchase insurance on behalf of any Person required or permitted to be indemnified pursuant to this Section 7. Any repeal or modification of this Agreement shall only be prospective and shall not affect the rights under this Agreement in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any proceeding against any Manager, employee, officer or agent of the Company. If this Section 7 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify each Manager, employee, officer or other agent to the full extent not prohibited by any applicable portion of this Agreement that shall not have been invalidated, or by any other applicable law. If this Section 7 shall be invalid due to the application of the indemnification provisions of another jurisdiction, then the Company shall indemnify each Manager, employee, officer or other agent to the full extent under applicable law.

       7.2    <u>Certain Definitions</u>.  For the purposes of this Section 7, the following definitions shall apply:

       7.2.1    The term "proceeding" shall be broadly construed and shall include, without limitation, the investigation, preparation, prosecution, defense, settlement, arbitration and appeal of, and the giving of testimony in, any threatened, pending or complete action, suit or proceeding, whether civil, criminal, administrative or investigative. The term "expenses" shall be broadly construed and shall include, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any proceeding.

       7.2.2    The term the "Company" shall include, in addition to the resulting company, any constituent company (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its managers, employees, officers, directors or agents, so that any Person who is or was a manager, employee, officer, director or agent of such constituent company, or is or was serving at the request of such constituent company as a manager, employee, officer, director or agent of another company, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Agreement with respect to the resulting or surviving company as he, she or it would have with respect to such constituent company if its separate existence had continued.

7

CBY_0158245

7.2.3    References to a "director," "manager," "officer," "employee," or "agent" of the Company shall include, without limitation, situations where such Person is serving at the request of the Company as, respectively, a director, manager, officer, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise.

8.    <u>Administration</u>.

8.1    <u>Books and Records</u>.  The Company shall keep or cause to be kept (a) true and complete information regarding the status of the business and financial condition of the Company; (b) copies of this Agreement and the Certificate of Formation of the Company, and all amendments thereto; and (c) any other information regarding the affairs of the Company as is reasonable.

8.2    <u>Bank Accounts</u>.  The Manager shall arrange for the Company to maintain bank accounts in such banks or institutions as the Member from time to time shall select, and such accounts shall be drawn upon by checks signed by such person or persons, and in such manner, as may be designated by the Manager, subject to any restrictions or conditions established by the Manager.  All monies of the Company shall be deposited in the bank account or accounts of the Company and shall not be commingled with monies of the Member.

9.    <u>Dissolution and Liquidation</u>.

9.1    <u>Events of Dissolution and Liquidation</u>.  The Company shall be dissolved and its affairs wound up pursuant to this Agreement upon the first to occur of the following events ("Events of Dissolution"):

> 9.1.1    The written consent of the Member to dissolution; or
>
> 9.1.2    Upon the occurrence of an event that would cause the Company to dissolve as described in the Certificate of Formation, as amended, or this Agreement, or, to the extent not covered by The Certificate of Formation, or this Agreement, or the Act, unless within ninety (90) days following the occurrence of the dissolving event, the Member votes to continue the business of the Company. If continuance of the Company is approved by or on behalf of the Member, the Company shall continue to exist without any further or additional documentation to effect such action, and the Member shall continue as such in the Company without any change in its respective rights and obligations.

No other event shall constitute an Event of Dissolution.

9.2    <u>Effect of Event of Dissolution</u>.  Upon the occurrence of an Event of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until a certificate of cancellation has been filed with the Delaware Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

CBY_0158246

9.3    Winding-Up. Upon the occurrence of an Event of Dissolution, the Company's affairs shall be wound up by the Member or by such other person or persons required by law to wind up the Company's affairs in accordance with the procedures set forth in this Section 9.

9.4    Provisions for Contingencies. The Company shall make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured claims and obligations, known to the Company and all claims and obligations which are known to the Company, but for which the identify of the claimant is unknown. If there are sufficient assets, such claims and obligations shall be paid in full and any such provisions for payment made shall be made in full. If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available. Any liquidating trustee (including the Member acting as a liquidating trustee) winding up the Company's affairs who has complied with this Agreement shall not be personally liable to the claimants of the dissolved Company by reason of such person's actions in winding up the Company.

9.5    Termination. Upon completion of the winding up, liquidation, and distribution of the assets, the Manager or other appropriate representative shall file or cause to be filed in the office of, and on a form prescribed by, the Delaware Secretary of State a certificate of cancellation of the certificate of formation of the Company.

10.    Miscellaneous.

10.1    Gender and Number. Each pronoun used in this Agreement shall include any gender or plural or singular form thereof as the situation requires.

10.2    Benefits and Obligations. All provisions of this Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the parties hereto, and their permitted successors, transferees, and assigns.

10.3    Counterparts. This Agreement may be executed in several counterparts, each of which when so executed shall be considered as an original and all of which together shall constitute one agreement.

10.4    Captions. The captions at the beginning of each paragraph of this Agreement are not a part of this Agreement but merely labels to assist in the locating and reading of those sections and shall be ignored in construing this Agreement.

10.5    Further Performance. The Member and the Company covenant and agree to execute any further instruments and documents and perform acts which are or may become necessary to carry out the purposes of this Agreement.

10.6    Governing Law. This Agreement shall be governed by the internal laws (and not the conflicts of laws rules) of the State of Delaware.

9

CBY_0158247

10.7   <u>Notices</u>.  Any notice which may be given in connection with the business of the Company or which is provided for in this Agreement shall be given in writing and may be delivered personally, by facsimile transmission, or by mail.

10.8   <u>Amendment and Waiver</u>.  No change, modification, waiver or amendment to this Agreement shall be valid unless the same is in writing and signed by the Member.

10.9   <u>Severability</u>.  Each provision of this Agreement shall be considered severable and if for any reason any provision of this Agreement is determined to be invalid, such invalidity shall not impair the operation or affect other provisions of the Agreement and the parties further agree that if a court of competent jurisdiction shall declare any provision of this Agreement to be invalid or unenforceable, the parties shall in good faith renegotiate such provision to carry out the intent of the parties at the time of the signing of this Agreement.

CBY_0158248

IN WITNESS WHEREOF, the Manager and Member of the Company hereto have executed this Agreement effective as of the date first written above.

**MANAGER:**

CBY HOLDINGS LLC

By: _____

Name: __JEFFREY J. FLEISCHMAN__

Title: __PRESIDENT__

**MEMBER:**

CBY HOLDINGS LLC

By: _____

Name: __JEFFREY J. FLEISCHMAN__

Title: __PRESIDENT__

11

05217.001/216896.2

CBY_0158249

EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

Case Number 3:15-cv-2789
Hon. Peter G. Sheridan
Mag. Lois G. Goodman

_____

30(b)(6) DEPOSITION OF:
WILLIAM P. LYNOTT - September 14, 2016
CRANBURY BRICK YARD, LLC

_____

CRANBURY BRICK YARD, LLC,

Plaintiff and Counter-Defendant,

v.

UNITED STATES OF AMERICA, et al.,

Defendant and Counter-Plaintiff.

_____

        PURSUANT TO NOTICE, the 30(b)(6)deposition
of WILLIAM P. LYNOTT, CRANBURY BRICK YARD, LLC, was
taken on behalf of the Defendant and Counter-Plaintiff
at 999 18th Street, South Terrace, Suite 370, Denver,
Colorado 80202 on September 14, 2016, at 8:56 a.m.,
before Theresa A. Coffman Davis, Federal Certified
Realtime Reporter, Registered Merit Reporter, and
Notary Public within Colorado.

WILLIAM P. LYNOTT  9/14/2016
Cranbury Brick Yard, LLC v. United States of America, et al.

1          A.    Commencing about 2004 when we were in

2     pursuit of the property and then through about 2007.

3          Q.    And have you been involved in the

4     day-to-day operations of CBY Holdings as the

5     development service provider starting in 2004 through

6     today?

7               MS. FEINGOLD:  Objection, asked and

8     answered.  You can answer again.

9               MS. TALBERT:  This is with respect to CBY

10    Holdings.

11         A.    Yes.  I've been involved during that time

12    frame.

13         Q.    (BY MS. TALBERT)  Do you understand

14    Viridian Partners, LLC, and Viridian Land Investment

15    Partners, LLC, to be the same entity?

16         A.    Could you repeat that one?

17         Q.    Do you understand Viridian Partners, LLC,

18    and Viridian Land Investment Partners, LLC, to be the

19    same entity?

20         A.    I think they're interchangeable.

21         Q.    How long have you been an employee of

22    Viridian Partners, LLC?

23         A.    I'm the founder.  Not to digress too much,

24    but the company was originally called the Lynott Group

25    and became Viridian Corp. roughly 2003.  So I've been

Case 3:15-cv-02789-BRM-LHG    Document 51-6    Filed 11/09/17    Page 55 of 77 PageID: 1485
WILLIAM F. LYNOTT - 9/14/2016
Cranbury Brick Yard, LLC v. United States of America, et al.

Page 21

 1        A.   I do not.

 2             Q.   Do you know what business it conducts

 3    other than with respect to the site?

 4        A.   I believe it's uniquely intended to focus

 5    on its investments in Viridian projects.

 6             Q.   So moving over to the middle box in the

 7    second row, who is LIT/Viridian, LLC?

 8        A.   That is the entity that actually makes the

 9    investment in Cranbury Brick Yard, both VLIP, LLC, and

10    LIT BF, LLC, are members of that entity.

11             Q.   And how much of LIT and Viridian -- how

12    much of CBY does each entity own?

13        A.   The LIT BF, LLC, was a 95 percent

14    participant.  VLIP, LLC, was a 50 percent participant.

15             Q.   You said "was."  Has that changed?

16        A.   It has.  They -- our investment was

17    returned, so we have -- we had no ownership interest at

18    the time that the property was remediated and being

19    redeveloped.

20             Q.   So you said "our investment was returned

21    and we had no ownership."  Are you referring to

22    Viridian Partners, LLC?

23        A.   Yes, I am.

24             Q.   And about what time, what date, was that

25    interest or investment returned?

Case 3:15-cv-02789-BRM-LHG   Document 51-6   Filed 11/09/17   Page 56 of 77 PageID: 1486

WILLIAM P. LYNOTT 9/14/2016
Cranbury Brick Yard, LLC v. United States of America, et al.

Page 22

 1                    MS. FEINGOLD:  Just want to remind the

 2      witness not to guess.  If you can approximate or

 3      estimate, that's fine.

 4           A.    I believe on or about 2007.

 5           Q.    (BY MS. TALBERT)  So in 2007, was any

 6      redevelopment or remediation occurring?

 7                    MS. FEINGOLD:  Object to form.

 8           A.    Yes.

 9           Q.    (BY MS. TALBERT)  I thought you had said

10      that you had no ownership interest at the time.  I'm

11      just trying to clarify.

12           A.    There's a big difference between our

13      interest and our continuing act of involvement in the

14      project.

15           Q.    Was the Viridian investment returned as

16      part of a restructuring of the investment?

17           A.    Yes.

18           Q.    Okay.  Moving, then, down to the -- did

19      that restructuring happen in 2007?

20           A.    Yes.  There was, as I recall, an amended

21      operating agreement.

22           Q.    Moving, then, on down to the next line on

23      the organization chart, who is Cranbury Brick Yard,

24      LLC?

25           A.    That's the entity that holds ownership of

Case 3:15-cv-02789-BRM-LHG   Document 51-6   Filed 11/09/17   Page 57 of 77 PageID: 1487
WILLIAM P. LYNOTT - 9/14/2016
Cranbury Brick Yard, LLC v. United States of America, et al.

Page 23

1   the property.

2         Q.    And who are its owners?

3         A.    The owners are LIT/Viridian, LLC.

4         Q.    Does it conduct any other business other

5   than with respect to the site?

6               MS. FEINGOLD:  Objection to form.  "It"

7   being Cranbury Brick Yard, LLC?

8               MS. TALBERT:  Yes.

9         A.    No.  The function of that entity is to

10  hold the ownership and the things that attach to

11  ownership.  You'll note the items in parens.  So it is

12  named on the administrative consent order.  It also

13  holds the -- is the primary named insured on the

14  referenced insurance policies, environmental liability

15  insurance, remediation cost overrun insurance.

16        Q.    (BY MS. TALBERT)  And who is -- moving to

17  the right -- CBY Holdings, LLC?

18        A.    They are the developer that actually

19  oversees all of the environmental and real estate

20  redevelopment functions on the property.

21        Q.    Does it have its own employees?

22        A.    It does not.

23        Q.    Who are its owners?

24        A.    Well, as you can see from the chart, VLIP,

25  LLC, is the manager and master member.  Ownership in

WILLIAM F. LYNOTT 9/14/2016
Cranbury Brick Yard, LLC v. United States of America, et al.

Page 171

 1   building pads were being constructed.  An acceptable

 2   way, then, to gauge any impacts in that area is to ring

 3   it with sentinel wells, we call them, to see if

 4   anything's moving in or out of that area.

 5        Q.   Were the costs for groundwater monitoring

 6   and stream corridor maintenance separate from other

 7   costs?

 8             MS. FEINGOLD:  Objection to form.

 9        Q.   (BY MS. TALBERT)  At the site?

10        A.   Well, the groundwater would have been part

11   of the development of the RI development process, the

12   remedial process, and I believe the RAWP specified how

13   we were to handle and address the stream corridors as

14   well.  So they were -- they were integrated into the

15   overall NJDEP game plan.

16        Q.   So in CBY's recordkeeping, separated from

17   other costs?

18        A.   I don't believe so.  Now, having said

19   that, groundwater and soils impacts from

20   non-MEC-related contaminants at the site were very

21   minimal.  What we found is that most of the metals were

22   naturally occurring in that area.  And the modest hits

23   we had on volatiles were very, very minor.  So this

24   site was a 99 percent MEC site.

25        Q.   If you could turn to page ending 769, the

Case 3:15-cv-02789-BRM-LHG   Document 51-6   Filed 11/09/17   Page 59 of 77 PageID: 1489

WILLIAM F. LYNOTT 9/14/2016
Cranbury Brick Yard, LLC v. United States of America, et al.

Page 173

1                    (Deposition Exhibit 45 was marked.)

2          Q.    (BY MS. TALBERT)   Do you recognize this

3    document?

4          A.    Yes.

5          Q.    What is it?

6          A.    It is a quote from Superior Fence Systems

7    dated 1/30.  I presume that's '07.

8          Q.    Is this the date when CBY installed a

9    fence on the property?

10         A.    This is the time frame that we did that.

11   The balance -- the total looks low to me.

12         Q.    So fencing may have been ongoing?

13         A.    Yeah.

14         Q.    This may be an interim invoice?

15         A.    Yeah.  I think the fencing was in excess

16   of a hundred thousand dollars.  It's a big site.

17         Q.    So around this date, CBY was in the

18   process of fencing the entire perimeter; is that right?

19         A.    Yes, the entire perimeter.

20         Q.    Was the fence ultimately effective in

21   keeping out trespassers?

22         A.    Largely so.  There was a group that had

23   hunted on the property for years, including our

24   neighbor.  But the general public, no.

25         Q.    The general public did not go onto the

1    property?

2              A.    Right.

3              Q.    How many people were in the hunting group?

4              A.    I don't honestly know.  Mr. Dillon, our

5    neighbor, was one, although he figured out how to not

6    need to get on the site to effectively hunt.  He

7    poached some acreage from us and planted corn to get

8    the deer to come to the corn.

9              Q.    Did he ever go on the property?

10             A.    I'm sure he did.

11             Q.    Did you take any other measures to keep

12   him off or other people off?

13             A.    We had the police talk to him.  We had the

14   police patrol around the fence.

15             Q.    Did CBY ever install cameras?

16             A.    Not to my knowledge.

17             Q.    Alarms?

18             A.    Those are questions that Mr. Ganch should

19   answer.  He put that system together.

20             Q.    By "system," what do you mean?

21             A.    Well, whatever security measures were

22   taken.  Certainly we did the fencing, but if there were

23   things beyond that, I'm not aware of it.  There may

24   have been cameras, but I'm not aware of it.

25             Q.    Okay.  If you could turn back to 24.  If

Case 3:15-cv-02789-BRM-LHG   Document 51-6   Filed 11/09/17   Page 61 of 77 PageID: 1491
WILLIAM F. LYNOTT 9/14/2016
Cranbury Brick Yard, LLC v. United States of America, et al.

Page 219

1          Q.    If you could just take a look on the next

2    couple other pages, Section 10.4.  It's on page 23 of

3    the document, Hazel 197.

4          A.    All right.  I'm on page 24.

5          Q.    I'm sorry.  Section 10.4.  If you could

6    just review Section 10.4 to yourself, please.

7          A.    I've read 10.4.1.

8          Q.    And does that refresh your recollection as

9    to the inclusion of the seller and Credit Agricole on

10   the insurance policies that we reviewed earlier?

11         A.    That was certainly the intent of the

12   purchase and sale agreement.

13         Q.    To include those parties as named insureds

14   on those policies?

15         A.    Yes.

16         Q.    Do you know what "run-off" means in

17   connection with an insurance company?

18         A.    They're running out of money.

19         Q.    So essentially the insurance equivalence

20   of bankruptcy?

21         A.    I don't know if I'd make that

22   relationship, but they'll pay -- they may negotiate

23   paying claims until they don't have any more money to

24   pay claims with.

25         Q.    Was the remediation of the MEC in the

Case 3:15-cv-02789-BRM-LHG   Document 51-6 Filed 11/09/17   Page 62 of 77 PageID: 1492
WILLIAM P. LYNOTT 9/14/2016
Cranbury Brick Yard, LLC v. United States of America, et al.

Page 220

1   wetlands part of the site remediation as a whole?

2        A.   Yes.

3        Q.   And the impact to the wetlands was

4   triggered by the need to address the MEC in the

5   wetlands?

6        A.   Yeah.  The wetlands were degraded by the

7   presence of MEC.

8        Q.   Earlier when you mentioned the retention

9   of Diamond to do the MEC cleanup, did Diamond actually

10  do the MEC cleanup, or did they subcontract to MMG/TLI

11  to do the tech cleanup?

12       A.   The latter.

13       Q.   The latter.  So the MEC cleanup work was

14  actually done under MMG/TLI under a subcontract?

15       A.   That's correct.

16       Q.   Earlier we were talking about the fencing

17  around the site.  Do you know if fencing was in place

18  at the time Cranbury Brick Yard purchased the site?

19       A.   No, it was not.

20       Q.   It wasn't?

21       A.   No.

22       Q.   Do you know whether the DEP had asked

23  Cranbury Development Corporation to?

24       A.   I'm not aware that they had.

25       Q.   Did Cranbury Brick Yard engage in diligent

Case 3:15-cv-02789-BRM-LHG   Document 51-6   Filed 11/09/17   Page 63 of 77 PageID: 1493
WILLIAM P. LYNOTT 9/14/2016
Cranbury Brick Yard, LLC v. United States of America, et al.

Page 223

1   they blessed the conceptual approach.

2          Q.   Did Cranbury Brick Yard or its

3   representatives -- let me back up.

4               Were there prior environmental

5   investigations performed on the Cranbury Brick Yard

6   site?

7          A.   Of course.

8          Q.   Did Cranbury Brick Yard, either itself or

9   through its representatives, review those prior

10  environmental investigations?

11         A.   All of them.  IRG.  That's a schedule

12  attendant to the insurance policies.

13         Q.   And did Cranbury Brick Yard perform a

14  title search of the Cranbury Brick Yard site?

15         A.   Of course.

16         Q.   I'm pulling out Exhibit 6 -- which is --

17  easier said than done.  Oh.  It's the amended and

18  restated LLC agreement, and I'm just going to open this

19  up for the witness to the very first page, page 1 of

20  the agreement, Bates Number CBY_131719.  If you could

21  just take a look at Recital A as set forth on that

22  page.  Let me know when you've read that.

23         A.   I've read it.

24         Q.   Okay.  Now, earlier I believe you couldn't

25  recall the date of the original agreement that this

WILLIAM P. LYNOTT 9/14/2016
**Cranbury Brick Yard, LLC v. United States of America, et al.**

Page 227

REPORTER CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )


        I, THERESA A. COFFMAN DAVIS, Federal
Certified Realtime Reporter, Registered Merit Reporter,
Federal, and Notary Public ID 20114028013, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said WILLIAM P.
LYNOTT was duly sworn by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place aforesaid
and was thereafter reduced to typewritten form; that
the foregoing is a true transcript of the questions
asked, testimony given, and proceedings had.

        I further certify that I am not employed
by, related to, nor counsel for any of the parties
herein, nor otherwise interested in the outcome of this
litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 28th day of September, 2016.

        My commission expires May 3, 2019.

  X    Reading and Signing was requested.

       Reading and Signing was waived.

       Reading and Signing is not required.

# EXHIBIT 10

# BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT (hereinafter referred to as this **"Bill of Sale"**), made and entered into as of the _44_ day of January, 2006, by **CRANBURY DEVELOPMENT CORPORATION**, a New Jersey corporation (hereinafter referred to as **"Seller"**), for the benefit of **CRANBURY BRICK YARD LLC**, a Delaware limited liability company (hereinafter referred to as **"Purchaser"**).

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

**WHEREAS,** Seller is the owner of certain unimproved real property (hereinafter referred to as the **"Property"**) located in Middlesex County, New Jersey, as more particularly described in Exhibit A attached hereto and by this reference made a part hereof; and

**WHEREAS,** pursuant to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated July 18, 2005, between Seller and Purchaser (the **"Purchase Agreement"**), Seller has on even date herewith conveyed the Property to Purchaser, and in connection therewith Seller wishes hereby to transfer and assign to Purchaser all of Seller's right, title and interest in and to certain personal property and intangible property related to the Property as more particularly described below. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.

**NOW THEREFORE,** in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, in hand paid by Purchaser to Seller, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby covenant and agree as follows:

1.      **Personalty.**    Seller hereby grants, bargains, sells, conveys, transfers, delivers, and assigns to Purchaser all of Seller's right, title, and interest in the Other Assets, the Permits, and the Existing Environmental Insurance Policies, but excluding the Excluded Assets.

2.      **Exclusion of Other Warranties.**  Seller represents and warrants to Purchaser that it holds good and marketable title to the Other Assets free and clear of all liens, charges, encumbrances or security interests. Any and all warranties of merchantability or warranties of fitness for a particular purpose with respect to the Other Assets, the Permits and the Existing Environmental Insurance Policies being transferred by this Bill of Sale are hereby excluded.

3.      **Successors and Assigns.**  This Bill of Sale shall be binding upon and inure to the benefit of Purchaser and Seller and their respective heirs, legal representatives, successors and assigns.

[Signature on Following Page]

CBY_0004800

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the date first above written.

**SELLER:**

**CRANBURY DEVELOPMENT CORPORATION,** a New Jersey corporation

By: _____
Name: Alain Kuentz
Title: President

CBY_0004801

## Exhibit A to Bill of Sale

### Property Description

ALL THAT CERTAIN TRACT, PARCEL AND LOT OF LAND LYING AND BEING SITUATE IN THE TOWNSHIP OF CRANBURY, COUNTY OF MIDDLESEX, STATE OF NEW JERSEY, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

PARCEL 1 - LOT 10, BLOCK 10

BEGINNING AT A POINT IN THE CENTERLINE OF BRICK YARD ROAD (AKA THE ROAD FROM CRANBURY TO WYKOFFS MILLS) WHERE THE SAME IS INTERSECTED BY THE SOUTHEASTERLY LINE OF LANDS N/F JOHN STASINOS, AND FROM SAID BEGINNING POINT RUNNING, THENCE;

1.    ALONG A SOUTHEASTERLY LINE OF SAID LANDS, N 15 DEGREES 56 MINUTES 30 SECONDS E, 467.19 FEET TO A POINT CORNER TO LANDS N/F FREDERICK PERRINE, JR., THENCE;

2.    ALONG THE SOUTHERLY LINE OF SAID LANDS, S 88 DEGREES 09 MINUTES 08 SECONDS E, 725.18 FEET TO A POINT CORNER TO SAID LANDS, THENCE;

3.    ALONG THE EASTERLY LINE OF SAID LANDS, N 15 DEGREES 46 MINUTES 07 SECONDS E, 445.07 FEET, TO A POINT CORNER TO SAID LANDS, THENCE;

4.    ALONG THE NORTHERLY LINE OF SAID LANDS, THE FOLLOWING TWO COURSES, N 88 DEGREES 16 MINUTES 08 SECONDS W, 102.96 FEET, TO POINT CORNER TO SAID LANDS, THENCE;

5.    STILL ALONG THE SAME, N 87 DEGREES 49 MINUTES 53 SECONDS W, 619.94 FEET, TO POINT IN THE EASTERLY LINE TO LANDS N/F LESTER HULSART REALTY CO., INC., THENCE;

6.    ALONG THE EASTERLY LINE OF SAID LANDS N 15 DEGREES 58 MINUTES 35 SECONDS E, 1,068.24 FEET TO A POINT IN THE SOUTHEASTERLY RIGHT OF WAY LINE OF US HIGHWAY ROUTE 130, THENCE;

7.    ALONG SAID RIGHT OF WAY LINE, THE FOLLOWING TWO COURSES, N 46 DEGREES 05 MINUTES 00 SECONDS E, 1,218.87 FEET, TO POINT OF CURVATURE, THENCE;

8.    ALONG A CURVE BEARING TO THE LEFT IN A NORTHEASTERLY DIRECTION, HAVING A RADIUS OF 5,789.65 FEET, AN ARC LENGTH OF 641.77 FEET TO A POINT CORNER TO LANDS N/F ALFIERI - FIRESTONE, LLC, THENCE;

9.    ALONG THE SOUTHERLY LINE OF SAID LANDS, THE FOLLOWING TWO COURSES, S 73 DEGREES 41 MINUTES 26 SECONDS E, 928.55 FEET, TO POINT CORNER TO SAID LANDS, THENCE;

CBY_0004802

10.     STILL ALONG THE SAME, S 70 DEGREES 11 MINUTES 42 SECONDS E, 1,525.98 FEET, TO A POINT IN A WESTERLY LINE TO LANDS N/F KEYSTONE, NJ, THENCE;

11.     ALONG SAID LANDS, THE FOLLOWING FIVE COURSES; ALONG THE AFOREMENTIONED WESTERLY LINE OF SAID LANDS, S 12 DEGREES 33 MINUTES 02 SECONDS W, 43.60 FEET, TO POINT CORNER TO SAID LANDS, THENCE;

12.     ALONG A SOUTHERLY LINE OF SAID LANDS, S 75 DEGREES 00 MINUTES 18 SECONDS E, 1,321.98 FEET, TO POINT CORNER TO SAID LANDS, THENCE;

13.     ALONG A SOUTHERLY LINE OF SAID LANDS, S 75 DEGREES 30 MINUTES 25 SECONDS E, 139.86 FEET, TO POINT CORNER TO SAID LANDS, THENCE;

14.     ALONG A WESTERLY LINE OF SAID LANDS, S 12 DEGREES 33 MINUTES 37 SECONDS W, 537.52 FEET, TO POINT CORNER TO SAID LANDS, THENCE;

15.     ALONG A SOUTHERLY LINE OF SAID LANDS, S 80 DEGREES 04 MINUTES 23 SECONDS E, 368.00 FEET, TO POINT IN THE WESTERLY RIGHT OF WAY OF THE NEW JERSEY TURNPIKE, THENCE;

16.     ALONG SAID RIGHT OF WAY LINE, ALONG A CURVE BEARING TO THE RIGHT IN A SOUTHERLY DIRECTION, HAVING A RADIUS OF 17,817.00 FEET, AN ARC LENGTH OF 899.21 FEET TO A POINT IN THE WESTERLY RIGHT OF WAY LINE OF HIGHTSTOWN - CRANBURY STATION ROAD, THENCE;

17.     ALONG SAID RIGHT OF WAY LINE, THE FOLLOWING TWO COURSES, S 45 DEGREES 25 MINUTES 39 SECONDS W, 853.08 FEET, TO A POINT CORNER, THENCE;

18.     STILL ALONG THE SAME, S 45 DEGREES 45 MINUTES 09 SECONDS W, 1529.23 FEET, TO POINT CORNER TO LANDS N/F ROBERT C. DILLON, THENCE;

19.     ALONG SAID LANDS, THE FOLLOWING FOUR COURSES, N 47 DEGREES 44 MINUTES 51 SECONDS W, 154.05 FEET, TO POINT CORNER TO SAID LANDS, THENCE;

20.     S 42 DEGREES 15 MINUTES 09 SECONDS W, 105.00 FEET, TO POINT CORNER TO SAID LANDS, THENCE;

21.     S 47 DEGREES 44 MINUTES 51 SECONDS E, 20.00 FEET, TO POINT CORNER TO SAID LANDS, THENCE;

22.     S 42 DEGREES 14 MINUTES 47 SECONDS W, 435.77 FEET, TO POINT IN THE AFOREMENTIONED CENTERLINE OF BRICK YARD ROAD, THENCE;

23.     ALONG THE CENTERLINE OF BRICK YARD ROAD, THE FOLLOWING FOUR COURSES, N 74 DEGREES 07 MINUTES 17 SECONDS W, 1,268.55 FEET, TO AN ANGLE POINT, THENCE;

CBY_0004803

24.　N 45 DEGREES 00 MINUTES 14 SECONDS W, 726.39 FEET, TO AN ANGLE POINT, THENCE;

25.　N 71 DEGREES 05 MINUTES 12 SECONDS W, 1,200.00 FEET, TO AN ANGLE POINT, THENCE;

26.　N 69 DEGREES 36 MINUTES 42 SECONDS W, 338.99 FEET, TO THE POINT AND PLACE OF BEGINNING.

PARCEL 2 - LOT 1, BLOCK 12

BEGINNING AT A POINT, SAID POINT BEING THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF BRICK YARD ROAD (AKA THE ROAD FROM CRANBURY TO WYKOFFS MILLS), WITH THE SOUTHEASTERLY LINE OF CAMDEN AND AMBOY DIVISION OF THE PENNSYLVANIA RAILROAD (CONRAIL, CAMDEN TO AMBOY MAIN LINE), AND FROM SAID BEGINNING POINT RUNNING, THENCE;

1.　ALONG THE SOUTHEASTERLY LINE OF SAID RAILROAD, THE FOLLOWING TWO COURSES, N 45 DEGREES 45 MINUTES 09 SECONDS E, 1,799.58 FEET TO A POINT, THENCE;

2.　N 45 DEGREES 25 MINUTES 39 SECONDS E, 684.68 FEET TO A POINT IN THE WESTERLY RIGHT OF WAY LINE OF THE NEW JERSEY TURNPIKE, THENCE;

3.　ALONG SAID RIGHT OF WAY LINE, S 29 DEGREES 19 MINUTES 11 SECONDS W, 2,409.09 FEET TO A POINT IN THE AFOREMENTIONED NORTHERLY RIGHT OF WAY LINE OF BRICK YARD ROAD, THENCE;

4.　ALONG SAID RIGHT OF WAY LINE, N 74 DEGREES 7 MINUTES 17 SECONDS W, 782.40 FEET, TO THE POINT AND PLACE OF BEGINNING.

BEING IN ACCORDANCE WITH A SURVEY PREPARED BY JOHN M. ROSSI, PLS, LLC DATED DECEMBER 22, 2005.

BEING ALSO KNOWN AS (REPORTED FOR INFORMATIONAL PURPOSES ONLY):

LOT 10, BLOCK 10 AND LOT 1, BLOCK 12, ON THE OFFICIAL TAX MAP OF CRANBURY TOWNSHIP.

CBY_0004804

EXHIBIT 11

FEB 17 2006 17:05 FR                    TO 919735302291    P.02/07

 FINAL ACO



### State of New Jersey
#### DEPARTMENT OF ENVIRONMENTAL PROTECTION

JON S. CORZINE
*Governor*

LISA P. JACKSON
*Acting Commissioner*

MS # 00087852
PI # G000061684

IN THE MATTER OF THE
UNEXCELLED CHEMICAL SITE
AND
CRANBURY BRICK YARD LLC
MAXXAM GROUP, INC.
Respondents

:
:
:
:
:
:
:

ADMINISTRATIVE CONSENT
ORDER AMENDMENT

    This Administrative Consent Order Amendment is issued pursuant to the authority vested in the Commissioner of the New Jersey Department of Environmental Protection (hereinafter "the Department" or "DEP") by N.J.S.A. 13:1D-1 through -19, the Solid Waste Management Act, N.J.S.A. 13:1E-1 through -91, and the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq., and the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq., and duly delegated to the Assistant Director, Division of Remediation Support, Oversight Resources Allocation Element, pursuant to N.J.S.A. 13:1B-4.

### FINDINGS

    1. The Unexcelled Chemical Site is located on Brickyard Road, also known as Block 10, Lot 10 and Block 12, Lot 1 on the tax maps of the Township of Cranbury, Middlesex County (hereinafter "Site") which is the subject of this Administrative Consent Order Amendment.

    2. The Department, Credit Agricole Asset Management, Cranbury Development Corporation and MAXXAM Group, Inc. entered into an Administrative Consent Order effective February 3, 2005 for the remediation of the Site ("Unexcelled Chemical Site ACO").

    3. The Department has been notified that Cranbury Brick Yard LLC has proposed to purchase the Site.

    4. The Administrative Consent Order Amendment is entered into by the Department, Credit Agricole Asset Management, Cranbury Development Corporation, MAXXAM Group, Inc. and Cranbury Brick Yard LLC to remove Cranbury Development Corporation and Credit Agricole Asset Management from the Unexcelled Chemical Site ACO and to replace Credit Agricole Asset Management and Cranbury Development Corporation (whether appearing individually or jointly as Respondents in the Unexcelled Chemical Site ACO) with Cranbury Brick Yard LLC as a Respondent to the Unexcelled Chemical Site ACO.

*New Jersey is an Equal Opportunity Employer • Printed on Recycled Paper and Recyclable*

CBY_0066077

5. Cranbury Brick Yard LLC is a Delaware Limited Liability Company with their business address located at 1745 Shea Center Drive, Suite 190, Highlands Ranch, Colorado 80129.

6. MAXXAM Group, Inc. is a Delaware Corporation with its corporate offices located at 1330 Post Oak Boulevard, Suite 2000, Houston, Texas 77056 (hereinafter "Maxxam" or "Respondent").

7. The provisions of this Administrative Consent Order Amendment shall become part of the Unexcelled Chemical Site Administrative Consent Order. The Unexcelled Chemical Site ACO shall remain in full force and effect and MAXXAM and Cranbury Brick Yard LLC shall continue to comply with the Unexcelled Chemical Site ACO.

8. This Administrative Consent Order Amendment shall be fully enforceable in the New Jersey Superior Court having jurisdiction over the subject matter and signatory parties. This Administrative Consent Order Amendment may be enforced in the same manner as an Administrative Consent Order issued by the Department pursuant to other statutory authority and should not preclude the Department from taking whatever action it deems appropriate to enforce the environmental protection laws of the State of New Jersey.

9. By entering this Administrative Consent Order Amendment, Respondents neither admit to nor deny any fact, fault or liability under any statute or regulation concerning the condition of the Site nor waive any rights or defenses with regard to the site except as specifically provided in this Administrative Consent Order.

10. This Administrative Consent Order shall be considered an "oversight document" for purposes of qualifying for reimbursement of remediation costs pursuant to NJSA 58:10B-29 et seq.

ORDER

11. On November 18, 2005 the Department approved the conceptual Remedial Action for the Site entitled "Former Unexcelled Chemical Corporation Site Cranbury, New Jersey, Conceptual Remedial Action Work Plan Revision 9 ".

12. Therefore, within one hundred twenty (120) calendar days of execution of this amendment, the Respondents shall submit a Remedial Action Work Plan, which incorporates the proposals in the Conceptual Work Plan as approved. In addition, the work plan shall include a schedule of implementation as requested in the November 18, 2005 letter from the Department which coincide with the proposed work to be completed.

13. Upon the Effective Date of this Administrative Consent Order Amendment, Credit Agricole Asset Management and Cranbury Development Corporation shall have no further obligations hereunder or under the Unexcelled Chemical Site ACO. Cranbury Brick Yard LLC will be responsible for establishment of a remediation funding source. Should Cranbury Brick

998364.1                                                                                2

CBY_0066078

Yard LLC fail to maintain the remediation funding source for the Site, MAXXAM Group, Inc. shall establish and maintain the Remediation Funding Source. Cranbury Brick Yard LLC and Maxxam Group, Inc. will be responsible for remediation of the Site pursuant to this Administrative Consent Order Amendment.

14. Except as otherwise stated herein, by the execution of this Administrative Consent Order Amendment, the Department does not release any person from any liabilities or obligations such person may have pursuant to any other applicable authority, nor does the Department waive any of its rights or remedies pursuant thereto.

15. The Respondents agree to submit to the Department, along with two original copies of the Administrative Consent Order, signed by the Respondents, documentary evidence, such as a corporate resolution or a certification by a corporate officer, that the signatory has the authority to bind the Respondents to the terms of this Administrative Consent Order, and proof that the remediation funding source has been established pursuant to N.J.A.C. 7:26C-7.7.

16. This Administrative Consent Order shall be effective upon the execution of this Administrative Consent Order by the Department and the Respondents.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION

Date: _02/16/06_        BY: _____

Ronald T. Corcory, Assistant Director
Oversight Resources Allocation Element

CRANBURY DEVELOPMENT CORPORATION

Date _01.27 - 2006_        BY: _____

Signature

_Alain KUENTZ_

Print Full Name Signed Above

Title _President_

CREDIT AGRICOLE ASSET MANAGEMENT (CAAM)
(as guarantor for CLAM Finance)

_SEGESPAR Finance, formely known as A_

998384.1                                                                     3

CBY_0066079

Date 27/1/06          BY: _____
                           Signature

                      COLIN Jean-Yves
                      Print Full Name Signed Above

                      Executive Vice President
                      Title


MAXXAM Group, Inc.

Date_____        BY: _____
                          Signature

                         _____
                         Print Full Name Signed Above

                         _____
                         Title


CRANBURY BRICK YARD LLC

Date_____        BY: _____
                          Signature

                         _____
                         Print Full Name Signed Above

                         _____
                         Title


998364.1

4

CBY_0066080

Date_____            BY: _____
                              Signature

                              _____
                              Print Full Name Signed Above

                              _____
                              Title


MAXXAM Group, Inc.

Date_____            BY: _____
                              Signature

                              J. KENT FRIEDMAN
                              Print Full Name Signed Above

                              GENERAL COUNSEL
                              Title


CRANBURY BRICK YARD LLC

Date_____            BY: _____
                              Signature

                              _____
                              Print Full Name Signed Above

                              _____
                              Title


998384.1

4

CBY_0066081

Date_____        BY: _____
                         Signature

                         _____
                         Print Full Name Signed Above

                         _____
                         Title


                         MAXXAM Group, Inc.

Date_____        BY: _____
                         Signature

                         _____
                         Print Full Name Signed Above

                         _____
                         Title


                         CRANBURY BRICK YARD LLC

Date 1/27/06         BY: _____
                         Signature

                         _____
                         Print Full Name Signed Above

                         _____
                         Title


998364.1

4

CBY_0066082