UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CRANBURY BRICK YARD, LLC, | : | |
| | : | |
| Plaintiff, | : | Hon. Brian R. Martinotti |
| | : | |
| | : | Civ. Action No. 15-2789(BRM) (LGH) |
| | : | |
| UNITED STATES OF AMERICA, | : | ORAL ARGUMENT REQUESTED |
| et al., | : | |
| | : | |
| Defendants. | : | Document Electronically Filed |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

# Attachment B

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3.15-cv-02739-BRM-LHG Document 56 Filed 12/15/17 Page 3 of 75 PageID: 2432



**Designation: E 1527 – 97**

## Standard Practice for
## Environmental Site Assessments: Phase I Environmental Site Assessment Process[1]

This standard is issued under the fixed designation E 1527; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ϵ) indicates an editorial change since the last revision or reapproval.

### 1. Scope

1.1 *Purpose*—The purpose of this practice, as well as Practice E 1528, is to define good commercial and customary practice in the United States of America for conducting an *environmental site assessment*[2] of a parcel of *commercial real estate* with respect to the range of contaminants within the scope of Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and *petroleum products*. As such, this practice is intended to permit a *user* to satisfy one of the requirements to qualify for the *innocent landowner defense* to CERCLA liability: that is, the practices that constitute "all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice" as defined in 42 USC § 9601(35)(B). (See Appendix X1 for an outline of CERCLA's liability and defense provisions.)

1.1.1 *Recognized Environmental Conditions*—In defining a standard of good commercial and customary practice for conducting an *environmental site assessment* of a parcel of *property*, the goal of the processes established by this practice is to identify *recognized environmental conditions*. The term *recognized environmental conditions* means the presence or likely presence of any *hazardous substances* or *petroleum products* on a *property* under conditions that indicate an existing release, a past release, or a material threat of a release of any *hazardous substances* or *petroleum products* into structures on the *property* or into the ground, groundwater, or surface water of the *property*. The term includes *hazardous substances* or *petroleum products* even under conditions in compliance with laws. The term is not intended to include *de minimis* conditions that generally do not present a material risk of harm to public health or the environment and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies.

1.1.2 *Two Related Practices*—This practice is closely related to Practice E 1528. Both are *environmental site assessments* for *commercial real estate*. See 4.3.

1.1.3 *Petroleum Products*—*Petroleum products* are included within the scope of both practices because they are of concern with respect to many parcels of *commercial real estate* and current custom and usage is to include an inquiry into the presence of *petroleum products* when doing an *environmental site assessment* of *commercial real estate*. Inclusion of *petroleum products* within the scope of this practice and Practice E 1528 is not based upon the applicability, if any, of CERCLA to *petroleum products*. (See Appendix X1 for discussion of *petroleum exclusion* to CERCLA liability.)

1.1.4 *CERCLA Requirements Other Than Appropriate Inquiry*—This practice does not address whether requirements in addition to *appropriate inquiry* have been met in order to qualify for CERCLA's *innocent landowner defense* (for example, the duties specified in 42 USC § 9607(b)(3)(a) and (b) and cited in Appendix X1).

1.1.5 *Other Federal, State, and Local Environmental Laws*—This practice does not address requirements of any state or local laws or of any federal laws other than the appropriate inquiry provisions of CERCLA's *innocent landowner defense*. *Users* are cautioned that federal, state, and local laws may impose environmental assessment obligations that are beyond the scope of this practice. *Users* should also be aware that there are likely to be other legal obligations with regard to *hazardous substances* or *petroleum products* discovered on *property* that are not addressed in this practice and that may pose risks of civil and/or criminal sanctions for non-compliance.

1.1.6 *Documentation*—The scope of this practice includes research and reporting requirements that support the user's ability to qualify for the *innocent landowner defense*. As such,

---

[1] This practice is under the jurisdiction of ASTM Committee E-50 on Environmental Assessment and is the direct responsibility of Subcommittee E50.02 on Commercial Real Estate Transactions.
Current edition approved March 10, 1997. Published May 1997. Originally published as E 1527 – 93. Last previous edition E 1527 – 94.
[2] All definitions, descriptions of terms, and acronyms are defined in Section 3. Whenever terms defined in 3.2 or described in 3.3 are used in this practice, they are in *italics*.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:15-cv-02739-BRM-LHG   Document 56   Filed 12/15/17   Page 4 of 75 PageID: 293



E 1527 – 97

sufficient documentation of all sources, records, and resources utilized in conducting the inquiry required by this practice must be provided in the written report (refer to 7.1.8 and 11.2).

1.2 *Objectives*—Objectives guiding the development of this practice and Practice E 1528 are (1) to synthesize and put in writing good commercial and customary practice for *environmental site assessments* for *commercial real estate*, (2) to facilitate high quality, standardized *environmental site assessments*, (3) to ensure that the standard of *appropriate inquiry* is practical and reasonable, and (4) to clarify an industry standard for *appropriate inquiry* in an effort to guide legal interpretation of CERCLA's *innocent landowner defense*.

1.3 *Considerations Beyond Scope*—The use of this practice is strictly limited to the scope set forth in this section. Section 12 of this practice, identifies, for informational purposes, certain environmental conditions (not an all-inclusive list) that may exist on a *property* that are beyond the scope of this practice but may warrant consideration by parties to a *commercial real estate* transaction.

1.4 *Organization of This Practice*—This practice has several parts and two appendixes. Section 1 is the Scope. Section 2 is Referenced Documents. Section 3, Terminology, has definitions of terms not unique to this practice and descriptions of terms unique to this practice and acronyms. Section 4 is Significance and Use of this practice. Section 5 describes User's Responsibilities. Sections 6–11 are the main body of the Phase I Environmental Site Assessment, including evaluation and report preparation. Section 12 provides additional information regarding non-scope considerations (see 1.3). The appendixes are included for information and are not part of the procedures prescribed in either this practice or Practice E 1528. Appendix X1 explains the liability and defense provisions of CERCLA that will assist the user in understanding the user's responsibilities under CERCLA; it also contains other important information regarding CERCLA and this practice. Appendix X2 provides a recommended table of contents and report format for a Phase I Environmental Site Assessment Report.

1.5 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*
E 1528 Practice for Environmental Site Assessments: Transaction Screen Process[3]

## 3. Terminology

3.1 This section provides definitions, descriptions of terms, and a list of acronyms for many of the words used in this practice and Practice E 1528. The terms are an integral part of both practices and are critical to an understanding of the practices and their use.

3.2 *Definitions:*

3.2.1 *asbestos*—six naturally occurring fibrous minerals found in certain types of rock formations. Of the six, the minerals chrysotile, amosite, and crocidolite have been most commonly used in building products. When mined and processed, asbestos is typically separated into very thin fibers. Because asbestos is strong, incombustible, and corrosion-resistant, asbestos was used in many commercial products beginning early in this century and peaking in the period from World War II into the 1970s. When inhaled in sufficient quantities, asbestos fibers can cause serious health problems.[4,5]

3.2.2 *asbestos containing material (ACM)*—any material or product that contains more than 1 % asbestos.[4]

3.2.3 *Comprehensive Environmental Response, Compensation, and Liability Information System (CERCLIS)*—the list of sites compiled by EPA that EPA has investigated or is currently investigating for potential hazardous substance contamination for possible inclusion on the National Priorities List.

3.2.4 *construction debris*—concrete, brick, asphalt, and other such building materials discarded in the construction of a building or other improvement to property.

3.2.5 *contaminated public wells*—public wells used for drinking water that have been designated by a government entity as contaminated by toxic substances (for example, chlorinated solvents), or as having water unsafe to drink without treatment.

3.2.6 *CORRACTS list*—environmental protection agencies (EPA's) list of treatment, storage, or disposal facilities subject to corrective action under RCRA.

3.2.7 *demolition debris*—concrete, brick, asphalt, and other such building materials discarded in the demolition of a building or other improvement to property.

3.2.8 *drum*—a container (typically, but not necessarily, holding 55 gal (208 L) of liquid) that may be used to store *hazardous substances* or *petroleum products*.

3.2.9 *dry wells*—underground areas where soil has been removed and replaced with pea gravel, coarse sand, or large rocks. Dry wells are used for drainage, to control storm runoff, for the collection of spilled liquids (intentional and non-intentional) and wastewater disposal (often illegal).

3.2.10 *dwelling*—structure or portion thereof used for residential habitation.

3.2.11 *environmental lien*—a charge, security, or encumbrance upon title to a *property* to secure the payment of a cost, damage, debt, obligation, or duty arising out of response actions, cleanup, or other remediation of *hazardous substances* or *petroleum products* upon a *property*, including (but not limited to) liens imposed pursuant to CERCLA 42 USC § 9607(1) and similar state or local laws.

3.2.12 *ERNS list*—EPA's emergency response notification system list of reported CERCLA hazardous substance releases or spills in quantities greater than the reportable quantity, as maintained at the National Response Center. Notification requirements for such releases or spills are codified in 40 CFR Parts 302 and 355.

---

[3] *Annual Book of ASTM Standards*, Vol 11.04.

[4] See EPA, *Managing Asbestos in Place, A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials*, July 1990, p. 2.
[5] See also, for an additional definition of asbestos, ASTM STP 834, ASTM.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017   2
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has been superseded and replaced by a new version or is withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:15-cv-02799-BRM-LHG Document 56 Filed 12/15/17 Page 5 of 75 PageID: 2314

E 1527 – 97

3.2.13 *Federal Register, (FR)*—publication of the United States government published daily (except for federal holidays and weekends) containing all proposed and final regulations and some other activities of the federal government. When regulations become final, they are included in the Code of Federal Regulations (CFR), as well as published in the Federal Register.

3.2.14 *fire insurance maps*—maps produced for private fire insurance map companies that indicate uses of properties at specified dates and that encompass the property. These maps are often available at local libraries, historical societies, private resellers, or from the map companies who produced them. See Question 23 of the transaction screen process in Practice E 1528 and 7.3.4.2 of this practice.

3.2.15 *hazardous substance*—A substance defined as a hazardous substance pursuant to CERCLA 42 USC § 9601(14), as interpreted by EPA regulations and the courts: ′′(A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (42 USC § 6921) (but not including any waste the regulation of which under the Solid Waste Disposal Act (42 USC § 6901 *et seq.*) has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act (42 USC § 7412), and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator (of EPA) has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).′′ (See Appendix X1.)

3.2.16 *hazardous waste*—any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (42 USC § 6921) (but not including any waste the regulation of which under the Solid Waste Disposal Act (42 USC § 6901 *et seq.*) has been suspended by Act of Congress). The Solid Waste Disposal Act of 1980 amended RCRA. RCRA defines a hazardous waste, in 42 USC § 6903, as: ′′a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.′′

3.2.17 *landfill*—a place, location, tract of land, area, or premises used for the disposal of solid wastes as defined by state solid waste regulations. The term is synonymous with the term *solid waste disposal site* and is also known as a garbage dump, trash dump, or similar term.

3.2.18 *local street directories*—directories published by private (or sometimes government) sources that show ownership, occupancy, and/or use of sites by reference to street addresses. Often local street directories are available at libraries of local governments, colleges or universities, or historical societies. See 7.3.4.6 of this practice.

3.2.19 *material safety data sheet (MSDS)*—written or printed material concerning a hazardous substance which is prepared by chemical manufacturers, importers, and employers for hazardous chemicals pursuant to OSHA's Hazard Communication Standard, 29 CFR 1910.1200.

3.2.20 *National Contingency Plan (NCP)*—the National Oil and Hazardous Substances Pollution Contingency Plan, found at 40 CFR § 300, that is the EPA's blueprint for how hazardous substances are to be cleaned up pursuant to CERCLA.

3.2.21 *National Priorities List (NPL)*—list compiled by EPA pursuant to CERCLA 42 USC § 9605(a)(8)(B) of properties with the highest priority for cleanup pursuant to EPA's Hazard Ranking System. See 40 CFR Part 300.

3.2.22 *occupants*—those tenants, subtenants, or other persons or entities using the *property* or a portion of the *property*.

3.2.23 *owner*—generally the fee owner of record of the *property*.

3.2.24 *petroleum exclusion*—The exclusion from CERCLA liability provided in 42 USC § 9601(14), as interpreted by the courts and EPA: ′′The term (hazardous substance) does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).′′

3.2.25 *petroleum products*—those substances included within the meaning of the *petroleum exclusion* to CERCLA, 42 USC§ 9601(14), as interpreted by the courts and EPA, that is: petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under Subparagraphs (A) through (F) of 42 USC § 9601(14), natural gas, natural gas liquids, liquefied natural gas, and synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). (The word fraction refers to certain distillates of crude oil, including gasoline, kerosene, diesel oil, jet fuels, and fuel oil, pursuant to *Standard Definitions of Petroleum Statistics*.[6]

3.2.26 *Phase I Environmental Site Assessment*—the process described in this practice.

3.2.27 *pits, ponds, or lagoons*—man-made or natural depressions in a ground surface that are likely to hold liquids or sludge containing *hazardous substances* or *petroleum products*. The likelihood of such liquids or sludge being present is determined by evidence of factors associated with the pit, pond, or lagoon, including, but not limited to, discolored water, distressed vegetation, or the presence of an obvious wastewater discharge.

---

[6] *Standard Definitions of Petroleum Statistics*, American Petroleum Institute, Fourth Edition, 1988.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:15-cv-02739-BRM-LHG Document 56 Filed 12/15/17 Page 6 of 75 PageID: 2495

E 1527 – 97

3.2.28 *property*—the real property that is the subject of the *environmental site assessment* described in this practice. Real property includes buildings and other fixtures and improvements located on the property and affixed to the land.

3.2.29 *property tax files*—the files kept for property tax purposes by the local jurisdiction where the property is located and includes records of past ownership, appraisals, maps, sketches, photos, or other information that is reasonably ascertainable and pertaining to the property. See 7.3.4.3.

3.2.30 *RCRA generators*—those persons or entities that generate hazardous wastes, as defined and regulated by RCRA.

3.2.31 *RCRA generators list*—list kept by EPA of those persons or entities that generate hazardous wastes as defined and regulated by RCRA.

3.2.32 *RCRA TSD facilities*—those facilities on which treatment, storage, and/or disposal of hazardous wastes takes place, as defined and regulated by RCRA.

3.2.33 *RCRA TSD facilities list*—list kept by EPA of those facilities on which treatment, storage, and/or disposal of hazardous wastes takes place, as defined and regulated by RCRA.

3.2.34 *recorded land title records*—records of fee ownership, leases, land contracts, easements, liens, and other encumbrances on or of the property recorded in the place where land title records are, by law or custom, recorded for the local jurisdiction in which the *property* is located. (Often such records are kept by a municipal or county recorder or clerk.) Such records may be obtained from title companies or directly from the local government agency. Information about the title to the property that is recorded in a U.S. district court or any place other than where land title records are, by law or custom, recorded for the local jurisdiction in which the property is located, are not considered part of recorded land title records. See 7.3.4.4.

3.2.35 *records of emergency release notifications (SARA § 304)*—Section 304 of EPCRA or Title III of SARA requires operators of facilities to notify their local emergency planning committee (as defined in EPCRA) and state emergency response commission (as defined in EPCRA) of any release beyond the facility's boundary of any reportable quantity of any extremely hazardous substance. Often the local fire department is the local emergency planning committee. Records of such notifications are "Records of Emergency Release Notifications" (SARA § 304).

3.2.36 *report*—the written record of a transaction screen process as required by Practice E 1528 or the written report prepared by the environmental professional and constituting part of a "Phase I Environmental Site Assessment," as required by this practice.

3.2.37 *solid waste disposal site*—a place, location, tract of land, area, or premises used for the disposal of solid wastes as defined by state solid waste regulations. The term is synonymous with the term *landfill* and is also known as a garbage dump, trash dump, or similar term.

3.2.38 *solvent*—a chemical compound that is capable of dissolving another substance and may itself be a *hazardous substance*, used in a number of manufacturing/industrial processes including but not limited to the manufacture of paints and coatings for industrial and household purposes, equipment clean-up, and surface degreasing in metal fabricating industries.

3.2.39 *state registered USTs*—state lists of underground storage tanks required to be registered under Subtitle I, Section 9002 of RCRA.

3.2.40 *sump*—a pit, cistern, cesspool, or similar receptacle where liquids drain, collect, or are stored.

3.2.41 *TSD facility*—treatment, storage, or disposal facility (see *RCRA TSD facilities*).

3.2.42 *underground storage tank (UST)*—any tank, including underground piping connected to the tank, that is or has been used to contain *hazardous substances* or *petroleum products* and the volume of which is 10 % or more beneath the surface of the ground.

3.2.43 *USGS 7.5 Minute Topographic Map*—the map (if any) available from or produced by the United States Geological Survey, entitled "USGS 7.5 Minute Topographic Map," and showing the property. See 7.3.4.5.

3.2.44 *wastewater*—water that (*1*) is or has been used in an industrial or manufacturing process, (*2*) conveys or has conveyed sewage, or (*3*) is directly related to manufacturing, processing, or raw materials storage areas at an industrial plant. Wastewater does not include water originating on or passing through or adjacent to a site, such as stormwater flows, that has not been used in industrial or manufacturing processes, is not been combined with sewage, or is not directly related to manufacturing, processing, or raw materials storage areas at an industrial plant.

3.2.45 *zoning/land use records*—those records of the local government in which the *property* is located indicating the uses permitted by the local government in particular zones within its jurisdiction. The records may consist of maps and/or written records. They are often located in the planning department of a municipality or county. See 7.3.4.8.

3.3 *Definitions of Terms Specific to This Standard:*

3.3.1 *actual knowledge*—the knowledge actually possessed by an individual who is a real person, rather than an entity. Actual knowledge is to be distinguished from constructive knowledge that is knowledge imputed to an individual or entity.

3.3.2 *adjoining properties*—any real property or properties the border of which is contiguous or partially contiguous with that of the property, or that would be contiguous or partially contiguous with that of the property but for a street, road, or other public thoroughfare separating them.

3.3.3 *aerial photographs*—photographs taken from an airplane or helicopter (from a low enough altitude to allow identification of development and activities) of areas encompassing the property. Aerial photographs are often available from government agencies or private collections unique to a local area. See 7.3.4.1 of this practice.

3.3.4 *appropriate inquiry*—that inquiry constituting ″all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice″ as defined in CERCLA, 42 USC § 9601(35)(B), that will give a party to a *commercial real estate* transaction the *innocent landowner defense* to CERCLA liability (42 USC

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017   4
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3.15-cv-02799-BRM-LHG Document 56 Filed 12/15/17 Page 7 of 75 PageID: 230

E 1527 – 97

§ 9601(A) and (B) and § 9607(b)(3)), assuming compliance with other elements of the defense. See Appendix X1.

3.3.5 *approximate minimum search distance*—the area for which records must be obtained and reviewed pursuant to Section 7 subject to the limitations provided in that section. This may include areas outside the *property* and shall be measured from the nearest *property* boundary. This term is used in lieu of radius to include irregularly shaped properties.

3.3.6 *building department records*—those records of the local government in which the property is located indicating permission of the local government to construct, alter, or demolish improvements on the property. Often building department records are located in the building department of a municipality or county. See 7.3.4.7.

3.3.7 *commercial real estate*—any real property except a dwelling or property with no more than four dwelling units exclusively for residential use (except that a dwelling or property with no more than four dwelling units exclusively for residential use is included in this term when it has a commercial function, as in the building of such dwellings for profit). This term includes but is not limited to undeveloped real property and real property used for industrial, retail, office, agricultural, other commercial, medical, or educational purposes; property used for residential purposes that has more than four residential dwelling units; and property with no more than four dwelling units for residential use when it has a commercial function, as in the building of such dwellings for profit.

3.3.8 *commercial real estate transaction*—a transfer of title to or possession of real property or receipt of a security interest in real property, except that it does not include transfer of title to or possession of real property or the receipt of a security interest in real property with respect to an individual dwelling or building containing fewer than five dwelling units, nor does it include the purchase of a lot or lots to construct a dwelling for occupancy by a purchaser, but a commercial real estate transaction does include real property purchased or leased by persons or entities in the business of building or developing dwelling units.

3.3.9 *due diligence*—the process of inquiring into the environmental characteristics of a parcel of *commercial real estate* or other conditions, usually in connection with a commercial real estate transaction. The degree and kind of due diligence vary for different properties and differing purposes. See Appendix X1.

3.3.10 *environmental audit*—the investigative process to determine if the operations of an existing facility are in compliance with applicable environmental laws and regulations. This term should not be used to describe Practice E 1528 or this practice, although an environmental audit may include an *environmental site assessment* or, if prior audits are available, may be part of an environmental site assessment. See Appendix X1.

3.3.11 *environmental professional*—a person possessing sufficient training and experience necessary to conduct a *site reconnaissance*, *interviews*, and other activities in accordance with this practice, and from the information generated by such activities, having the ability to develop opinions and conclusions regarding *recognized environmental conditions* in con-nection with the *property* in question. An individual's status as an environmental professional may be limited to the type of assessment to be performed or to specific segments of the assessment for which the professional is responsible. The person may be an independent contractor or an employee of the *user*.

3.3.12 *environmental site assessment (ESA)*—the process by which a person or entity seeks to determine if a particular parcel of real *property* (including improvements) is subject to *recognized environmental conditions*. At the option of the user, an environmental site assessment may include more inquiry than that constituting *appropriate inquiry* or, if the user is not concerned about qualifying for the *innocent landowner defense*, less inquiry than that constituting *appropriate inquiry*. See Appendix X1. An environmental site assessment is both different from and less rigorous than an *environmental audit*.

3.3.13 *fill dirt*—dirt, soil, sand, or other earth, that is obtained off-site, that is used to fill holes or depressions, create mounds, or otherwise artificially change the grade or elevation of real property. It does not include material that is used in limited quantities for normal landscaping activities.

3.3.14 *hazardous waste/contaminated sites*—sites on which a release has occurred, or is suspected to have occurred, of any *hazardous substance*, *hazardous waste*, or *petroleum products*, and that release or suspected release has been reported to a government entity.

3.3.15 *innocent landowner defense*—that defense to CER-CLA liability provided in 42 USC § 9601(35) and § 9607(b)(3). One of the requirements to qualify for this defense is that the party make "all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice." There are additional requirements to qualify for this defense. See Appendix X1.

3.3.16 *interviews*—those portions of this practice that are contained in Section 9 and 10 thereof and address questions to be asked of *owners* and *occupants* of the *property* and questions to be asked of local government officials.

3.3.17 *key site manager*—the person identified by the *owner* of a *property* as having good knowledge of the uses and physical characteristics of the property. See 9.5.1.

3.3.18 *local government agencies*—those agencies of municipal or county government having jurisdiction over the *property*. Municipal and county government agencies include but are not limited to cities, parishes, townships, and similar entities.

3.3.19 *LUST sites*—state lists of leaking underground storage tank sites. Section 9003 (h) of Subtitle I of RCRA gives EPA and states, under cooperative agreements with EPA, authority to clean up releases from UST systems or require owners and operators to do so.

3.3.20 *major occupants*—those tenants, subtenants, or other persons or entities each of which uses at least 40 % of the leasable area of the *property* or any anchor tenant when the *property* is a shopping center.

3.3.21 *obvious*—that which is plain or evident; a condition or fact that could not be ignored or overlooked by a reasonable observer while *visually or physically observing the property*.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017   5
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

E 1527 – 97

3.3.22 *other historical sources*—any source or sources other than those designated in 7.3.4.1-7.3.4.8 that are credible to a reasonable person and that identify past uses of the property. The term includes, but is not limited to: miscellaneous maps, newspaper archives, and records in the files and/or personal knowledge of the *property owner* and/or *occupants*. See 7.3.4.9.

3.3.23 *physical setting sources*—sources that provide information about the geologic, hydrogeologic, hydrologic, or topographic characteristics of a *property*. See 7.2.3.

3.3.24 *practically reviewable*—information that is practically reviewable means that the information is provided by the source in a manner and in a form that, upon examination, yields information relevant to the *property* without the need for extraordinary analysis of irrelevant data. The form of the information shall be such that the user can review the records for a limited geographic area. Records that cannot be feasibly retrieved by reference to the location of the *property* or a geographic area in which the *property* is located are not generally *practically reviewable*. Most databases of public records are *practically reviewable* if they can be obtained from the source agency by the county, city, zip code, or other geographic area of the facilities listed in the record system. Records that are sorted, filed, organized, or maintained by the source agency only chronologically are not generally practically reviewable. Listings in publicly available records which do not have adequate address information to be located geographically are not generally considered pratically reviewable. For large databases with numerous facility records (such as RCRA hazardous waste generators and registered underground storage tanks), the records are not *practically reviewable* unless they can be obtained from the source agency in the smaller geographic area of zip codes. Even when information is provided by zip code for some large databases, it is common for an unmanageable number of sites to be identified within a given zip code. In these cases, it is not necessary to review the impact of all of the sites that are likely to be listed in any given zip code because that information would not be *practically reviewable*. In other words, when so much data is generated that it cannot be feasibly reviewed for its impact on the *property*, it is not *practically reviewable*.

3.3.25 *preparer*—the person preparing the *transaction screen questionnaire* pursuant to Practice E 1528, who may be either the user or the person to whom the user has delegated the preparation of the *transaction screen questionnaire*.

3.3.26 *publicly available*—information that is publicly available means that the source of the information allows access to the information by anyone upon request.

3.3.27 *reasonably ascertainable*—for purposes of both this practice and Practice E 1528, information that is (*1*) *publicly available*, (*2*) obtainable from its source within reasonable time and cost constraints, and (*3*) *practically reviewable*.

3.3.28 *recognized environmental conditions*—the presence or likely presence of any *hazardous substances* or *petroleum products* on a *property* under conditions that indicate an existing release, a past release, or a material threat of a release of any *hazardous substances* or *petroleum products* into structures on the *property* or into the ground, groundwater, or

surface water of the *property*. The term includes *hazardous substances* or *petroleum products* even under conditions in compliance with laws. The term is not intended to include *de minimis* conditions that generally do not present a material risk of harm to public health or the environment and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies.

3.3.29 *records review*—that part that is contained in Section 7 of this practice addresses which records shall or may be reviewed.

3.3.30 *site reconnaissance*—that part that is contained in Section 8 of this practice and addresses what should be done in connection with the *site visit*. The site reconnaissance includes, but is not limited to, the *site visit* done in connection with such a Phase I Environmental Site Assessment.

3.3.31 *site visit*—the visit to the property during which observations are made constituting the *site reconnaissance* section of this practice and the *site visit* requirement of Practice E 1528.

3.3.32 *standard environmental record sources*—those records specified in 7.2.1.1.

3.3.33 *standard historical sources*—those sources of information about the history of uses of property specified in 7.3.4.

3.3.34 *standard physical setting source*—a current USGS 7.5 minute topographic map (if any) showing the area on which the property is located. See 7.2.3.

3.3.35 *standard practice(s)*—the activities set forth in either and both this practice and Practice E 1528.

3.3.36 *standard sources*—sources of environmental, physical setting, or historical records specified in Section 7 of this practice.

3.3.37 *transaction screen process*—the process described in Practice E 1528.

3.3.38 *transaction screen questionnaire*—the questionnaire provided in Section 6 of Practice E 1528.

3.3.39 *user*—the party seeking to use Practice E 1528 to perform an *environmental site assessment* of the *property*. A user may include, without limitation, a purchaser of *property*, a potential tenant of property, an *owner* of *property*, a lender, or a property manager.

3.3.40 *visually and/or physically observed*—during a *site visit* pursuant to Practice E 1528, or pursuant to this practice, this term means observations made by vision while walking through a *property* and the structures located on it and observations made by the sense of smell, particularly observations of noxious or foul odors. The term "walking through" is not meant to imply that disabled persons who cannot physically walk may not conduct a *site visit*; they may do so by the means at their disposal for moving through the *property* and the structures located on it.

3.4 *Acronyms:Acronyms:*

3.4.1 *CERCLA*—Comprehensive Environmental Response, Compensation and Liability Act of 1980 (as amended, 42 USC § 9601 *et seq.*).

3.4.2 *CERCLIS*—Comprehensive Environmental Response, Compensation and Liability Information System (maintained by EPA).

3.4.3 *CFR*—Code of Federal Regulations.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017   6
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has been superseded and replaced by a new version or is withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3.15-cv-02789-BRM-LHG Document 56 Filed 12/15/17 Page 9 of 75 PageID: 298

E 1527 – 97

3.4.4 *CORRACTS*—TSD facilities subject to Corrective Action under RCRA.

3.4.5 *EPA*—United States Environmental Protection Agency.

3.4.6 *EPCRA*—Emergency Planning and Community Right to Know Act ((also known as SARA Title III), 42 USC § 11001 *et seq*.).

3.4.7 *ERNS*—emergency response notification system.

3.4.8 *ESA*—environmental site assessment (different than an *environmental audit*; see 3.3.12).

3.4.9 *FOIA*—U.S. Freedom of Information Act (5 USC 552 *et seq*.).

3.4.10 *FR*—Federal Register.

3.4.11 *LUST*—leaking underground storage tank.

3.4.12 *MSDS*—material safety data sheet.

3.4.13 *NCP*—National Contingency Plan.

3.4.14 *NPDES*—national pollutant discharge elimination system.

3.4.15 *NPL*—national priorities list.

3.4.16 *PCBs*—polychlorinated biphenyls.

3.4.17 *PRP*—potentially responsible party (pursuant to CERCLA 42 USC § 9607(a)).

3.4.18 *RCRA*—Resource Conservation and Recovery Act (as amended, 42 USC § 6901 *et seq*.).

3.4.19 *SARA*—Superfund Amendments and Reauthorization Act of 1986 (amendment to CERCLA).

3.4.20 *USC*—United States Code.

3.4.21 *USGS*—United States Geological Survey.

3.4.22 *UST*—underground storage tank.

## 4. Significance and Use

4.1 *Uses*—This practice is intended for use on a voluntary basis by parties who wish to assess the environmental condition of *commercial real estate*. While use of this practice is intended to constitute *appropriate inquiry* for purposes of CERCLA's *innocent landowner defense*, it is not intended that its use be limited to that purpose. This practice is intended primarily as an approach to conducting an inquiry designed to identify *recognized environmental conditions* in connection with a *property*, and *environmental site assessments* that are both more and less comprehensive than this practice (including, in some instances, no *environmental site assessment*) may be appropriate in some circumstances. Further, no implication is intended that a person must use this practice in order to be deemed to have conducted inquiry in a commercially prudent or reasonable manner in any particular transaction. Nevertheless, this practice is intended to reflect a commercially prudent and reasonable inquiry.

4.2 *Clarifications on Use*:

4.2.1 *Use Not Limited to CERCLA*—This practice and Practice E 1528 are designed to assist the *user* in developing information about the environmental condition of a *property* and as such has utility for a wide range of persons, including those who may have no actual or potential CERCLA liability and/or may not be seeking the *innocent landowner defense*.

4.2.2 *Residential Tenants/Purchasers and Others*—No implication is intended that it is currently customary practice for residential tenants of multifamily residential buildings, tenants of single-family homes or other residential real estate, or purchasers of dwellings for one's own residential use, to conduct an *environmental site assessment* in connection with these transactions. Thus, these transactions are not included in the term commercial real estate transactions, and it is not intended to imply that such persons are obligated to conduct an *environmental site assessment* in connection with these transactions for purposes of *appropriate inquiry* or for any other purpose. In addition, no implication is intended that it is currently customary practice for *environmental site assessments* to be conducted in other unenumerated instances (including but not limited to many commercial leasing transactions, many acquisitions of easements, and many loan transactions in which the lender has multiple remedies). On the other hand, anyone who elects to do an *environmental site assessment* of any *property* or portion of a property may, in such person's judgment, use either this practice or Practice E 1528.

4.2.3 *Site-Specific*—This practice is site-specific in that it relates to assessment of environmental conditions on a specific parcel of *commercial real estate*. Consequently, this practice does not address many additional issues raised in transactions such as purchases of business entities, or interests therein, or of their assets, that may well involve environmental liabilities pertaining to properties previously owned or operated or other off-site environmental liabilities.

4.3 *Two Related Practices*—This practice sets forth one procedure for an *environmental site assessment* known as a "Phase I Environmental Site Assessment" or a "Phase I ESA" or simply a "Phase I." This practice is a companion to Practice E 1528. These practices are each intended to meet the standard of *appropriate inquiry* necessary to qualify for the *innocent landowner defense*. It is essential to consider that these practices, taken together, provide for two alternative practices of *appropriate inquiry*.

4.3.1 *Election to Commence with Either Practice*—The *user* may commence inquiry to identify *recognized environmental conditions* in connection with a *property* by performing either the *transaction screen process*, or the Phase I Environmental Site Assessment given in this practice.

4.3.2 *Who May Conduct*—The *transaction screen process* may be conducted either by the *user* (including an agent or employee of the user) or wholly or partially by an *environmental professional*. The *transaction screen process* does not require the judgment of an *environmental professional*. Whenever a Phase I Environmental Site Assessment is conducted, it must be performed by an *environmental professional* to the extent specified in 6.5.1. Further, at the Phase I Environmental Site Assessment level, no practical standard can be designed to eliminate the role of judgment and the value and need for experience in the party performing the inquiry. The professional judgment of an *environmental professional* is, consequently, vital to the performance of appropriate inquiry at the Phase I Environmental Site Assessment level.

4.4 *Additional Services*—As set forth in 11.9, additional services may be contracted for between the *user* and the *environmental professional*.

4.5 *Principles*—The following principles are an integral part of both practices and are intended to be referred to in

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 5:15-cv-02789-BLF-EHC    Document 56    Filed 12/15/17    Page 10 of 75   PageID: 429

E 1527 – 97

resolving any ambiguity or exercising such discretion as is accorded the *user* or *environmental professional* in performing an *environmental site assessment* or in judging whether a *user* or *environmental professional* has conducted *appropriate inquiry* or has otherwise conducted an adequate *environmental site assessment*.

4.5.1 *Uncertainty Not Eliminated*—No *environmental site assessment* can wholly eliminate uncertainty regarding the potential for *recognized environmental conditions* in connection with a *property*. Performance of this practice or E1528 is intended to reduce, but not eliminate, uncertainty regarding the potential for *recognized environmental conditions* in connection with a property, and both practices recognize reasonable limits of time and cost.

4.5.2 *Not Exhaustive*—*Appropriate inquiry* does not mean an exhaustive assessment of a clean *property*. There is a point at which the cost of information obtained or the time required to gather it outweighs the usefulness of the information and, in fact, may be a material detriment to the orderly completion of transactions. One of the purposes of this practice is to identify a balance between the competing goals of limiting the costs and time demands inherent in performing an *environmental site assessment* and the reduction of uncertainty about unknown conditions resulting from additional information.

4.5.3 *Level of Inquiry Is Variable*—Not every *property* will warrant the same level of assessment. Consistent with good commercial or customary practice, the appropriate level of *environmental site assessment* will be guided by the type of *property* subject to assessment, the expertise and risk tolerance of the *user*, and the information developed in the course of the inquiry.

4.5.4 *Comparison With Subsequent Inquiry*—It should not be concluded or assumed that an inquiry was not *appropriate inquiry* merely because the inquiry did not identify *recognized environmental conditions* in connection with a *property*. *Environmental site assessments* must be evaluated based on the reasonableness of judgments made at the time and under the circumstances in which they were made. Subsequent *environmental site assessments* should not be considered valid standards to judge the appropriateness of any prior assessment based on hindsight, new information, use of developing technology or analytical techniques, or other factors.

4.6 *Continued Viability of Environmental Site Assessment*—An *environmental site assessment* meeting or exceeding either Practice E 1528 or this practice and completed less than 180 days previously is presumed to be valid. An *environmental site assessment* meeting or exceeding either practice and completed more than 180 days previously may be used to the extent allowed by *4.7-4.7.5*.

4.7 *Prior Assessment Usage*—Both Practice E 1528 and this practice recognize that *environmental site assessments* performed in accordance with these practices will include information that subsequent *users* may want to use to avoid undertaking duplicative assessment procedures. Therefore, the practices describe procedures to be followed to assist users in determining the appropriateness of using information in *environmental site assessments* performed previously. The system of prior assessment usage is based on the following principles that should be adhered to in addition to the specific procedures set forth elsewhere in these practices:

4.7.1 *Use of Prior Information*—Subject to *4.7.4*, *users* and *environmental professionals* may use information in prior *environmental site assessments* provided such information was generated as a result of procedures that meet or exceed the requirements of this practice or Practice E 1528 and then only provided that the specific procedures set forth in the appropriate practice are met.

4.7.2 *Prior Assessment Meets or Exceeds*—Subject to *4.7.4*, a prior *environmental site assessment* may be used in its entirety, without regard to the specific procedures set forth in these practices, if, in the reasonable judgment of the *user*: the prior *environmental site assessment* meets or exceeds the requirements of Practice E 1528 or this practice and the conditions at the *property* likely to affect *recognized environmental conditions* in connection with the *property* are not likely to have changed materially since the prior *environmental site assessment* was conducted. In making this judgment, the *user* should consider the type of *property* assessed and the conditions in the area surrounding the *property*.

4.7.3 *Current Investigation*—Except as provided in *4.7.2* and *4.7.2* of Practice E 1528 prior *environmental site assessments* should not be used without current investigation of conditions likely to affect *recognized environmental conditions* in connection with the *property* that may have changed materially since the prior *environmental site assessment* was conducted. At a minimum, for a Phase I Environmental Site Assessment consistent with this practice, a new *site reconnaissance*, interviews, and an update of the *records review* should be performed.

4.7.4 *Actual Knowledge Exception*—If the *user* or *environmental professional(s)* conducting an *environmental site assessment* has *actual knowledge* that the information being used from a prior *environmental site assessment* is not accurate or if it is *obvious*, based on other information obtained by means of the *environmental site assessment* or known to the person conducting the *environmental site assessment*, that the information being used is not accurate, such information from a prior *environmental site assessment* may not be used.

4.7.5 *Contractual Issues Regarding Prior Assessment Usage*—The contractual and legal obligations between prior and subsequent *users* of *environmental site assessments* or between *environmental professionals* who conducted prior *environmental site assessments* and those who would like to use such prior *environmental site assessments* are beyond the scope of this practice.

4.8 *Rules of Engagement*—The contractual and legal obligations between an *environmental professional* and a *user* (and other parties, if any) are outside the scope of this practice. No specific legal relationship between the *environmental professional* and the user is necessary for the *user* to meet the requirements of this practice.

## 5. User's Responsibilities

5.1 *Scope*—The purpose of this section is to describe tasks that will help identify the possibility of *recognized environmental conditions* in connection with the *property*. These tasks do not require the technical expertise of an *environmental*

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017    8
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:15-cv-02789-BRM-LHG   Document 50   Filed 12/15/17   Page 11 of 75 PageID: 290



**E 1527 – 97**

*professional* and are generally not performed by *environmental professionals* performing a Phase I Environmental Site Assessment. They may be performed by the *user*.

5.2 *Checking Title Records for Environmental Liens*—*Reasonably ascertainable recorded land title records* (see 7.3.4.4) should be checked to identify *environmental liens*, if any, that are currently recorded against the *property*. Any *environmental liens* so identified shall be reported to the *environmental professional* conducting a Phase I Environmental Site Assessment. This practice does not impose on the *environmental professional* the responsibility to check for recorded *environmental liens*. Rather the *user* should check or engage a title company or title professional to check *reasonably ascertainable recorded land title records* for *environmental liens* currently recorded against the *property*.

5.2.1 *Reasonably Ascertainable*—Environmental liens that are unrecorded or are located any place other than *recorded land title records* are not considered to be in *recorded land title records* that are *reasonably ascertainable*. *Recorded land title records* need not be checked if they otherwise do not meet the definition of the term *reasonably ascertainable*.

5.3 *Specialized Knowledge or Experience of the User*—If the *user* is aware of any specialized knowledge or experience that is material to *recognized environmental conditions* in connection with the *property*, it is the *user's* responsibility to communicate any information based on such specialized knowledge or experience to the *environmental professional*. The *user* should do so before the *environmental professional* does the *site reconnaissance*.

5.4 *Reason for Significantly Lower Purchase Price*—In a transaction involving the purchase of a parcel of *commercial real estate*, if a user has *actual knowledge* that the purchase price of the *property* is significantly less than the purchase price of comparable properties, the *user* should try to identify an explanation for the lower price and to make a written record of such explanation. Among the factors to consider will be the information that becomes known to the *user* pursuant to the Phase I Environmental Site Assessment.

## 6. Phase I Environmental Site Assessment

6.1 *Objective*—The purpose of this Phase I Environmental Site Assessment is to identify, to the extent feasible pursuant to the processes prescribed herein, recognized environmental conditions in connection with the property. (See 1.1.1.)

6.2 *Four Components*—A Phase I Environmental Site Assessment shall have four components, as described as follows:

6.2.1 *Records Review*—Review of records; see Section 7.

6.2.2 *Site Reconnaissance*, A visit to the property; see Section 8,

6.2.3 *Interviews*:

6.2.3.1 Interviews with current *owners* and *occupants* of the property; see Section 9, and

6.2.3.2 Interviews with local government officials; see Section 10, and

6.2.4 *Report*—Evaluation and report; see Section 11.

6.3 *Coordination of Parts*:

6.3.1 *Parts Used in Concert*—The *records review*, *site reconnaissance*, and *interviews* are intended to be used in concert with each other. If information from one source

indicates the need for more information, other sources may be available to provide information. For example, if a previous use of the *property* as a gasoline station is identified through the *records review*, but the present *owner* and *occupants* interviewed report no knowledge of an underground storage tank, the person conducting the *site reconnaissance* should be alert for signs of the presence of an underground storage tank.

6.3.2 *User Obligations*—The *environmental professional* shall note in the report whether or not the *user* has reported to the *environmental professional* any *environmental liens* encumbering the *property* or any specialized knowledge or experience of the *user* that would provide important information about previous ownership or uses of the *property* that may be material to identifying *recognized environmental conditions*.

6.4 *No Sampling*—This practice does not include any testing or sampling of materials (for example, soil, water, air, building materials).

6.5 *Who May Conduct a Phase I*:

6.5.1 *Environmental Professional's Duties*—The *interviews* and *site reconnaissance*, as well as review and interpretation of information upon which the report is based and overseeing the writing of the report, are all portions of a Phase I Environmental Site Assessment that shall be performed by an *environmental professional* or *environmental professionals*. If more than one environmental professional is involved in these tasks, they shall coordinate their efforts.

6.5.2 *Environmental Professional Supervision*—Information for the *records review* needed for completion of a Phase I Environmental Site Assessment may be provided by a number of parties including government agencies, third-party vendors, the *user*, and present and past *owners* and *occupants* of the *property*, provided that the information is obtained by or under the supervision of an *environmental professional* or is obtained by a third-party vendor specializing in retrieval of the information specified in Section 7. Prior assessments may also contain information that will be appropriate for usage in a current *environmental site assessment* provided the prior usage procedures set forth in Sections 7, 8, and 9 are followed. The *environmental professional(s)* participating in the *site reconnaissance* and responsible for the report shall review all of the information provided.

6.5.2.1 *Reliance*—An environmental professional is not required to verify independently the information provided but may rely on information provided unless he or she has *actual knowledge* that certain information is incorrect or unless it is *obvious* that certain information is incorrect based on other information obtained in the Phase I Environmental Site Assessment or otherwise actually known to the *environmental professional*.

## 7. Records Review

7.1 *Introduction*:

7.1.1 *Objective*—The purpose of the *records review* is to obtain and review records that will help identify *recognized environmental conditions* in connection with the *property*.

7.1.2 *Approximate Minimum Search Distance*—Some records to be reviewed pertain not just to the *property* but also

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

E 1527 – 97

pertain to properties within an additional *approximate minimum search distance* in order to help assess the likelihood of problems from migrating *hazardous substances* or *petroleum products*. When the term *approximate minimum search distance* includes areas outside the *property*, it shall be measured from the nearest *property* boundary. The term *approximate minimum search distance* is used in lieu of radius in order to include irregularly shaped properties.

7.1.2.1 *Reduction of Approximate Minimum Search Distance*—When allowed by 7.2.1.1, the *approximate minimum search distance* for a particular record may be reduced in the discretion of the environmental professional. Factors to consider in reducing the *approximate minimum search distance* include: (*1*) the density (for example, urban, rural, or suburban) of the setting in which the *property* is located; (*2*) the distance that the *hazardous substances* or *petroleum products* are likely to migrate based on local geologic or hydrogeologic conditions; and (*3*) other reasonable factors. The justification for each reduction and the *approximate minimum search distance* actually used for any particular record shall be explained in the report. If the *approximate minimum search distance* is specified as "property only," then the search shall be limited to the *property* and may not be reduced unless the particular record is not *reasonably ascertainable*.

7.1.3 *Accuracy and Completeness*—Accuracy and completeness of record information varies among information sources, including governmental sources. Record information is often inaccurate or incomplete. The *user* or *environmental professional* is not obligated to identify mistakes or insufficiencies in information provided. However, the *environmental professional* reviewing records shall make a reasonable effort to compensate for mistakes or insufficiencies in the information reviewed that are *obvious* in light of other information of which the *environmental professional* has *actual knowledge*.

7.1.4 *Reasonably Ascertainable/Standard Sources*—Availability of record information varies from information source to information source, including governmental jurisdictions. The *user* or *environmental professional* is not obligated to identify, obtain, or review every possible record that might exist with respect to a *property*. Instead, this practice identifies record information that shall be reviewed from standard sources, and the *user* or *environmental professional* is required to review only record information that is reasonably ascertainable from those standard sources. Record information that is *reasonably ascertainable* means (*1*) information that is publicly available, (*2*) information that is obtainable from its source within reasonable time and cost constraints, and (*3*) information that is *practically reviewable*.

7.1.4.1 *Publicly Available*—Information that is *publicly available* means that the source of the information allows access to the information by anyone upon request.

7.1.4.2 *Reasonable Time and Cost*—Information that is obtainable within reasonable time and cost constraints means that the information will be provided by the source within 20 calendar days of receiving a written, telephone, or in-person request at no more than a nominal cost intended to cover the source's cost of retrieving and duplicating the information. Information that can only be reviewed by a visit to the source

is *reasonably ascertainable* if the visit is permitted by the source within 20 days of request.

7.1.4.3 *Practically Reviewable*—Information that is *practically reviewable* means that the information is provided by the source in a manner and in a form that, upon examination, yields information relevant to the *property* without the need for extraordinary analysis of irrelevant data. The form of the information shall be such that the *user* can review the records for a limited geographic area. Records that cannot be feasibly retrieved by reference to the location of the *property* or a geographic area in which the *property* is located are not generally *practically reviewable*. Most databases of public records are practically reviewable if they can be obtained from the source agency by the county, city, zip code, or other geographic area of the facilities listed in the record system. Records that are sorted, filed, organized, or maintained by the source agency only chronologically are not generally *practically reviewable*. Listings in publicly available records which do not have adequate address information to be located geographically are not generally considered practically reviewable. For large databases with numerous facility records (such as RCRA generators and registered USTs), the records are not *practically reviewable* unless they can be obtained from the source agency in the smaller geographic area of zip codes. Even when information is provided by zip code for some large databases, it is common for an unmanageable number of sites to be identified within a given zip code. In these cases, it is not necessary to review the impact of all of the sites that are likely to be listed in any given zip code because that information would not be *practically reviewable*. In other words, when so much data is generated that it cannot be feasibly reviewed for its impact on the *property*, it is not required to be reviewed.

7.1.5 *Alternatives to Standard Sources*—Alternative sources may be used instead of standard sources if they are of similar or better reliability and detail, or if a *standard source* is not *reasonably ascertainable*.

7.1.6 *Coordination*—If records are not *reasonably ascertainable* from *standard sources* or alternative sources, the *environmental professional* shall attempt to obtain the requested information by other means specified in this practice such as questions posed to the current *owner* or *occupant(s)* of the *property* or appropriate persons available at the source at the time of the request.

7.1.7 *Sources of Standard Source Information*—Standard *source* information or other record information from government agencies may be obtained directly from appropriate government agencies or from commercial services. Government information obtained from nongovernmental sources may be considered current if the source updates the information at least every 90 days or, for information that is updated less frequently than quarterly by the government agency, within 90 days of the date the government agency makes the information available to the public.

7.1.8 *Documentation of Sources Checked*—The report shall document each source that was used, even if a source revealed no findings. Sources shall be sufficiently documented, including name, date request for information was filled, date information provided was last updated by source, date information

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:15-cv-02789-BRM-LHG Document 56 Filed 12/15/17 Page 13 of 75 PageID: 2492



E 1527 – 97

was last updated by original source (if provided other than by original source; see 7.1.7) so as to facilitate reconstruction of the research at a later date.

7.1.9 *Significance*—If a standard *environmental record source* (or other sources in the course of conducting the *Phase I Environmental Site Assessment*) identifies the *property* or another site within the *approximate minimum search distance*, the report shall include the *environmental professional's* judgment about the significance of the listing to the analysis of *recognized environmental conditions* in connection with the *property* (based on the data retrieved pursuant to 7.2, additional information from the government source, or other sources of information). In doing so, the *environmental professional* may make statements applicable to multiple sites (for example, a statement to the effect that none of the sites listed is likely to have a negative impact on the property except ...).

7.2 *Environmental Information*:

7.2.1 *Standard Environmental Sources*—The following *standard environmental record sources* shall be reviewed, subject to the conditions of 7.1.1-7.1.7:

7.2.1.1 *Standard Environmental Record Sources: Federal and State*—The *approximate minimum search distance* may be reduced, pursuant to 7.2.1.2, for any of these *standard environmental record sources* except the Federal NPL site list and Federal RCRA TSD list.

| | Approximate Minimum Search Distance, miles (kilometres) |
|---|---|
| Federal NPL site list | 1.0 (1.6) |
| Federal CERCLIS list | 0.5 (0.8) |
| Federal RCRA CORRACTS TSD facilities list | 1.0 (1.6) |
| Federal RCRA non-CORRACTS TSD facilities list | 0.5 (0.8) |
| Federal RCRA generators list | property and adjoining properties |
| Federal ERNS list | property only |
| State lists of hazardous waste sites identified for investigation or remediation: | |
| State-equivalent NPL | 1.0 (1.6) |
| State-equivalent CERCLIS | 0.5 (0.8) |
| State landfill and/or solid waste disposal site lists | 0.5 (0.8) |
| State leaking UST lists | 0.5 (0.8) |
| State registered UST lists | property and adjoining properties |

7.2.2 *Additional Environmental Record Sources: State or Local*—One or more additional state sources or local sources of environmental records may be checked, in the discretion of the *environmental professional*, to enhance and supplement federal and state sources identified above. Factors to consider in determining which local or additional state records, if any, should be checked include (*1*) whether they are *reasonably ascertainable*, (*2*) whether they are sufficiently useful, accurate, and complete in light of the objective of the *records review* (see 7.1.1), and (*3*) whether they are generally obtained, pursuant to local good commercial or customary practice, in initial *environmental site assessments* in the type of *commercial real estate* transaction involved. To the extent additional state sources or local sources are used to supplement the same record types listed above, *approximate minimum search distances* should not be less than those specified above (adjusted as provided in 7.2.1.1 and 7.2.1.2). Some types of records and sources that may be useful include:

*Types of Local Records*

Lists of Landfill/Solid Waste Disposal Sites
Lists of Hazardous Waste/Contaminated Sites
Lists of Registered Underground Storage Tanks
Records of Emergency Release Reports (SARA § 304)
Records of Contaminated Public Wells

*Local Sources*

Department of Health/Environmental Division
Fire Department
Planning Department
Building Permit/Inspection Department
Local/Regional Pollution Control Agency
Local/Regional Water Quality Agency
Local Electric Utility Companies (for records relating to PCBs)

7.2.3 *Physical Setting Sources*—A current USGS 7.5 Minute Topographic Map (or equivalent) showing the area on which the *property* is located shall be reviewed, provided it is *reasonably ascertainable*. It is the only *standard physical setting source* and the only *physical setting source* that is required to be obtained (and only if it is *reasonably ascertainable*). One or more additional *physical setting sources* may be obtained in the discretion of the *environmental professional*. Because such sources provide information about the geologic, hydrogeologic, hydrologic, or topographic characteristics of a site, discretionary *physical setting sources* shall be sought when (*1*) conditions have been identified in which *hazardous substances* or *petroleum products* are likely to migrate to the *property* or from or within the *property* to the groundwater or soil and (*2*) more information than is provided in the current USGS 7.5 Minute Topographic Map (or equivalent) is generally obtained, pursuant to local good commercial or customary practice in initial *environmental site assessments* in the type of *commercial real estate transaction* involved, in order to assess the impact of such migration on *recognized environmental conditions* in connection with the *property*.

*Mandatory Standard Physical Setting Source*

USGS—Current 7.5 Minute Topographic Map (or equivalent)

*Discretionary and Non-Standard Physical Setting Sources*

USGS and/or State Geological Survey—Groundwater Maps
USGS and/or State Geological Survey—Bedrock Geology Maps
USGS and/or State Geological Survey—Surficial Geology Maps
Soil Conservation Service—Soil Maps
Other Physical Setting Sources that are reasonably credible (as well as reasonably ascertainable)

7.3 *Historical Use Information*:

7.3.1 *Objective*—The objective of consulting historical sources is to develop a history of the previous uses of the *property* and surrounding area, in order to help identify the likelihood of past uses having led to *recognized environmental conditions* in connection with the *property*.

7.3.2 *Uses of the Property*—All *obvious* uses of the *property* shall be identified from the present, back to the *property's obvious* first developed use, or back to 1940, whichever is earlier. This task requires reviewing only as many of the *standard historical sources* in 7.3.4.1-7.3.4.8 as are necessary and both *reasonably ascertainable* and likely to be useful (as defined under *Data Failure* in 7.3.2.3). For example, if the *property* was developed in the 1700's, it might be feasible to identify uses back to the early 1900's, using sources such as *fire insurance maps* or *USGS 7.5 minute topographic maps* (or

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

E 1527 – 97

equivalent). Although other sources such as *recorded land title records* might go back to the 1700's, it would not be required to review them unless they were both *reasonably ascertainable* and likely to be useful. As another example, if the *property* was reportedly not developed until 1960, it would still be necessary to confirm that it was undeveloped back to 1940. Such confirmation may come from one or more of the *standard historical sources* specified in 7.3.4.1-7.3.4.8, or it may come from *other historical sources* (such as someone with personal knowledge of the *property*; see 7.3.4.9). However, checking other historical sources (see 7.3.4.9) would not be required. For purposes of 7.3.2, the term "developed use" includes agricultural uses and placement of fill. The report shall describe all identified uses, justify the earliest date identified (for example, records showed no development of the *property* prior to the specific date), and explain the reason for any gaps in the history of use (for example, *data failure*).

7.3.2.1 *Intervals*—Review of *standard historical sources* at less than approximately five year intervals is not required by this practice (for example, if the *property* had one use in 1950 and another use in 1955, it is not required to check for a third use in the intervening period). If the specific use of the *property* appears unchanged over a period longer than five years, then it is not required by this practice to research the use during that period (for example, if *fire insurance maps* show the same apartment building in 1940 and 1960, then the period in between need not be researched).

7.3.2.2 *General Type of Use*—In identifying previous uses, more specific information about uses is more helpful than less specific information, but it is sufficient, for purposes of 7.3.2, to identify the general type of use (for example: office, retail, and residential) unless it is *obvious* from the source(s) consulted that the use may be more specifically identified. However, if the general type of use is industrial or manufacturing (for example, *zoning/land use records* show industrial zoning), then additional *standard historical sources* should be reviewed if they are likely to identify a more specific use and are *reasonably ascertainable*, subject to the constraints of *data failure* (see 7.3.2.3).

7.3.2.3 *Data Failure*—A *standard historical source* may be excluded *(1)* if the source is not *reasonably ascertainable*, or *(2)* if past experience indicates that the source is not likely to be sufficiently useful, accurate, or complete in terms of satisfying 7.3.2. *Other historical sources* specified in 7.3.4.9 may be used to satisfy 7.3.2, 7.3.2.1, and 7.3.2.2, but are not required to comply with this practice. Whatever history of previous uses is derived from checking the *standard historical sources* specified in 7.3.4.1-7.3.4.8 (except those excluded by *(1)* and *(2)* of 7.3.2.3) shall be deemed sufficient historical use information to comply with this practice.

7.3.3 *Uses of Properties in Surrounding Area*—Uses in the area surrounding the *property* shall be identified in the report, but this task is required only to the extent that this information is revealed in the course of researching the *property* itself (for example, an *aerial photograph* or *fire insurance map* of the *property* will usually show the surrounding area). If the *environmental professional* uses sources that include the surrounding area, surrounding uses should be identified to a

distance determined at the discretion of the *environmental professional* (for example, if an aerial photo shows the area surrounding the *property*, then the *environmental professional* shall determine how far out from the *property* the photo should be analyzed). Factors to consider in making this determination include, but are not limited to: the extent to which information is *reasonably ascertainable*; the time and cost involved in reviewing surrounding uses (for example, analyzing *aerial photographs* is relatively quick, but reviewing *property tax files* for adjacent properties or reviewing *local street directories* for more than the few streets that surround the site is typically too time-consuming); the extent to which information is useful, accurate, and complete in light of the purpose of the records review (see 7.1.1); the likelihood of the information being significant to *recognized environmental conditions* in connection with the *property*; the extent to which potential concerns are *obvious*; known hydrogeologic/geologic conditions that may indicate a high probability of *hazardous substances* or *petroleum products* migration to the property; how recently local development has taken place; information obtained from *interviews* and other sources; and local good commercial or customary practice.

7.3.4 *Standard Historical Sources*:

7.3.4.1 *Aerial Photographs*—The term "aerial photographs" means photographs taken from an airplane or helicopter (from a low enough altitude to allow identification of development and activities) of areas encompassing the *property*. Aerial photographs are often available from government agencies or private collections unique to a local area.

7.3.4.2 *Fire Insurance Maps*—The term *fire insurance maps* means maps produced by private fire insurance map companies that indicate uses of properties at specified dates and that encompass the *property*. These maps are often available at local libraries, historical societies, private resellers, or from the map companies who produced them.

7.3.4.3 *Property Tax Files*—The term *property tax files* means the files kept for property tax purposes by the local jurisdiction where the *property* is located and includes records of past ownership, appraisals, maps, sketches, photos, or other information that is *reasonably ascertainable* and pertaining to the *property*.

7.3.4.4 *Recorded Land Title Records*—The term *recorded land title records* means records of fee ownership, leases, land contracts, easements, liens, and other encumbrances on or of the *property* recorded in the place where land title records are, by law or custom, recorded for the local jurisdiction in which the *property* is located. (Often such records are kept by a municipal or county recorder or clerk.) Such records may be obtained from title companies or directly from the local government agency. Information about the title to the *property* that is recorded in a U.S. district court or any place other than where land title records are, by law or custom, recorded for the local jurisdiction in which the *property* is located, are not considered part of recorded land title records, because often this source will provide only names of previous owners, lessees, easement holders, etc. and little or no information about uses or occupancies of the *property*, but when employed in combination with another source recorded land title records

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:15-cv-02789-BRM-LHG   Document 56   Filed 12/15/17   Page 15 of 75 PageID: 2904

E 1527 – 97

may provide helpful information about uses of the *property*. This source cannot be the sole historical source consulted. If this source is consulted, at least one additional standard historical source must also be consulted.

7.3.4.5 *USGS 7.5 Minute Topographic Maps*—The term *USGS 7.5 Minute Topographic Maps* means the map (if any) available from or produced by the United States Geological Survey, entitled "USGS 7.5 minute topographic map," and showing the property.

7.3.4.6 *Local Street Directories*—The term *local street directories* means directories published by private (or sometimes government) sources and showing ownership and/or use of sites by reference to street addresses. Often local street directories are available at libraries of local governments, colleges or universities, or historical societies.

7.3.4.7 *Building Department Records*—The term *building department records* means those records of the local government in which the property is located indicating permission of the local government to construct, alter, or demolish improvements on the property. Often building department records are located in the *building department* of a municipality or county.

7.3.4.8 *Zoning/Land Use Records*—The term *zoning/land use records* means those records of the local government in which the property is located indicating the uses permitted by the local government in particular zones within its jurisdiction. The records may consist of maps and/or written records. They are often located in the *planning department* of a municipality or county.

7.3.4.9 *Other Historical Sources*—The term *other historical sources* means any source or sources other than those designated in 7.3.4.1-7.3.4.8 that are credible to a reasonable person and that identify past uses of the *property*. This category includes, but is not limited to: miscellaneous maps, newspaper archives, and records in the files and/or personal knowledge of the property *owner* and/or *occupants*.

7.4 *Prior Assessment Usage*—Standard historical sources reviewed as part of a prior *environmental site assessment* do not need to be searched for or reviewed again, but uses of the *property* since the prior *environmental site assessment* should be identified either through *standard historical sources* (as specified in 7.3) or by alternatives to *standard historical sources*, to the extent such information is reasonably ascertainable. (See 4.7.)

## 8. Site Reconnaissance

8.1 *Objective*—The objective of the *site reconnaissance* is to obtain information indicating the likelihood of identifying *recognized environmental* conditions in connection with the property.

8.2 *Observation*—On a visit to the *property* (the *site visit*), the *environmental professional* shall *visually and physically* observe the *property* and any structure(s) located on the *property* to the extent not obstructed by bodies of water, adjacent buildings, or other obstacles.

8.2.1 *Exterior*—The periphery of the *property* shall be *visually and physically observed*, as well as the periphery of all structures on the property, and the *property* should be viewed from all adjacent public thoroughfares. If roads or paths with no apparent outlet are observed on the *property*, the use of the

road or path should be identified to determine whether it was likely to have been used as an avenue for disposal of *hazardous substances* or *petroleum products*.

8.2.2 *Interior*—On the interior of structures on the *property*, accessible common areas expected to be used by *occupants* or the public (such as lobbies, hallways, utility rooms, recreation areas, etc.), maintenance and repair areas, including boiler rooms, and a representative sample of *occupant* spaces, should be *visually and physically observed*. It is not necessary to look under floors, above ceilings, or behind walls.

8.2.3 *Methodology*—The *environmental professional* shall document, in the report, the method used (for example, grid patterns or other systematic approaches used for large properties, which spaces for *owner* or *occupants* were observed) to observe the *property*.

8.2.4 *Limitations*—The *environmental professional* shall document, in the report, general limitations and bases of review, including limitations imposed by physical obstructions such as adjacent buildings, bodies of water, asphalt, or other paved areas, and limiting conditions (for example, snow, rain).

8.2.5 *Frequency*—It is not expected that more than one visit to the *property* shall be made by the *environmental professional* in connection with a *Phase I Environmental Site Assessment*. The one visit constituting part of the *Phase I Environmental Site Assessment* may be referred to as the *site visit*.

8.3 *Prior Assessment Usage*—The information supplied in connection with the *site reconnaissance* portion of a prior *environmental site assessment* may be used for guidance but shall not be relied upon without determining through a new *site reconnaissance* whether any conditions that are material to *recognized environmental conditions* in connection with the *property* have changed since the prior *environmental site assessment*.

8.4 *Uses and Conditions*—The *environmental professional(s)* conducting the *site reconnaissance* should note the uses and conditions specified in 8.4.1 through 8.4.4.8 to the extent *visually or physically observed* during the *site visit*. The uses and conditions specified in 8.4.4 through 8.4.4.8 should also be the subject of questions asked as part of *interviews* of *owners* and *occupants* (see Section 9). Uses and conditions to be noted shall be recorded in field notes of the *environmental professional(s)* conducting the *site reconnaissance* but are only required to be described in the report to the extent specified in 8.4.1 through 8.4.4.8. The *environmental professional(s)* performing the *Phase I Environmental Site Assessment* are obligated to identify uses and conditions only to the extent that they may be *visually and physically observed* on a *site visit*, as described in this practice, or to the extent that they are identified by the *interviews* (see Sections 9 and 10) or *record review* (see Section 7) processes described in this practice.

8.4.1 *General Site Setting*:

8.4.1.1 *Current Use(s) of the Property*—The current use(s) of the *property* shall be identified in the report. Any current uses likely to involve the use, treatment, storage, disposal, or generation of *hazardous substances* or *petroleum products* shall be identified in the report. Unoccupied occupant spaces should be noted. In identifying current uses of the *property*,

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

E 1527 – 97

more specific information is more helpful than less specific information. (For example, it is more useful to identify uses such as a hardware store, a grocery store, or a bakery rather than simply retail use.)

8.4.1.2 *Past Use(s) of the Property*—To the extent that indications of past uses of the *property* are *visually or physically observed* on the *site visit*, or are identified in the *interviews* or *record review*, they shall be identified in the report, and past uses so identified shall be described in the report if they are likely to have involved the use, treatment, storage, disposal, or generation of *hazardous substances* or *petroleum products*. (For example, there may be signs indicating a past use or a structure indicating a past use.)

8.4.1.3 *Current Uses of Adjoining Properties*—To the extent that current uses of *adjoining properties* are *visually or physically observed* on the *site visit*, or are identified in the *interviews* or *records review*, they shall be identified in the report, and current uses so identified shall be described in the report if they are likely to indicate *recognized environmental conditions* in connection with the *adjoining properties* or the *property*.

8.4.1.4 *Past Uses of Adjoining Properties*—To the extent that indications of past uses of *adjoining properties* are *visually or physically observed* on the *site visit*, or are identified in the *interviews* or *record review*, they shall be noted by the *environmental professional*, and past uses so identified shall be described in the report if they are likely to indicate *recognized environmental conditions* in connection with the *adjoining properties* or the *property*.

8.4.1.5 *Current or Past Uses in the Surrounding Area*—To the extent that the general type of current or past uses (for example, residential, commercial, industrial) of properties surrounding the *property* are *visually or physically observed* on the *site visit* or going to or from the *property* for the *site visit*, or are identified in the *interviews* or *record review*, they shall be noted by the *environmental professional*, and uses so identified shall be described in the report if they are likely to indicate *recognized environmental conditions* in connection with the *property*.

8.4.1.6 *Geologic, Hydrogeologic, Hydrologic, and Topographic Conditions*—The topographic conditions of the *property* shall be noted to the extent *visually or physically observed* or determined from *interviews*, as well as the general topography of the area surrounding the *property* that is *visually or physically observed* from the periphery of the *property*. If any information obtained shows there are likely to be *hazardous substances* or *petroleum products* on the property or on nearby properties and those *hazardous substances* or *petroleum products* are of a type that may migrate, topographic observations shall be analyzed in connection with geologic, hydrogeologic, hydrologic, and topographic information obtained pursuant to *records review* (see 7.2.3) and *interviews* to evaluate whether *hazardous substances* or *petroleum products* are likely to migrate to the *property*, or within or from the *property*, into groundwater or soil.

8.4.1.7 *General Description of Structures*—The report shall generally describe the structures or other improvements on the *property*, for example: number of buildings, number of stories each, approximate age of buildings, ancillary structures (if any), etc.

8.4.1.8 *Roads*—Public thoroughfares adjoining the *property* shall be identified in the report and any roads, streets, and parking facilities on the *property* shall be described in the report.

8.4.1.9 *Potable Water Supply*—The source of potable water for the *property* shall be identified in the report.

8.4.1.10 *Sewage Disposal System*—The sewage disposal system for the *property* shall be identified in the report. Inquiry shall be made as to the age of the system as part of the process under Sections 7, 9, or 10.

8.4.2 *Interior and Exterior Observations*:

8.4.2.1 *Current Use(s) of the Property*—The current use(s) of the *property* shall be identified in the report. Any current uses likely to involve the use, treatment, storage, disposal, or generation of *hazardous substances* or *petroleum products* shall be identified in the report. Unoccupied *occupant* spaces should be noted. In identifying current uses of the *property*, more specific information is more helpful than less specific information. (For example, it is more useful to identify uses such as a hardware store, a grocery store, or a bakery rather than simply retail use.)

8.4.2.2 *Past Use(s) of the Property*—To the extent that indications of past uses of the *property* are *visually or physically observed* on the *site visit*, or are identified in the *interviews* or *records review*, they shall be identified in the report, and past uses so identified shall be described in the report if they are likely to have involved the use, treatment, storage, disposal, or generation of *hazardous substances* or *petroleum products*. (For example, there may be signs indicating a past use or a structure indicating a past use.)

8.4.2.3 *Hazardous Substances and Petroleum Products in Connection with Identified Uses*—To the extent that present uses are identified that use, treat, store, dispose of, or generate *hazardous substances* and *petroleum products* on the *property*: (*1*) the *hazardous substances* and *petroleum products* shall be identified or indicated as unidentified in the report, and (*2*) the approximate quantities involved, types of containers (if any) and storage conditions shall be described in the report. To the extent that past uses are identified that used, treated, stored, disposed of, or generated *hazardous substances* and *petroleum products* on the *property*, the information shall be identified to the extent it is *visually or physically observed* during the *site visit* or identified from the *interviews* or the *records review*.

8.4.2.4 *Storage Tanks*—Above ground storage tanks, or underground storage tanks or vent pipes, fill pipes or access ways indicating underground storage tanks shall be identified (for example, content, capacity, and age) to the extent *visually or physically observed* during the *site visit* or identified from the *interviews* or *records review*.

8.4.2.5 *Odors*—Strong, pungent, or noxious odors shall be described in the report and their sources shall be identified in the report to the extent *visually or physically observed* or identified from the *interviews* or *records review*.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

8.4.2.6 *Pools of Liquid*—Standing surface water shall be noted. Pools or *sumps* containing liquids likely to be *hazardous substances* or *petroleum products* shall be described in the report to the extent *visually or physically observed* or identified from the *interviews* or *records review*.

8.4.2.7 *Drums*—To the extent *visually or physically observed* or identified from the *interviews* or *records review*, *drums* shall be described in the report, whether or not they are leaking, unless it is known that their contents are not *hazardous substances* or *petroleum products* (in that case the contents should be described in the report). *Drums* often hold 55 gal (208 L) of liquid, but containers as small as 5 gal (19 L) should also be described.

8.4.2.8 *Hazardous Substance and Petroleum Products Containers (Not Necessarily in Connection With Identified Uses)*— When containers identified as containing *hazardous substances* or *petroleum products* are *visually or physically observed* on the *property* and are or might be a *recognized environmental condition*: the *hazardous substances* or *petroleum products* shall be identified or indicated as unidentified in the report, and the approximate quantities involved, types of containers, and storage conditions shall be described in the report.

8.4.2.9 *Unidentified Substance Containers*—When open or damaged containers containing unidentified substances suspected of being *hazardous substances* or *petroleum products* are *visually or physically observed* on the *property*, the approximate quantities involved, types of containers, and storage conditions shall be described in the report.

8.4.2.10 *PCBs*—Electrical or hydraulic equipment known to contain PCBs or likely to contain PCBs shall be described in the report to the extent *visually or physically observed* or identified from the *interviews* or *records review*. Fluorescent light ballast likely to contain PCBs does not need to be noted.

8.4.3 *Interior Observations*:

8.4.3.1 *Heating/Cooling*—The means of heating and cooling the buildings on the property, including the fuel source for heating and cooling, shall be identified in the report (for example, heating oil, gas, electric, radiators from steam boiler fueled by gas).

8.4.3.2 *Stains or Corrosion*—To the extent *visually or physically observed* or identified from the *interviews*, stains or corrosion on floors, walls, or ceilings shall be described in the report, except for staining from water.

8.4.3.3 *Drains and Sumps*—To the extent *visually or physically observed* or identified from the *interviews*, floor drains and *sumps* shall be described in the report.

8.4.4 *Exterior Observations*:

8.4.4.1 *Pits, Ponds, or Lagoons*—To the extent *visually or physically observed* or identified from the *interviews* or *records review*, *pits, ponds, or lagoons* on the *property* shall be described in the report, particularly if they have been used in connection with waste disposal or waste treatment. *Pits, ponds, or lagoons* on *properties* adjoining the *property* shall be described in the report to the extent they are *visually or physically observed* from the *property* or identified in the *interviews* or *records review*.

8.4.4.2 *Stained Soil or Pavement*—To the extent *visually or physically observed* or identified from the *interviews*, areas of stained soil or pavement shall be described in the report.

8.4.4.3 *Stressed Vegetation*—To the extent *visually or physically observed* or identified from the *interviews*, areas of stressed vegetation (from something other than insufficient water) shall be described in the report.

8.4.4.4 *Solid Waste*—To the extent *visually or physically observed* or identified from the *interviews* or *records review*, areas that are apparently filled or graded by non-natural causes (or filled by fill of unknown origin) suggesting trash or other solid waste disposal, or mounds or depressions suggesting trash or other solid waste disposal, shall be described in the report.

8.4.4.5 *Waste Water*—To the extent *visually or physically observed* or identified from the *interviews* or *records review*, waste water or other liquid (including storm water) or any discharge into a drain, ditch, or stream on or adjacent to the *property* shall be described in the report.

8.4.4.6 *Wells*—To the extent *visually or physically observed* or identified from the *interviews* or *records review*, all wells (including dry wells, irrigation wells, injection wells, abandoned wells, or other wells) shall be described in the report.

8.4.4.7 *Septic Systems*—To the extent *visually or physically observed* or identified from the *interviews* or *records review*, indications of on-site septic systems or cesspools should be described in the report.

## 9. Interviews With Owners and Occupants

9.1 *Objective*—The objective of *interviews* is to obtain information indicating *recognized environmental conditions* in connection with the *property*.

9.2 *Content*—Interviews with *owners* and *occupants* consist of questions to be asked in the manner and of persons as described in this section. The content of questions to be asked shall attempt to obtain information about uses and conditions as described in Section 8, as well as information described in 9.8 and 9.9.

9.3 *Medium*—Questions to be asked pursuant to this section may be asked in person, by telephone, or in writing, in the discretion of the *environmental professional*.

9.4 *Timing*—Except as specified in 9.8 and 9.9, it is in the discretion of the *environmental professional* whether to ask questions before, during, or after the *site visit* described in Section 8, or in some combination thereof.

9.5 *Who Should be Interviewed*:

9.5.1 *Key Site Manager*—Prior to the *site visit*, the *owner* should be asked to identify a person with good knowledge of the uses and physical characteristics of the *property* (the *key site manager*). Often the *key site manager* will be the property manager, the chief physical plant supervisor, or head maintenance person. (If the *user* is the current *property* owner, the user has an obligation to identify a *key site manager*, even if it is the *user* himself or herself.) If a *key site manager* is identified, the person conducting the *site visit* shall make at least one reasonable attempt (in writing or by telephone) to arrange a mutually convenient appointment for the *site visit* when the *key site manager* agrees to be there. If the attempt is successful, the *key site manager* shall be interviewed in

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017 15
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3.15-cv-02789-BRM-LHG Document 56 Filed 12/15/17 Page 18 of 75 PageID: 747

E 1527 – 97

conjunction with the *site visit*. If such an attempt is unsuccessful, when conducting the *site visit*, the *environmental professional* shall evaluate whether an identified *key site manager* (if any) or if a person with good knowledge of the uses and physical characteristics of the *property* is available to be interviewed at that time; if so, that person shall be interviewed. In any case, it is within the discretion of the *environmental professional* to decide which questions to ask before, during, or after the *site visit* or in some combination thereof.

9.5.2 *Occupants*—A reasonable attempt shall be made to interview a reasonable number of *occupants* of the *property*.

9.5.2.1 *Multi-Family Properties*—For multi-family residential properties, residential *occupants* do not need to be interviewed, but if the *property* has nonresidential uses, interviews should be held with the nonresidential *occupants* based on criteria specified in 9.5.2.2.

9.5.2.2 *Major Occupants*—Except as specified in 9.5.2.1, if the *property* has five or fewer current *occupants*, a reasonable attempt shall be made to interview a representative of each one of them. If there are more than five current *occupants*, a reasonable attempt shall be made to interview the *major occupant(s)* and those other *occupants* whose operations are likely to indicate *recognized environmental conditions* in connection with the *property*.

9.5.2.3 *Reasonable Attempts to Interview*—Examples of reasonable attempts to interview those *occupants* specified in 9.5.2.2 include (but are not limited to) an attempt to interview such *occupants* when making the *site visit* or calling such *occupants* by telephone. In any case, when there are several *occupants* to interview, it is not expected that the *site visit* must be scheduled at a time when they will all be available to be interviewed.

9.5.2.4 *Occupant Identification*—The report shall identify the occupants interviewed and the duration of their occupancy.

9.5.3 *Prior Assessment Usage*—Persons interviewed as part of a prior *Phase I Environmental Site Assessment* consistent with this practice do not need to be questioned again about the content of answers they provided at that time. However, they should be questioned about any new information learned since that time, or others should be questioned about conditions since the prior *Phase I Environmental Site Assessment* consistent with this practice.

9.6 *Quality of Answers*—The person(s) interviewed should be asked to be as specific as reasonably feasible in answering questions. The person(s) interviewed should be asked to answer in good faith and to the extent of their knowledge.

9.7 *Incomplete Answers*—While the person conducting the interview(s) has an obligation to ask questions, in many instances the persons to whom the questions are addressed will have no obligation to answer them.

9.7.1 *User*—If the person to be interviewed is the user (the person on whose behalf the *Phase I Environmental Site Assessment* is being conducted), the *user* has an obligation to answer all questions posed by the person conducting the interview, in good faith, to the extent of his or her *actual knowledge* or to designate a *key site manager* to do so. If answers to questions are unknown or partially unknown to the

*user* or such *key site manager*, this *interview* section of the *Phase I Environmental Site Assessment* shall not thereby be deemed incomplete.

9.7.2 *Non-user*—If the person conducting the interview(s) asks questions of a person other than a user but does not receive answers or receives partial answers, this *interview* section of the *Phase I Environmental Site Assessment* shall not thereby be deemed incomplete, provided that (*1*) the questions have been asked (or attempted to be asked) in person or by telephone and written records have been kept of the person to whom the questions were addressed and the responses, or (*2*) the questions have been asked in writing sent by first class mail or by private, commercial carrier and no answer or incomplete answers have been obtained and at least one reasonable follow up (telephone call or written request) was made again asking for responses.

9.8 *Questions About Helpful Documents*—Prior to the *site visit*, the *property owner*, *key site manager* (if any is identified), and *user* (if different from the *property owner*) shall be asked if they know whether any of the documents listed in 9.8.1 exists and, if so, whether copies can and will be provided to the *environmental professional* within reasonable time and cost constraints. Even partial information provided may be useful. If so, the *environmental professional* conducting the *site visit* shall review the available documents prior to or at the beginning of the *site visit*.

9.8.1 *Helpful Documents*:

9.8.1.1 Environment site assessment reports,

9.8.1.2 Environment audit reports,

9.8.1.3 Environmental permits (for example, solid waste disposal permits, hazardous waste disposal permits, wastewater permits, NPDES permits),

9.8.1.4 Registrations for underground and above-ground storage tanks,

9.8.1.5 Material safety data sheets,

9.8.1.6 Community right-to-know plan,

9.8.1.7 Safety plans; preparedness and prevention plans; spill prevention, countermeasure, and control plans; etc.,

9.8.1.8 Reports regarding hydrogeologic conditions on the property or surrounding area,

9.8.1.9 Notices or other correspondence from any government agency relating to past or current violations of environmental laws with respect to the property or relating to environmental liens encumbering the property,

9.8.1.10 Hazardous waste generator notices or reports, and

9.8.1.11 Geotechnical studies.

9.9 *Proceedings Involving the Property*—Prior to the *site visit*, the *property owner*, *key site manager* (if any is identified), and *user* (if different from the *property owner*) shall be asked whether they know of: (*1*) any pending, threatened, or past litigation relevant to *hazardous substances* or *petroleum products* in, on, or from the *property*; (*2*) any pending, threatened, or past administrative proceedings relevant to *hazardous substances* or *petroleum products* in, on, or from the *property*; and (*3*) any notices from any governmental entity regarding any possible violation of environmental laws or possible liability relating to *hazardous substances* or *petroleum products*.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

16

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 5:15-cv-02789-BRM-EHC    Document 56    Filed 12/15/17    Page 19 of 75 PageID: 298

E 1527 – 97

## 10. Interviews With Local Government Officials

10.1 *Objective*—The objective of *interviews* with *local government officials* is to obtain information indicating *recognized environmental conditions* in connection with the *property*.

10.2 *Content*—Interviews with *local government officials* consist of questions to be asked in the manner and of persons as described in this section. The content of questions to be asked shall be decided in the discretion of the *environmental professional(s)* conducting the *Phase I Environmental Site Assessment*, provided that the questions shall generally be directed towards identifying *recognized environmental conditions* in connection with the *property*.

10.3 *Medium*—Questions to be asked may be asked in person or by telephone, in the discretion of the *environmental professional*.

10.4 *Timing*—It is in the discretion of the *environmental professional* whether to ask questions before or after the *site visit* described in Section 8, or in some combination thereof.

10.5 *Who Should Be Interviewed*:

10.5.1 *Local Agency Officials*—A reasonable attempt shall be made to interview at least one staff member of any one of the following types of local government agencies:

10.5.1.1 Local fire department that serves the *property*,

10.5.1.2 Local health agency or local/regional office of state health agency serving the area in which the *property* is located, or

10.5.1.3 Local agency or local/regional office of state agency having jurisdiction over hazardous waste disposal or other environmental matters in the area in which the *property* is located.

10.6 *Prior Assessment Usage*—Persons interviewed as part of a prior *Phase I Environmental Site Assessment* consistent with this practice do not need to be questioned again about the content of answers they provided at that time. However, they should be questioned about any new information learned since that time, or others should be questioned about conditions since the prior *Phase I Environmental Site Assessment* consistent with this practice.

10.7 *Quality of Answers*—The person(s) interviewed should be asked to be as specific as reasonably feasible in answering questions. The person(s) interviewed should be asked to answer in good faith and to the extent of their knowledge.

10.8 *Incomplete Answers*—While the person conducting the *interview(s)* has an obligation to ask questions, in many instances the persons to whom the questions are addressed will have no obligation to answer them. If the person conducting the *interview(s)* asks questions but does not receive answers or receives partial answers, this section shall not thereby be deemed incomplete, provided that questions have been asked (or attempted to be asked) in person or by telephone and written records have been kept of the person to whom the questions were addressed and their responses.

## 11. Evaluation and Report Preparation

11.1 *Report Format*—The report of findings for the *Phase I Environmental Site Assessment* should generally follow the recommended report format attached as Appendix X2 unless otherwise required by the user.

11.2 *Documentation*—The report should include documentation (for example, references, key exhibits) to support the analysis, opinions, and conclusions found in the report. All sources, including those that revealed no findings, should be sufficiently documented to facilitate reconstruction of the research at a later date.

11.3 *Contents of Report*—The report shall include those matters required to be included in the report pursuant to various provisions of this practice. In addition, the report shall state whether the *user* reported to the *environmental professional* any information pursuant to the user's responsibilities described in Section 5 of this practice (for example, an *environmental lien* encumbering the *property* or any relevant specialized knowledge or experience of the user).

11.4 *Credentials*—The report shall name the *environmental professional(s)* involved in conducting the *Phase I Environmental Site Assessment*. One of two options shall be available to address qualifications of those persons involved in conducting the *Phase I Environmental Site Assessment*: (*1*) the report shall include a qualifications statement of the *environmental professional(s)* responsible for the *Phase I Environmental Site Assessment* and preparation of the report, and the qualifications statement shall include relevant individual and corporate qualifications; or (*2*) a written qualifications statement of the *environmental professional(s)* responsible for the *Phase I Environmental Site Assessment* and preparation of the report, including relevant individual and corporate qualifications, shall be delivered to the *user*.

11.5 *Opinion*—All evidence of recognized environmental conditions shall be described in full. The report shall include the *environmental professional's* opinion of the impact of *recognized environmental conditions* in connection with the *property*.

11.6 *Findings and Conclusions*—The report shall have a findings and conclusions section that states one of the following:

11.6.1 "We have performed a *Phase I Environmental Site Assessment* in conformance with the scope and limitations of ASTM Practice E 1527 of [insert address or legal description], the *property*. Any exceptions to, or deletions from, this practice are described in Section [ ] of this report. This assessment has revealed no evidence of recognized environmental conditions in connection with the property," or

11.6.2 "We have performed a *Phase I Environmental Site Assessment* in conformance with the scope and limitations of ASTM Practice E 1527 of [insert address or legal description], the property. Any exceptions to, or deletions from, this practice are described in Section [ ] of this report. This assessment has revealed no evidence of recognized environmental conditions in connection with the *property* except for the following: (list)."

11.7 *Deviations*—All deletions and deviations from this practice (if any) shall be listed individually and in detail and all additions should be listed.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:15-cv-02789-BRM-LHG   Document 56   Filed 12/15/17   Page 20 of 75 PageID: 749



E 1527 – 97

11.8 *Signature*—The environmental professional(s) responsible for the *Phase I Environmental Site Assessment* shall sign the report.

11.9 *Additional Services*—Any additional services contracted for between the user and the environmental professional(s), including a broader scope of assessment, more detailed conclusions, liability/risk evaluations, recommendation for Phase II testing, remediation techniques, etc., are beyond the scope of this practice, and should only be included in the report if so specified in the terms of engagement between the user and the *environmental professional*.

## 12. Non-Scope Considerations

12.1 *General*:

12.1.1 *Additional Issues*—There may be environmental issues or conditions at a property that parties may wish to assess in connection with *commercial real estate* that are outside the scope of this practice (the non-scope considerations). As noted by the legal analysis in Appendix X1 of this practice, some substances may be present on a property in quantities and under conditions that may lead to contamination of the property or of nearby properties but are not included in CERCLA's definition of hazardous substances (42 USC §

9601(14)) or do not otherwise present potential CERCLA liability. In any case, they are beyond the scope of this practice.

12.1.2 *Outside Standard Practices*—Whether or not a *user* elects to inquire into non-scope considerations in connection with this practice or any other environmental site assessment, no assessment of such non-scope considerations is required for appropriate inquiry as defined by this practice.

12.1.3 *Other Standards*—There may be standards or protocols for assessment of potential hazards and conditions associated with non-scope conditions developed by governmental entities, professional organizations, or other private entities.

12.1.4 *List of Additional Issues*—Following are several non-scope considerations that persons may want to assess in connection with commercial real estate. No implication is intended as to the relative importance of inquiry into such non-scope considerations, and this list of non-scope considerations is not intended to be all-inclusive:

12.1.4.1 Asbestos-Containing Materials,

12.1.4.2 Radon,

12.1.4.3 Lead-Based Paint,

12.1.4.4 Lead in Drinking Water, and

12.1.4.5 Wetlands.

## APPENDIXES

### (Nonmandatory Information)

## X1. LEGAL BACKGROUND TO FEDERAL LAW AND THE PRACTICES ON ENVIRONMENTAL ASSESSMENTS IN COMMERCIAL REAL ESTATE TRANSACTIONS

### INTRODUCTION

The legal section of Subcommittee E50.02 on Environmental Assessments In Commercial Real Estate Transactions provides the following background to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as amended including amended by the Superfund Amendments and Reauthorization Act (SARA), 42 USC§ 9601 *et seq*. The background to CERCLA, commonly known as the Superfund law, outlines the potential liability for the cleanup of hazardous substances, available defenses to such liability, appropriate inquiry under Superfund, statutory definition of hazardous substances, petroleum products and petroleum exclusion to CERCLA, and reasons why certain environmental-hazards are excluded from the scope of Superfund and this practice and Practice E 1528.

There are several elements of Superfund liability and the commonly termed "innocent purchaser" defense, that arises out of the statutory third-party defense, that may impact on the development and understanding of this practice and Practice E 1528.

X1.1 *Superfund Liability:*

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

### E 1527 – 97

X1.1.1 All of the following elements of liability under Superfund must be established by a plaintiff before a defendant will be liable under superfund for a *government's* response costs:[7]

X1.1.1.1 The site is a facility, as defined at § 9601(9),

X1.1.1.2 A release or threatened release of a hazardous substance from the site occurred (release is defined at § 9601(22) as *any* amount of any hazardous substance;" hazardous substance" is defined at § 9601(14) (see statutory definition of "hazardous substance"),

X1.1.1.3 A release or threatened release caused the plaintiff to incur response costs. Response costs are defined at § 9601(25) to mean costs related to both removal actions (§ 9601(23)) and remedial actions (§ 9601(24)), and

X1.1.1.4 Defendants fall within at least one of the four classes of responsible parties.[8]

X1.1.2 In order to recover response costs, a government plaintiff must prove that the costs were not inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan (commonly referred to as the National Contingency Plan or NCP), 40 CFR § 300.[9] A private plaintiff must prove its costs were necessary costs of response and that the response action was consistent with the NCP. 42 USC§ 9607 (a).[10]

X1.1.3 If there is a release or threatened release of hazardous substances on a site, private parties, even if they are not PRPs, may decide to incur response costs and seek recovery from other private parties, and PRPs may seek contribution from other PRPs.

X1.1.4 There is an important difference between government's burden to show that its response costs are "not inconsistent with the NCP" and the burden a private party bears to show that its response costs are "consistent with the NCP". See § 9607 (a)(4)(A) and (B). Courts have interpreted this statutory difference to give the government a rebuttable presumption that its response costs are consistent with the NCP, whereas a private party who undertakes response costs and seeks recovery from responsible parties bears the burden of proving its response was consistent with the NCP.[11] The EPA takes the position that a private party who undertakes a response action must be only in "substantial compliance", rather than strict technical compliance, with the NCP, as long as a CERCLA-quality cleanup is achieved. The NCP requirements for a private party response-action are set forth at 40 CFR § 300.700.

X1.2 *Defenses to Liability:*

X1.2.1 Assuming that all the elements of liability exist, a party may avoid liability only by meeting one of the defenses listed in§ 9607(b). These listed defenses are exclusive of all others.[12] Section 9607(b) states (*emphasis added*):

"There shall be no liability under subsection (a) for a person otherwise liable who can establish by a preponderance of the evidence [the lowest evidentiary standard available, meaning more probable than not] that the release or threat of release of a hazardous substance and the damages resulting therefrom were *caused solely by—*
1) an act of God;
2) an act of war;
3) *an act or omission of a third party other* than an employee or agent of the defendant, or *than one whose act or omission occurs in connection with a contractual relationship* [see the definition of "contractual relationship" in X1.2.2], existing directly or indirectly, with the defendant ..., if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned ..., and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such actions or omissions."

X1.2.2 Under § 9601(35)(A), a contractual relationship "includes, but is not limited to, land contracts, deeds, or other instruments transferring title or possession ...". These contractual relationships with third parties eliminate the defense to liability unless the defendant is an innocent purchaser. Or as stated by the statute at § 9601(35) (A)(emphasis added), a contractual relationship with the third party defeats the defense.

"unless the real property on which the facility is located was acquired by the defendant after disposal or placement of the hazardous substance ... and one or more of the following circumstances is also established by the defendant by a preponderance of the evidence:
   (i) At the time the defendant acquired the facility the defendant *did not know and had no reason to know* that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.
   (ii) The defendant is the government ...
   (iii) The defendant acquired the facility by inheritance or bequest."

X1.2.3 Therefore, the so-called innocent purchaser defense arises out of the third-party defense of § 9607(b)(3). Restated, this defense to Superfund liability is available only if the defendant shows the following:

---

[7] 42 USC §9607(a). (All statutory references are to Title 42 of the United States Code, unless otherwise specified.) See *United States versus Aceto Agricultural Chemicals Corp*., 872 F.2d 1373 (8th Cir. 1989). Private plaintiffs, as well as the government, may seek response costs under Superfund from defendants. While many users of these ASTM practices or other private parties may think in terms of how to defend against Superfund liability, they should recognize that they may decide to conduct cleanup actions and seek response costs from other parties.

[8] The four classes of potentially responsible parties (PRPs) are listed as § 9607(a) as follows:
(*1*) Owner and operator of a facility (See § 9601 (20)(A): the term "owner or operator" does not include a person, who, without participating in the management of a facility, holds indicia of ownership primarily to protect his security interest in the facility. In *re: Bergsoe Metal Corporation*, 910 F.2d 668 (9th Cir. Aug. 9, 1990); *Guidice versus BFG Electroplating and Manufacturing Co*., 732 F.Supp. 556 (W.D.Pa. 1989); *United States v. Mirabile*, 23 ERC 1511 (E.D.Pa. 1985). But see *United States versus Fleet Factors Corp*., 901 F.2d 1550 (11th Cir. 1990); *United States versus Maryland Bank and Trust Co*., 632 F. Supp. 573 (D. Md. 1986). For clarification of the security interest exclusion, see EPA's rule on lender liability under CERCLA, 57 Federal Register 18344 (April 29, 1992),
(*2*) Any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(*3*) Any person who by contract, agreement, or otherwise arranged for disposal or treatment or transport of hazardous substances, and
(*4*) Any person who accepts hazardous substances for transport to a facility selected by such person.
[9] The National Contingency Plan is the federal government's blueprint on how hazardous substances are to be cleaned up pursuant to CERCLA.
[10] See *Dedham Water Co. versus Cumberland Farms Dairy, Inc*., 889 F.2d 1146 (1st Cir. 1989); other cases cited at ABA, *Natural Resources, Energy, and Environmental Law: 1989 The Year In Review*, p. 215, Note 155.

---

[11] *Amland Properties Corp. versus Aluminum Co. of America*, 711 F. Supp. 784, 794 (D. N.J. 1989); *Artesian Water Co. versus New Castle County*, 659 F. Supp. 1269, 1291 (D. Del. 1987); *United States versus Northeastern Pharmaceutical and Chemical Co*., 579 F. Supp. 823 (W.D. Mo. 1984), *aff'd in part, rev'd on other grounds*, 810 F.2d 726 (8th Cir. 1986).
[12] *United States versus Aceto Agricultural Chemicals Corp*., 872 F.2d 1373 (8th Cir. 1989). But see *United States versus Marisol, Inc*., 725 F. Supp. 833 (M.D. Pa. 1989) (equitable defenses under CERCLA may be available after the development of a factual record).

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:15-cv-02789-BRM-LHG Document 56 Filed 12/15/17 Page 22 of 75 PageID: 451

E 1527 – 97

X1.2.3.1 The release or threat of release was caused solely by a third party,

X1.2.3.2 The third party is not an employee or agent of the defendant,

X1.2.3.3 The acts or omissions of the third party did not occur in connection with a direct or indirect contractual relationship to the defendant, or if there was a contractual relationship, the defendant acquired the property after disposal or placement of the hazardous substance, and at the time the defendant acquired the facility the defendant *did not know and had no reason to know* that any hazardous substance that is the subject of the release or threatened release was disposed of on, in, or at the facility, and

X1.2.3.4 The defendant exercised due care with respect to the hazardous substances and took precautions against foreseeable acts or omissions of the third party.

X1.2.4 The statute then states at § 9601(35)(B) (*emphasis added*):

"To establish that the defendant had no reason to know, as provided [above], *the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice* in an effort to minimize liability... . [T]he court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection."

X1.3 *Appropriate Inquiry in Commercial Real Estate Transactions:*

X1.3.1 One of the major questions that parties to commercial real estate transactions face when considering their potential Superfund liability is, "What level of inquiry into the previous ownership and uses of the property is appropriate to establish the innocent purchaser defense to Superfund liability?" These practices are structured to articulate the level of inquiry under Superfund that is appropriate for different situations.

X1.3.2 *The Appropriate Level of Inquiry:*

X1.3.2.1 The level of environmental inquiry that is appropriate under Superfund cannot be the same for every property or every party to a real estate transaction. The level of inquiry, in fact, will change depending on the particular property or party involved in a transaction. The statutory language, Congressional history, and common sense support this conclusion.

X1.3.2.2 First, it must be noted that little case law exists to serve as guidance about the minimum level of inquiry that will be deemed appropriate for the innocent purchaser defense. See, for example, *United States versus Serafini*, 706 F. Supp. 346 (M.D. Pa. 1988), and 1990 U.S. Dist. LEXIS 18466 (M.D. Pa. 1990) (By entertaining disputed facts as to the custom and practice of viewing land prior to purchase, the court implied that appropriate inquiry necessarily varies on a site-by-site basis); *United States versus Pacific Hide and Fur Depot, Inc.*, 716 F. Supp. 1341 (D. Idaho 1989) (No inquiry was required by those who received an ownership interest in property via corporate stock transfer and warranty deed under the facts of this case); *International Clinical Laboratories, Inc. versus Stevens*, 30 ERC 2066, 20 ELR 20,560 (E.D.N.Y. 1990). (Despite a long history of toxic wastewater disposal and

presence of the site on the state's hazardous waste disposal site list, the purchaser established the innocent purchaser defense since there were no visible environmental problems at the site, the defendant had no knowledge of environmental problems at the site and the purchase price did not reflect a reduction on account of the problem.)

X1.3.2.3 While the statute does not specifically distinguish certain types of properties and uses from others, or certain types of parties from others, it does list certain factors courts should consider in determining whether one's inquiry under the circumstances is appropriate. The statute, as explained in X1.2, requires a court to consider a party's specialized knowledge or experience. The statute further mandates a court to consider what is "*reasonably* ascertainable information about the property", what contamination is *obviously* present, and the *party's* "ability to detect such contamination". The very use of terms such as "appropriate" and "reasonably", and the use of "specialized knowledge and experience" and "ability" in conjunction with the specific person attempting to utilize the defense signifies that Congress did not intend the appropriateness of the inquiry to be judged by a bright line standard. If it so intended, Congress would have stated, but did not, that the same inquiry should be made in every case.

X1.3.2.4 What is reasonable and obvious to one party may not be so to other parties, and ability, by necessity, varies among all parties. The statute, therefore, recognizes that different properties and parties must be treated differently. That is, different parties may conduct different levels of inquiry appropriate to their circumstances.

X1.3.2.5 The statutory standard of "appropriate inquiry" suggests the level of inquiry will depend on the circumstances and the underlying facts. Since the facts are almost always different, the level of inquiry must change with them. The legislative history on this particular issue demonstrates that Congress intended that the level of inquiry changes with the type of property and party:[13]

The duty to inquire under this provision shall be judged as of the time of acquisition. Defendants shall be held to a higher standard as public awareness of the hazards associated with hazardous releases has grown, as reflected by this Act, the 1980 Act [CERCLA] and other Federal and State statutes. Moreover, good commercial or customary practice with respect to inquiry in an effort to minimize liability shall mean that a reasonable inquiry must have been made in all circumstances, in light of best business and land transfer principles. Those engaged in commercial transactions should, however, be held to a higher standard than those who are engaged in private residential transactions.

X1.3.2.6 Because few cases address the standard of inquiry in the innocent purchaser defense and the legislative history describing Congressional intent is sparse, common sense is a useful guide in interpreting statutory language. If CERCLA mandated that the level of inquiry be the same for every property or potential defendant, then a lay consumer (renter or buyer) of a home, a purchaser of a small environmentally benign business, and a multinational corporate buyer of an industrial complex would have to conduct the same environmental site assessment (ESA) of the different properties in question. Additionally, the statute makes no mention of a Phase

_____

[13] H.R. Rep. No. 962, 99th Cong., 2d Sess. 187 (1986), *reprinted at* 1986 U.S. Code Cong. and Admin. News 3276, 3280.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

E 1527 – 97

I ESA or any other specific type of inquiry one is to conduct in order for the inquiry to be deemed appropriate. If all inquires had to be at the same level to be "appropriate", it would be illogical to stop at a Phase I ESA since some commercial or industrial properties routinely undergo, in the exercise of good commercial and customary practices, intrusive sampling (typically a Phase II ESA activity). Therefore, since routinely some properties undergo sampling, an inflexible standard would require sampling of all properties, no matter what its use. This could not have been the intended result of SARA.

X1.3.3 *The Minimum Inquiries to Satisfy All Appropriate Inquiry*:

X1.3.3.1 Recognizing that inquiry changes with the underlying circumstances, the next question concerns that level of inquiry, if any, that Superfund requires to utilize the innocent landowner defense.

X1.3.3.2 As noted above, in some real estate transactions a Phase II ESA is routinely conducted. A Phase I ESA is conducted in these transactions only as a necessary prerequisite to outline the scope of the Phase II ESA. A Phase II ESA typically involves taking soil, water, and air samples to determine their contaminant content or verify that no contaminants are present or likely present. Note, however, that this simplistic outline of the Phase II ESA is misleading since the party can always dig down one foot deeper, take one more sample, or conduct one more test. The problem of how much inquiry is conducted, or at what level a party should begin, involves proving a negative, that is, that no contamination is present.[14] Since, according to the statute, inquiries should be judged by the circumstances existing at the time of acquisition, then there could be some properties and parties to real estate transactions where it may be appropriate to begin the inquiry with an intrusive Phase II ESA in order to invoke the innocent purchaser defense to liability.

X1.3.3.3 At the other extreme, the minimum level of inquiry that a party would be expected to conduct is found by looking at the least environmentally obtrusive class of property and party from a CERCLA perspective. This transaction likely involves the lay buyer of a home or the renter of an apartment. Assuming these parties meet the other prerequisites for the innocent purchaser defense, what level of environmental inquiry must they conduct to avoid Superfund liability? While there are no recorded court cases on this issue, the answer is probably none, unless a particular residential purchaser or renter has some specialized knowledge about or experience with the property in question that would lead a court to

conclude that some questions should have been asked. Beyond these rare situations, it is highly unlikely that Congress intended to saddle housing consumers with the burden of investigating or cleaning up contaminated sites. In fact, EPA has issued a statement of enforcement policy to the effect that it will not generally pursue owners of single family residences pursuant to CERCLA.[15] Therefore, for some properties and parties to real estate transactions, it is appropriate to conduct no environmental inquiry in order to meet one's innocent purchaser defense to liability.

X1.3.3.4 The minimum level of appropriate inquiry under Superfund, therefore, ranges from no specialized inquiry to conducting an intrusive Phase II ESA. In order to satisfy these practices, to do no specialized inquiry, such as the Transaction Screen or Phase I ESA, is not enough for commercial real estate transactions. Under current commercial and customary practice and in light of best business and land transfer principles, however, no environmental site assessments are conducted in many real estate transactions, particularly those involving smaller properties, vacant land, or transactions of low monetary value. This practice and Practice E 1528 and the minimum level of inquiry under these practices, actually raises the average level of inquiry that should be performed where the parties want to come within the protection of the innocent landowner defense.

X1.3.3.5 The burden of proof is on the defendant to sustain by a preponderance of the evidence, the innocent purchaser defense. This is the least onerous burden of proof available to a party in litigation. The defendant must show only that the evidence offered to support the level of inquiry that was taken at the time of acquisition is of greater weight or more convincing than the evidence offered in opposition to it. In other words, the evidence on the inquiry issue taken as a whole shows that the fact sought to be proved is more probable than not. There may be technical or business judgments on whether the inquiry conducted or any other fact in a particular case is sufficient to meet the needs or concerns of a party to the real estate transaction. The bottom line, however, is that the judgment on whether the specific facts of a case, in light of statutory language, are sufficient to produce liability or a viable defense to liability is a legal one and such judgments constitute the practice of law.

X1.3.3.6 Practice E 1528 is designed as the minimum level of inquiry to satisfy the practice from which a party to a commercial real estate transaction should proceed, recognizing that some parties to some commercial real estate transactions may wish to proceed by beginning with a Phase I or a Phase II ESA.

X1.4 *Statutory Definition of Hazardous Substance:*

X1.4.1 The statute at 42 USC § 9601(14)(A − F) defines hazardous substance by referring to five other statutes as well as to Superfund's own § 9602. The following is a description of the relevant portions of the other statutes and § 9602 of Superfund:

---

[14] The inability to prove a negative creates a dilemma for the potential defendant. If the party's inquiry discovers contamination, then under the statute the party will not be able to avail itself of the innocent purchaser defense. If the inquiry does not discover contamination, EPA or another private party can argue in a response action that the inquiry was not "appropriate" and, therefore, the defendant can have no defense. This dilemma is explicitly recognized by the Subcommittee E50.02 as beyond any reasonable interpretation of Congressional intent. The scope of the E50.02 Standard Practices resolves the party's dilemma in the only reasonable way by stating: "It should not be concluded or assumed that the inquiry was not appropriate inquiry merely because the inquiry did not identify existing recognized environmental conditions in connection with a property. Environmental site assessments must be evaluated based on the reasonableness of the judgments made at the time and under the circumstances in which they were made." See 4.5.4.

[15] EPA, *Policy Towards Owners of Residential Property at Superfund Sites*, OSWER Directive No. 9834.6, July 3, 1991.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:15-cv-02789-BRM-LHG    Document 56    Filed 12/15/17    Page 24 of 75 PageID: 743



E 1527 – 97

42 USC § 9601(14)(A):" [A]ny substance designated pursuant to section 1321(b)(2)(A) of Title 33." Title 33 USC § 1321 lies within the Clean Water Act and refers to, among other things, hazardous substance liability. 33 USC § 1321(b)(2)(A) states that the EPA shall develop, "as may be appropriate, regulations designating as hazardous substances, other than oil as defined in this section, such elements and compounds which, when discharged in any quantity into" the navigable waters of the United States ..., present an imminent and substantial danger to the public ... health or welfare, including, but not limited to, fish, shellfish, wildlife, shorelines, and beaches."

42 USC § 9601(14)(B):" [A]ny element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title." Section 9602 gives EPA the authority to designate as a hazardous substance "such elements, compounds, mixtures, solutions, and substances which, when released into the environment may present substantial danger to the public health or welfare or the environment... ."

42 USC § 9601(14)(C):" [A]ny hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 USCA § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 USCA § 6901 et seq.] has been suspended by Act of Congress)." The Solid Waste Disposal Act of 1980 amended the Resource Conservation and Recovery Act (RCRA). 42 USCA § 6921 of RCRA provides authority to the EPA to develop criteria for identifying characteristics of hazardous waste and for listing particular hazardous wastes within the meaning of 42 USCA § 6903 (5) of RCRA. RCRA, § 6903(5), defines hazardous waste to mean

"a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."

For the identification and listing of hazardous wastes under RCRA, see 40 CFR §§ 261.1 et seq.

42 USC § 9601(14)(D):" [A]ny toxic pollutant listed under Section 1317(a) of Title 33." Section 1317(a) of Title 33 refers to toxic and pretreatment effluent standards under the Clean Water Act. The EPA is charged in this section with publishing and revising from time to time a list of toxic pollutants, taking "into account toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms, and the nature and extent of the effect of the toxic pollutant on such organisms." Each toxic pollutant listed according to this section shall be subject to effluent limitations. For toxic pollutant effluent standards, see 40 CFR §§ 129.1 et seq.

42 USC § 9601(14)(E):" [A]ny hazardous air pollutant listed under Section 112 of the Clean Air Act [42 USCA§ 7412]." Section 7412 of Title 42 deals with national emission standards for hazardous air pollutants. The EPA is charged here with publishing and revising from time to time "a list which includes each hazardous air pollutant for which [it] intends to establish an emission standard under this section." The term "hazardous air pollutant" means an air pollutant that in EPA's judgment "causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." For emission standards for hazardous pollutants, see 40 CFR § 61.01 et seq.

42 USC § 9601(14)(F):" [A]ny imminently hazardous chemical substance or mixture with respect to which the [EPA] has taken action pursuant to Section 2606 of Title 15." Section 2606 of Title 15 deals with imminent hazards under the Toxic Substances Control Act (TSCA). The EPA is authorized under 15 USC § 2606 to seize an imminently hazardous chemical substance or mixture or seek other relief, such as requiring notice to users of the chemical substance or public notice of the risk associated with the substance or mixture. The term " 'imminently hazardous chemical substance or mixture' means a chemical substance or mixture which presents an imminent and unreasonable risk of serious or widespread injury to health or the environment."

X1.4.2 After Subsections A–F, outlined above, the Superfund definition of "hazardous substance" in § 9601(14) then goes on to state:

"The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under Subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas)."

X1.4.3 The EPA has collected a list of "those substances in the statutes referred to in Section 101(14) of the Act [42 USC § 9601(14)]" 40 CFR § 302.1 (1989) ("List of Hazardous

Substances And Reportable Quantities," 40 CFR Part 302). This list changes with notices in the Federal Register. Also, any time a new hazardous waste is listed, the waste automatically becomes a hazardous substance.

X1.5 *Petroleum Products:*

X1.5.1 Under the petroleum exclusion of CERCLA (42 USC§ 9601(14)), petroleum and crude oil have been explicitly excluded from the definition of hazardous substances under CERCLA. Nevertheless, petroleum products are included within the scope of both practices because they are of concern in many commercial real estate transactions and current custom and usage is to include an inquiry into the presence of petroleum products in an environmental site assessment. Inclusion of petroleum products within the scope of the practices is not based upon the applicability, if any, of CERCLA to petroleum products.

X1.5.2 One reason to include petroleum products within the scope of the practices is because to do so reflects custom and usage: when environmental assessments are conducted in connection with commercial real estate transactions, they customarily include an assessment of the presence or likely presence of petroleum products under conditions that may lead to contamination. For example, environmental assessments ordinarily seek to assess whether there may be underground or above-ground storage tanks that may be leaking, whether those tanks contain petroleum products or some other product.

X1.5.3 In addition, although CERCLA may exclude petroleum products, other laws require cleanup of releases or spills of petroleum products. For example, petroleum products sometimes (for example, when they cannot be reclaimed from soil) become hazardous wastes subject to RCRA Subtitle C (42 USC § 6921 et seq.), must be cleaned up if released from underground storage tanks pursuant to RCRA Subtitle I (42 USC § 6991 et seq.), must be cleaned up pursuant to the Oil Pollution Act of 1990 (33 USC § 1321 et seq.), and must be cleaned up if released into the navigable waters of the United States pursuant to the Clean Water Act (33 USC § 1251 et seq.).

X1.5.4 Moreover, case law and EPA interpretations of the petroleum exclusion require an analysis of the facts of each case to determine whether a particular petroleum product is included in CERCLA's petroleum exclusion. The exclusion has been broadly interpreted to exclude gasoline and leaded gasoline from CERCLA's definition of hazardous substances regardless of the fact that gasoline and leaded gasoline contain certain indigenous components and additives which have themselves been designated as hazardous pursuant to CERCLA. See *Wilshire Westwood Associates versus Atlantic Richfield Corporation*, 881 F.2d 801 (9th Cir. 1989). The interpretation was narrowed when a judicial distinction was made between petroleum fractions produced by distillation processes and waste products resulting from contaminated tank scale. See *United States versus Western Processing Co*., 761 F.Supp. 713 (W.D. Wash. 1991). Another decision narrowly interpreted CERCLA's petroleum exclusion to be inapplicable to oil-related wastes containing hazardous substances because the primary purpose of the exclusion is to remove "spills or other releases strictly of oil" from the scope of CERCLA response

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

E 1527 – 97

and liability (not releases of hazardous substances mixed with oil). See *City of New York versus Exxon Corporation*, 744 F. Supp. 474 (S.D.N.Y. 1990). For additional discussion, see EPA Memorandum entitled, "The Petroleum Exclusion Under the Comprehensive Environmental Response Compensation and Liability Act," issued by EPA's General Counsel, Francis S. Blake, July 31, 1987.

X1.6 *Exclusion of Certain Hazards From Superfund:*

X1.6.1 The information that follows is provided to explain why these potential environmental hazards are not covered by Superfund's appropriate inquiry responsibilities.

X1.6.2 As a preliminary matter, it should be noted that an environmental site assessment that does not address substances excluded from CERCLA (whether those substances are excluded because they are petroleum products or by virtue of other characteristics) but they otherwise constitutes" all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice" should nevertheless entitle the user to the innocent purchaser defense, assuming that other requirements of the defense are met.

X1.6.3 *Radon*:

X1.6.3.1 A case discussing Superfund and radon is *Amoco Oil Company versus Borden, Inc.*, 889 F.2d 664 (5th Cir. 1989). This case dealt with a private cost recovery action by the buyer of a site against the seller for response costs relating to radiation from phosphogypsum wastes left on the site. Radon emanated from these radioactive wastes. The case points out that the "EPA has designated radionuclides as hazardous substances under § 9602(a) of CERCLA... . Additionally, the ... EPA under § 112 of the Clean Air Act ... list radionuclides as a hazardous air pollutant. Radon and its daughter products are considered radionuclides, which are defined as 'any nuclide that emits radiation.' " Therefore, radon is a CERCLA hazardous substance. Also, when discussing what constitutes a release of a hazardous substance under the statute, the statute is plain that there is no quantitative requirement and that a release, broadly defined at 42 USC § 9601(22), of *any* amount constitutes a CERCLA release.

X1.6.3.2 Liability under Superfund depends on several factors, as noted in X1.1. Only one of four factors is the release or threatened release of a hazardous substance. The other three factors are (*1*) the site is a facility, (*2*) the defendant falls within at least one of four classes of potentially responsible parties (PRPs), and (*3*) the release or threatened release *caused* the plaintiff (that can be the government or another private party) to incur response costs. Further, response costs must not be inconsistent with the National Contingency Plan (NCP), *and must not be limited by § 9604(a)(3)*. And, of course, there is no need to raise the innocent purchaser defense and its appropriate inquiry requirements unless the elements of liability will be met.

X1.6.3.3 Where radon from any source occurs in a building, three of the liability elements under CERCLA are met. There is a release of a hazardous substance, the building is a facility, and we can assume the defendant is a PRP. However, under 42 USC § 9604(a)(3)(A), "[r]emedial actions taken in response to hazardous substances as they occur naturally are specifically

excluded from the NCP and are therefore not recoverable." *Amoco Oil Company versus Borden, Inc.*, 889 F.2d at 570. The statute is plain.[16]

"(3) Limitations on response
  The President shall not provide for a removal or remedial action under this section in response to a release or threat of release—
    (A) of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found;
    (B) from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures;[17] or
    (C) into public or private drinking water supplies due to deterioration of the system through ordinary use.[18]
(4) Exception to limitations
    Notwithstanding paragraph of this subsection, to the extent authorized by this section, the President may respond to any release or threat of release if in the President's discretion, it constitutes a public health or environmental emergency and no other person with the authority and capability to respond to the emergency will do so in a timely manner."

X1.6.3.4 Therefore, no liability under CERCLA attaches for naturally occurring radon. If a party to a real estate transaction wants to look for radon within a building, no amount of radon investigation will have any bearing on one's innocent purchaser defense under Superfund. Investigation of naturally occurring radon would be included, if at all, in the portion of the practice that deals with non-scope issues.

X1.6.4 *Asbestos*:

X1.6.4.1 The analysis of asbestos is similar to that involving radon. Before considering appropriate inquiry responsibilities, the four elements of CERCLA liability must be satisfied. Once again, as with radon, they are not met.

X1.6.4.2 Section 9604(a)(3)(B) of CERCLA prohibits response actions involving a release or threat of release "from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures." There are a number of cases dealing with asbestos that interpret this statutory language. One such case is *First United Methodist Church of Hyattsville versus United States Gypsum Co.* that cites to other relevant cases.

X1.6.4.3 In *First United* the church brought a private cost recovery action against the manufacturer of asbestos-containing acoustical plaster. In holding that the action was barred by a state statute of repose (a certain time allowed by statute for bringing litigation) and that CERCLA did not preempt the state statute of repose, the court stated that § 9604(a)(3)(B) of CERCLA "represents much more than a procedural limitation on the President's authority; it is a substantive limitation of the breadth of CERCLA itself."[19] Therefore, the limitations of§ 9604(a)(3) apply to private parties as well.

X1.6.4.4 Citing to the legislative history, the *First United* court concluded, "[i]n view of this clear expression of Congressional intent, we wil[l] not expand CERCLA to encompass asbestos-removal actions." The court further explained:[20]

---

[16] 42 USC § 9604(a)(3) and (4) (*emphasis added*).

[17] This provision has implications for asbestos and lead-based paint. See X1.6.4 and X1.6.5.

[18] This provision has implications for lead from lead pipes and solder. See X1.6.5.

[19] One such case is *First United Methodist Church of Hyattsville versus United States Gypsum Co.*, 882 F.2d 862 (4th Cir. 1989), that cites to other relevant cases.

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

NOTICE: This standard has either been superseded and replaced by a new version or withdrawn. Contact ASTM International (www.astm.org) for the latest information.

Case 3:15-cv-02769-BRM-LHG   Document 56   Filed 12/15/17   Page 26 of 75 PageID: 455



## E 1527 – 97

"In closing, we note that this interpretation of CERCLA fully comports with the most fundamental guide to statutory construction—common sense. To extend CERCLA's strict liability scheme to all past and present owners of buildings containing asbestos as well as to all persons who manufactured, transported, and installed asbestos products into buildings, would be to shift literally billions of dollars of removal cost liability based on nothing more than an improvident interpretation of a statute that Congress never intended to apply in this context. [FN12] ... Certainly, if Congress had intended for CERCLA to address the monumental asbestos problem, it would have said so more directly when it passed SARA... .

*FN12*—It is for this reason, that Congress simply did not intend for CERCLA to remedy the asbestos-removal problem, that we decline to follow the reasoning of *Prudential, Knox and Covalt* in rejecting First United's preemption argument. Instead of recognizing the fact that CERCLA is out of context in this situation, these courts rejected similar attempts to invoke the statute by construing CERCLA's key terms in a way to exclude asbestos-removal actions. *Covalt,* 860 F.2d [1434] at 1438-39 (defining" environment" to exclude the interior of a workplace); *Knox,* 690 F. Supp at 756-57 (defining "release" in terms of "spills" or "disposal"); *Prudential,* [711 F. Supp 1244] at 1254-55 (defining" disposal" to exclude the sale of a product for consumer use). We find this analysis unsatisfactory because it runs the risk of unnecessarily restricting the scope of CERCLA merely to dispose of claims that the statute was never intended to encompass in the first place. It is far better to simply acknowledge the inapplicability of CERCLA to asbestos-removal claims than to restrict its operative terms."

X1.6.4.5  Since asbestos that is a part of the structure of, and results in exposure within, residential buildings or business or community structures is excluded from CERCLA liability, it should not be investigated pursuant to a party's innocent purchaser appropriate inquiry requirements. Like naturally occurring radon, investigation of asbestos-containing materials that are part of the structure of buildings should be included, if at all, in the portion of this practice that deals with non-scope issues. Note, however, if asbestos is disposed of on a site and, therefore, is no longer part of the structure of a building, the cleanup of the disposed asbestos is subject to Superfund response actions. Likewise, if a building is sold with the knowledge that it will be demolished, one court ruled that the sale constitutes a disposal falling under CERCLA's liability provisions.[21]

X1.6.5  *Lead in Drinking Water and Lead-Based Paint*
These hazards can be evaluated in terms of the exclusions of 42 USC § 9604(a)(3)(B) and (C), in an analysis similar to the analysis applied above to radon and asbestos. While there is no reported case law on these environmental issues as they relate to Superfund, the statutory language seems clear that these environmental hazards are not encompassed by Superfund's appropriate inquiry responsibilities. Note, however, like asbestos, where there is a disposal of these substances on the site or in a facility, CERCLA liability may arise.

---

[20] The same at 869; See also *3550 Stevens Creek Associates versus Barclays Bank of California,* 915 F.2d 1355 (9th Cir. 1990).

[21] *CP Holdings, Inc. versus Goldberg-Zoino & Associates, Inc.,* 769 F. Supp. 432 (D.N.H. 1991).

## X2.  RECOMMENDED TABLE OF CONTENTS AND REPORT FORMAT

**X2.1  Summary**

**X2.2  Introduction**

X2.2.1  Purpose
X2.2.2  Special Terms and Conditions
X2.2.3  Limitations and Exceptions of Assessment
X2.2.4  Limiting Conditions and Methodology Used

**X2.3  Site Description**

X2.3.1  Location and Legal Description
X2.3.2  Site and Vicinity Characteristics
X2.3.3  Descriptions of Structures, Roads, Other Improvements on the Site (including heating/cooling system, sewage disposal, source of potable water)
X2.3.4  Information (if any) Reported by User Regarding Environmental Liens or Specialized Knowledge or Experience (pursuant to Section 5.)
X2.3.5  Current Uses of the Property
X2.3.6  Past Uses of the Property (to the extent identified)
X2.3.7  Current and Past Uses of Adjoining Properties (to the extent identified)
X2.3.8  Site Rendering, Map, or Site Plan

**X2.4  Records Review**

X2.4.1  Standard Environmental Record Sources, Federal and State
X2.4.2  Physical Setting Source(s)
X2.4.3  Historical Use Information
X2.4.4  Additional Record Sources (if any)

**X2.5  Information from Site Reconnaissance and Interviews**

X2.5.1  Hazardous Substances in Connection with Identified Uses (including storage, handling, disposal)
X2.5.2  Hazardous Substance Containers and Unidentified Substance Containers (including storage, handling, disposal)
X2.5.3  Storage Tanks (including contents and assessment of leakage or potential for leakage)
X2.5.4  Indications of PCBs (including how contained and assessment of leakage or potential for leakage)
X2.5.5  Indications of Solid Waste Disposal
X2.5.6  Physical Setting Analysis, if migrating Hazardous Substances are an issue
X2.5.7  Any Other Conditions of Concern
X2.5.8  Site Plan (if available)

**X2.6  Findings and Conclusions**

**X2.7  Signatures of Environmental Professionals**

**X2.8  Qualifications of Environmental Professionals Participating in Phase I Environmental Site Assessment**

**X2.9  Optional Appendices (for example):**

X2.9.1  Other Maps, Figures, and Photographs
X2.9.2  Ownership/Historical Documentation
X2.9.3  Regulatory Documentation
X2.9.4  Interview Documentation

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

 E 1527 – 97

X2.9.5 Contract between User and Environmental Professional

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).

Copyright by ASTM Int'l (all rights reserved); Mon Oct 23 11:30:37 EDT 2017
Downloaded/printed by
Cherie Rogers (US DOJ ENRD) pursuant to License Agreement. No further reproductions authorized.

## **TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMEN T ...........................................1

BACKGROUND.................................................................................................2

ARGUMENT ......................................................................................................4

I.   MATERIAL FACTUAL DISPUTES PRECLUDE SUMMARY
     JUDGMENT ON THE ISSUE OF WHETHER THE UNITED
     STATES IS LIABLE FOR ANY OF CBY'S CLAIMED COSTS .....................4

     A.   CBY's Evidence Does Not Establish that the United States
          Owned a Facility at Which Hazardous Substances Were
          Disposed of at the Time of Ownership .........................................4

          1.   There is conflicting and insufficient evidence with respect
               to each asserted "facility" and its allegedly associated
               "disposal." ..................................................................7

               a.   AN-M69 incendiary bombs ....................................7

               b.   Equipment installed under Contract 1089 ............8

                    i.    Tetryl dust collectors ............................9

                    ii.   Vacuum system.......................................9

                    iii.  Degreasing tank ....................................10

               c.   Black powder.........................................................14

          2.   The occurrence of the July 1954 explosion is not a basis for
               finding the United States liable under section 9607(a)(2) .............15

     B.   CBY Fails to Show that the United States Arranged for
          Disposal .................................................................................16

          1.   Arranger liability requires "intentional steps to dispose" of a
               hazardous substance, not just "knowledge" of a disposal. ............17

i

2.    CBY's evidence does not establish that the United States "controlled the production and disposal" of hazardous substances at the Site ............................................................18

    a.    Safety manuals ............................................................18

    b.    National Bureau for Industrial Protection ..........................22

    c.    Mr. Redmond's testimony ............................................22

3.    CBY has not shown that the single documented disposal of drums by the United States occurred within the Site ..................23

C.    Whether CBY Incurred "Necessary" Response Costs "Consistent with the NCP" Is Also in Dispute ............................................24

1.    Evidence of compliance with the state administrative consent order and of NJDEP approval does not, by itself, establish consistency with the NCP ............................................26

2.    A presumption of NCP consistency is particularly inappropriate here because CBY's contractor has final decision-making authority. ............................................29

3.    Additional evidence shows that CBY substantially failed to comply with the NCP ............................................30

II.    CBY Is Not A Bona Fide Prospective Purchaser ............................................33

CONCLUSION ............................................................40

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Int'l Specialty Lines Ins. Co. v. United States*, ("*AISLIC*"),
  No. CV 09-01734 AHM (RZx), 2010 WL 2635768 (C.D. Cal. June 30, 2010) .... 8, 20

[*]*Amland Props. Corp. v. Aluminum Co. of Am.*,
  711 F. Supp. 784 (D.N.J. 1989) ......................................................................12, 25, 27

*Artesian Water Co. v. Government of New Castle Cty.*,
  659 F. Supp. 1269 (D. Del. 1987), *aff'd*,
  851 F.2d 643 (3d Cir. 1988)........................................................................................25

*Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*,
  791 F. Supp. 2d 431 (D.S.C. 2011), *aff'd*,
  714 F.3d 161 (4th Cir. 2013) ............................................................................34, 36, 39

*Burlington N. & Santa Fe Ry. Co. v. United States*,
  556 U.S. 599 (2009) ........................................................................................17, 18, 21

*Cadillac Fairview/California, Inc. v. Dow Chem. Co.*,
  299 F.3d 1019 (9th Cir. 2002) ....................................................................................13

*City of Bangor v. Citizens Commc'ns Co.*,
  532 F.3d 70 (1st Cir. 2008) .........................................................................................26

*County Line Inv. Co. v. Tinney*,
  933 F.2d 1508 (10th Cir. 1991) ............................................................................24, 25

*Dexter v. Cosan Chem. Corp.*,
  No. 91-5436 (DRD), 1997 WL 557637 (D.N.J. Jan. 10, 1997) ...................................27

*Elf Atochem N. Am. v. United States*, ("*Elf Atochem II*"),
  914 F. Supp. 1166 (E.D. Pa. 1996)..............................................................................13

---

[*] Cases on which the United States chiefly relies are marked with an asterix.

*Elf Atochem N. Am., Inc. v. United States*, ("*Elf Atochem I*"),
    868 F. Supp. 707 (E.D. Pa. 1994) ......................................................................12

*FMC Corp. v. U.S. Dep't of Commerce*,
    786 F. Supp. 471 (E.D. Pa. 1992), *aff'd*,
    29 F.3d 833 (3d Cir. 1994) ..................................................................13, 20, 21

*\*Litgo New Jersey, Inc. v. Comm'r, NJDEP*,
    725 F.3d 369 (3d Cir. 2013) ............................................................................. 5, 6

*Maxxam Group, Inc. v. United States*,
    Civil Action No. 05-cv-1834 (DMC), 2008 WL 305286 (D.N.J. Jan. 28, 2008) ........28

*Miami-Dade County v. United States*,
    345 F. Supp. 2d 1319 (S.D. Fla. 2004) ...............................................................8

*Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*,
    343 F.3d 669 (3d Cir. 2003) .............................................................................17

*\*New Jersey Turnpike Auth. v. PPG Indus., Inc.*,
    197 F.3d 96 (3d Cir. 1999) ...............................................................................23

*Niagara Mohawk Power Corp. v. Chevron, U.S.A., Inc.*,
    596 F.3d 112 (2d Cir. 2010) .............................................................................27

*NutraSweet Co. v. X-L Eng'g Co.*,
    227 F.3d 776 (7th Cir. 2000) ............................................................................26

*Raytheon Aircraft Co. v. United States*,
    556 F. Supp. 2d 1265 (D. Kan. 2008) ...............................................................10

*Rospatch Jessco Corp. v. Chrysler Corp.*,
    962 F. Supp. 998 (W.D. Mich. 1995) ..................................................................6

*SPS Limited Partnership LLLP v. Sparrows Point, LLC,*
　　Civil No. JFM-14-589, 2017 WL 3917153 (D. Md. Sept. 6, 2017) .............................37

*\*Town of Halfmoon v. General Elec. Co.,*
　　105 F. Supp. 3d 202 (N.D.N.Y. 2015)..........................................................................27

*\*United States v. CDMG Realty Co.,*
　　96 F.3d 706 (3d Cir. 1996)...........................................................................................34

*United States v. Cornell-Dubilier Elec., Inc.,*
　　Civil Action No. 12-5407 (JLL), 2014 WL 4978635 (D.N.J. Oct. 3, 2014)...............18

*United States v. M/V Santa Clara I,*
　　887 F. Supp. 825 (D.S.C. 1995) ...................................................................................13

*\*United States v. Northeastern Pharm. & Chem. Co., Inc., ("NEPACCO"),*
　　810 F.2d 726 (8th Cir. 1986) ..................................................................................24, 25

## STATUTES

42 U.S.C. § 6903(3)............................................................................................... 5, 34

42 U.S.C. § 9601(29) ............................................................................................ 5, 34

42 U.S.C. § 9601(40)(C)...........................................................................................40

42 U.S.C. § 9601(40)(E)............................................................................................40

42 U.S.C. § 9601(40)(F)(i) ........................................................................................40

42 U.S.C. § 9601(40)(H)(i)(II)............................................................................34, 35

42 U.S.C. § 9605 .......................................................................................................24

42 U.S.C. § 9607(a).....................................................................................................1

42 U.S.C. § 9607(a)(1) ........................................................................................13

42 U.S.C. § 9607(a)(2) ........................................................ 4, 5, 6, 8, 11, 12, 13, 15

42 U.S.C. § 9607(a)(3) ...............................................................................16, 17, 18

42 U.S.C. § 9607(a)(4)(A) ..................................................................................24

42 U.S.C. § 9607(a)(4)(B) ..................................................................................24

42 U.S.C. § 9613(f)(3)(B) .....................................................................................1

## CODE OF FEDERAL REGULATIONS

40 C.F.R. Pt. 300..............................................................................................24

40 C.F.R. § 300.400(g) .....................................................................................30

40 C.F.R. § 300.700 ..........................................................................................25

40 C.F.R. § 300.700(c)(3)(i) ..............................................................................25

40 C.F.R. § 300.700(c)(5)-(6) ............................................................................25

## GLOSSARY

| | |
|---|---|
| AECOM | Architecture, Engineering, Construction, Operation, and Management |
| ARARs | Applicable and Relevant or Appropriate Requirements |
| ASTM | American Society for Testing and Materials |
| BFPP | Bona Fide Prospective Purchaser |
| CBY | Cranbury Brick Yard, LLC. |
| CBY SOF | Plaintiff's Statement of Undisputed Facts |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act |
| EPA | Environmental Protection Agency |
| LSRP | Licensed Site Remediation Professional |
| Maxxam | Maxxam Group, Inc. |
| MEC | Munitions and Explosives of Concern |
| NCP | National Contingency Plan |
| NJDEP | New Jersey Department of Environmental Protection |
| PCBs | Polychlorinated Biphenyls |
| TCE | Trichloroethylene |
| U.S. SOF | United States' Statement of Undisputed Facts |
| U.S. Supp. SOF | United States' Supplemental Disputed Material Facts |
| WWII | World War Two |

## INTRODUCTION AND SUMMARY OF ARGUMENT

In its motion for summary judgment, the United States showed that, based on facts not subject to reasonable dispute, CBY's First Claim for Relief seeking cost recovery under 42 U.S.C. § 9607(a) is not an available remedy for response costs that CBY incurred after the effective date of its administrative consent order with the State of New Jersey, or that otherwise are related to matters addressed in that Order; that CBY's Second Claim for Relief seeking contribution under 42 U.S.C.§ 9613(f)(3)(B) is time-barred; and that CBY is a liable party under CERCLA, not a "bona fide prospective purchaser" exempt from such liability.[1]  *See* Defs.' Mem. of Points & Authorities in Support of Mot. for Summary Judgment (Dkt.49-2) ("US Mot.").  CBY seeks summary judgment on two questions distinct from those the United States presented—whether the United States is liable under CERCLA as a former "owner," and as an "arranger"—as well as on the common question of CBY's asserted BFPP status.  *See* Plfs.' Mem. of Law in Support of Mot. for Summary Judgment (Dkt. 51-2) ("CBY Mot.").  On the first two questions, the evidence CBY presents either fails to carry its burden of proof or is materially disputed by other evidence discussed below. On the third question, the United States' motion demonstrated that CBY cannot meet its burden of proving all eight of the required elements for BFPP status, and CBY has not shown otherwise in its filing.  Therefore, the Court should deny CBY's motion.

---

[1] This opposition brief uses certain terms and acronyms previously explained in the United States' opening brief, such as "bona fide prospective purchaser" or "BFPP."

## BACKGROUND

CBY's motion presents factual issues concerning the contracting relationship during World War II ("WWII") and the Korean War between the United States and Unexcelled, the private company that owned and operated the Site during the period in which it was used for assembly of munitions and became contaminated. Accordingly, some factual background regarding that relationship is provided below. Additional factual and legal background, including the standard of review, is provided in the United States' opening brief. *See* US Mot. at 3-9.

From 1942 through the mid-1950s, Unexcelled handled munitions and manufactured fireworks at the Site, including various munitions under contracts with the United States military during WWII and the Korean War. U.S. SOF ¶¶ 1-2. During that time, the Site became contaminated with munitions and explosives of concern ("MEC") and other contaminants. *Id.* ¶ 3. Throughout this period—and ever since—the Site was always privately-owned and operated.[2] As CBY's expert Mr. Robert Zoch, Jr. testified, there is no evidence that the United States ever owned any land or buildings at the Site. U.S. Supp. SOF ¶ 335. In 1941, the Site's owner and operator, Unexcelled, built what it later described as a "modern type of loading plant."

---

[2] CBY alleges that the United States was an "operator" during the munitions contracting period, but has not sought summary judgment on that issue. Compl. ¶ 75.

*Id.* ¶ 336. Unexcelled continued to own its preexisting installations during the munitions contracting period.  *Id.* ¶ 337.[3]

As the United States' expert historian Dr. Jay Brigham opined, in contrast, "[d]uring World War II, government ownership of property at [the Site] was limited to equipment purchased under two Navy facilities contracts."  *Id.* ¶ 345; *see also id.* ¶ 342. The first facilities contract, signed April 1, 1942, was designated as DA NOrd(F)-1089 ("Contract 1089") and included an "Appendix A" listing the equipment to be installed.  *Id.* ¶ 340.  The second facilities contract, signed in 1944, was designated DA NOrd(F)-1269.  *Id.* ¶ 343.  No one has found a copy of the second facilities contract, only second-hand references to it in other historic documents.  *Id.* ¶ 344.  Nor is the list of equipment to be installed under Contract 1089 extant, though again there are other documents making references to equipment that, from context, is understood to have likely been listed in Appendix A.  *Id.* ¶ 341.  The historical record indicates that the equipment installed under these contracts was removed shortly after the war's end, and no U.S.-owned equipment was present thereafter until the Korean War.  *Id.* ¶¶ 346-47.

During the Korean War, any government ownership of on-Site equipment was even more limited than during WWII.  There is no evidence that Unexcelled and the

---

[3] Contract 1089 states that "the land upon which the facilities" described in Appendix A were to be located "is the property of the Contractor and is not subject to any lien or encumbrance except such as are hereinafter specifically mentioned and excepted from this representation, or any requirement contained herein."  *Id.* ¶ 342.

United States ever entered into a facilities contract like Contract 1089 during the Korean War. *Id.* ¶ 348. Instead, Unexcelled took out a federally-guaranteed loan (then known as a "V Loan") from a private bank in November 1951. *Id.* ¶ 349. Unexcelled then received "progress payments" from the United States for munitions (at that time, grenade fuzes), that Unexcelled had completed and shipped under its supply contracts. *Id.* ¶ 350. Munitions assembly operations at the Site ceased permanently within a few months after a July 1954 explosion. CBY SOF ¶¶ 127, 129.

## ARGUMENT

**I.    MATERIAL FACTUAL DISPUTES PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF WHETHER THE UNITED STATES IS LIABLE FOR ANY OF CBY'S CLAIMED COSTS.**

### A.    CBY's Evidence Does Not Establish that the United States Owned a Facility at Which Hazardous Substances Were Disposed of at the Time of Ownership.

CBY seeks summary judgment that the United States is an "owner" within the meaning of 42 U.S.C. § 9607(a)(2). CBY Mot. at 15-23. This provision of CERCLA imposes liability on "any person who *at the time of disposal* of any hazardous substance *owned . . . any facility at which such hazardous substances were disposed of . . . .*" 42 U.S.C. § 9607(a)(2) (emphasis added). "Disposal" is further defined as:

> [T]he discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3); *id.* § 9601(29) (incorporating the same definition).  CBY has not met its burden to present undisputed evidence establishing the italicized portions of the section 9607(a)(2) statutory standard.

CBY begins by asserting that "[t]he generation of waste is an inevitable consequence of explosives manufacturing operations," and that the "[m]anufacturing of munitions produces a waste stream that must be destroyed on-site."  CBY Mot. at 18 (citing CBY SOF 173-74).[4]  However, the government's mere awareness that waste would be "inherent" to the process of assembling the munitions for which it contracted with Unexcelled does not establish past owner liability under section 9607(a)(2).  The Third Circuit's decision in *Litgo New Jersey, Inc. v. Comm'r NJDEP*, 725 F.3d 369, 384 (3d Cir. 2013), makes this clear, as the court rejected an argument that similarly sought to impose section 9607(a)(2) liability for ownership of equipment even though that equipment was not the place at or from which a "disposal" occurred.  Specifically, the *Litgo* claimant argued that the United States was liable because the machinery and equipment it allegedly owned was "a necessary part" of a larger "manufacturing process" that led to contamination, even though the specific U.S.-owned items were not the source of that contamination.  725 F.3d at 384.  As the Third Circuit noted, if this "broad definition of facility" were correct, "a party [that] owns any equipment used at a manufacturing site, [could] be held responsible for the

_____

[4] CBY's additional assertion that the "United States set the policies for waste disposal by statute" is factually disputed, as discussed further below.  *See infra* Argument I.B.

disposal of hazardous waste that occurs at other pieces of equipment elsewhere at the site, as long as the two pieces of equipment are part of the same overarching 'process.'" *Id.* The Third Circuit concluded, however, that this approach has "no support in CERCLA," and therefore upheld the lower court's rejection of it. *Id.*

Similar to *Litgo*, *see* 725 F.3d at 373, the land and buildings at this Site have always been private property, with any government ownership limited to certain equipment and other items specified by contract as described above. *Supra* at 2-4. In such factual circumstances, both the statutory text and the *Litgo* opinion make clear that merely establishing that the United States "owned some of the equipment" at this otherwise privately-owned Site, or even that it "owned munitions," is not enough to prove that the United States is liable under 42 U.S.C. § 9607(a)(2). Rather, CBY must also establish that specific equipment or munitions owned by the United States constituted a "facility" within the meaning of section 9607(a)(2), that a "disposal" occurred "at" such facility at the time of U.S. ownership, and that such a disposal led CBY to incur response costs. Where such additional evidence is lacking, unclear or contested, summary judgment is not appropriate. *See, e.g., Rospatch Jessco Corp. v. Chrysler Corp.*, 962 F. Supp. 998, 1007 (W.D. Mich. 1995) (as amended) (denying summary judgment, in part, because it was "unclear . . . precisely how [the site operator] disposed of wastes from the plating system" that the U.S. allegedly owned). CBY's attempt to connect these dots falls well short of the mark.

6

### 1. There is conflicting and insufficient evidence with respect to each asserted "facility" and its allegedly associated "disposal."

For each item that CBY asserts should be deemed a "facility," the evidence either is conflicting or fails to establish all facts required for liability, as shown below.

### a. AN-M69 incendiary bombs

CBY initially contends that "nearly six hundred AN-M69 incendiary napalm bombs [were] found at the Site during cleanup activities," and that the Government "sent these napalm bombs to [the Site], fully assembled, for refurbishment, and by its own admission retained title to these bombs until they were located during cleanup." CBY Mot. at 16-17.  The only document CBY identifies, however, refers to WWII-era contracts pertaining to two different sites, one of which is in New Brunswick, New Jersey, and does not discuss actual implementation of any contract at the Cranbury Site.  *See* Resp to CBY SOF ¶¶ 100-01.  Otherwise, CBY relies entirely on the testimony of Don Jenkins, a contractor who assisted CBY in the cleanup, to establish: (1) that the bombs were "refurbished" at the Cranbury Site, specifically; (2) the process by which they were refurbished; (3) the means by which they allegedly were disposed of; and (4) the approximate timing of that disposal.  *See* CBY SOF ¶¶ 103-04, 108.  Mr. Jenkins obviously has no first-hand knowledge of events that took place more than 70 years ago.  He admitted, moreover, that his statements about refurbishment of incendiary bombs are "just an assumption," and his statements about disposal of the bombs are "based on a lot of assumptions."  U.S. Supp. SOF

¶ 351. As Mr. Jenkins was not offered as an historical expert witness on WWII munitions contracting, his "assumptions" are not admissible evidence.

Given this complete lack of admissible evidence concerning disposal, CBY's attempt to analogize the United States' asserted ownership of the AN-M69 bombs to the facts established in *Am. Int'l Specialty Lines Ins. Co. v. United States*, No. CV 09-01734 AHM RZX, 2010 WL 235768 (C.D. Cal. June 30, 2010) ("*AISLIC*") is flawed. CBY Mot. at 16. In *AISLIC*, following a trial, the court found the United States liable under section 9607(a)(2) for costs of perchlorate cleanup based on its ownership of perchlorate-fueled rocket motors. 2010 WL 23578, at *20-27. The court's judgment was based on part on testimony by a witness who "personally oversaw the removal of propellant from rocket motors," and who testified that rocket motors not meeting specifications were "hogged out" with water on a daily basis, resulting in the spillage of perchlorate. *Id.* at *4; *compare with Miami-Dade County v. United States*, 345 F. Supp. 2d 1319, 1340 (S.D. Fla. 2004) (due to lack of trial evidence of disposal or leakage from U.S.-owned aircraft engine parts, the United States could not be held liable under 9607(a)(2) based on ownership of the aircraft engines). CBY proffers no evidence comparable to that in *AISLIC* that would support summary judgment here.

### b. Equipment installed under Contract 1089

CBY argues that during WWII, the United States owned "equipment installed pursuant to [Contract 1089]" that "disposed of wastes . . . that were inherent to munitions and explosives operations." CBY Mot. at 17. Specifically, CBY identifies:

(1) tetryl dust collectors; (2) a "vacuum line system related to the collection of tetryl dust"; and (3) degreasing tanks and equipment. *Id.* (citing CBY SOF ¶¶ 53-66). But the evidence does not establish that any *disposal* occurred from this equipment.

### i.    Tetryl dust collectors

It is undisputed that Contract 1089 provided for installation of tetryl dust collectors, and that their purpose was to "collect[] tetyrl dust." However, none of the documents CBY cites discusses how or where the dust collected using this equipment was disposed of. *See* CBY SOF ¶¶ 60-64.[5] The only testimony CBY cites is that of Dr. Brigham, who stated that given the lack of historical information about disposal, "I don't know what they actually did with the tetryl dust." U.S. Supp. SOF ¶ 352.

### ii.    Vacuum system

Similarly, CBY cites documents establishing that an "Allen-Billmyre Vacuum system" was installed pursuant to the 1089 Contract, but the documents again lack any information concerning the disposal of wastes from the vacuum system. *See* CBY SOF ¶¶ 53-55, 59. CBY further relies on the testimony of Dr. Brigham and of the United States' 30(b)(6) designee Mr. Daniel Linehan. *Id.* ¶¶ 53-56, 58-59. But neither witness testified that this vacuum system was "related to the collection of tetryl dust," as CBY alleges. Resp. to CBY SOF ¶ 56. Dr. Brigham, in fact, testified that tetryl is

---

[5] Another CBY SOF, 57, cites a New Jersey statutory provision for the proposition that a "[a] dust collection system can be characterized as an air pollution control system." This is a legal conclusion, not proof of a fact.

not mentioned anywhere on the documents referring to the Allen-Billmyre Vacuum system. *Id.* He further testified that "any industrial process I'm sure is going to have some sort of waste disposal." Resp. to CBY SOF ¶ 58. But he was not asked if the historical record had informed him regarding how wastes from the vacuum system were disposed of, and he did not testify about any such disposal process. *Id.*

### iii.    Degreasing tank

Finally, CBY identifies a document indicating that in 1943, the Unites States Navy approved expenditures to install "two Detroit Rex Degreasing Tanks" and accessory equipment at the Site—though the document states that only "one" tank was actually installed—and that the United States acquired title to this equipment upon installation. *See* Resp. to CBY SOF ¶¶ 65-66; CBY Mot. at 17. CBY then asserts that "[t]richloroethylene (TCE) was routinely used in ordnance operations for degreasing," and that "TCE was detected at elevated levels" at the Site during cleanup. CBY SOF ¶¶ 94, 96. CBY thus implies that the "Detroit Rex Degreasing Tanks" are the source of the TCE contamination. But the evidence fails to support this conclusion. The use of TCE was highly regulated during WWII due to its scarcity, and from October 1941 through the end of the war, TCE could only be used in vapor degreasers. Resp to CBY SOF ¶ 94; U.S. Supp. SOF ¶ 357; *see also Raytheon Aircraft Co. v. United States*, 556 F. Supp. 2d 1265, 1272-83 (D. Kan. 2008) (opinion relying on Dr. Brigham's testimony concerning WWII-era TCE use restrictions and finding that trial evidence failed to prove the United States Army had used TCE at the pertinent

site).  The document does not identify the Detroit Rex Degreasing Tank as a "vapor degreaser."  Resp to CBY SOF ¶¶ 65-66, 94.

The sampling data CBY obtained during cleanup also fails to supports its theory.  CBY's lead environmental cleanup contractor, Langan Engineering and Environmental Services, Inc. ("Langan"), reported a total of two soil samples with detectable TCE contamination based on its remedial investigation.  Resp to CBY SOF ¶ 96.  These samples were taken from two separate locations in the historical production area.  *Id.*  However, CBY cites no evidence associating either sampling location with the location where the single Detroit Rex tank was installed.  Moreover, Mr. Zoch acknowledged in prior litigation concerning this Site that he had "seen no evidence regarding this site of specific releases" of hazardous substances from *any* production equipment, let alone the degreasing tank.  U.S. Supp SOF ¶ 362.

Finally, Langan reported in 2016 that it did not find TCE in groundwater, and that "there are no contaminants of concern present in groundwater at the Site."  *Id.* ¶ 363.  Thus, CBY also is unable to point to any evidence that would associate groundwater contamination with the location of the Detroit Rex tank.

Collectively, this evidence falls well short of meeting CBY's burden of proof.  Because liability under section 9607(a)(2) attaches only to those who owned a facility "at which such hazardous substances were disposed of," "at the time of disposal," 42 U.S.C. § 9607(a)(2), courts applying this standard in the context of alleged equipment ownership have required evidence connecting the specific equipment at issue to waste

disposal.  For example, in *Amland Props. Corp. v. Aluminum Co. of Am.*, 711 F. Supp. 784 (D.N.J. 1989), the court found that photographic evidence of oily stains on the floors of a building during the historical time period, coupled with further evidence that specific machinery used at the building leaked PCBs, was a sufficient basis to find that a "disposal" had occurred.  *Id.* at 787, 792.  But the court rejected a further argument that past ownership of "PCB-laden transformers" gave rise to section 9607(a)(2) liability, holding the transformers' mere presence on site constituted a "threat of release," but not a "disposal."  *Id.* at 793 n.8.  Here, likewise, merely showing that the United States owned dust collectors or degreasers or a degreasing tank, without more evidence regarding the actual use of that equipment and its association with leakage or other contaminant discharges to the environment, does not establish that a "disposal" occurred.

A comparison with *Elf Atochem N. Am., Inc. v. United States*, 868 F. Supp. 707 (E.D. Pa. 1994) ("*Elf Atochem I*"), the case on which CBY primarily relies (*e.g.*, CBY Mot. at 15, 16, 17 and 18) likewise illustrates the deficiencies of CBY's proffered evidence.  In *Elf Atochem I*, there was uncontested evidence that three specific waste streams had been discharged from U.S.-owned equipment into pipes and then conveyed directly to outdoor waste ponds on the site.  868 F. Supp. at 710-11.  The court concluded that "when each of the waste streams left the United States' equipment it was being sent to the pipes as means of getting rid of it, transferring it, throwing it out; in other words, disposing of it."  *Id.* at 711.  In a subsequent decision

in the same litigation, however, the court denied other requests for summary judgment as to the alleged disposals of sulfuric acid from government-owned chlorinating equipment and of arsenic from government-owned tank cars, because there was no direct evidence of hazardous substance discharges from those items. *Elf Atochem N. Am. v. United States*, 914 F. Supp. 1166, 1170-71 (E.D. Pa. 1996) ("*Elm Atochem II*"). Thus, the *Elf Atochem* court granted summary judgment *only* when it had admissible, uncontested and probative evidence available to it that CBY has failed to present here, and denied summary judgment when such evidence was lacking.

Finally, in *FMC Corp. v U.S. Dep't of Commerce* (CBY Mot. at 16, 17), the court's post-trial finding of section 9607(a)(2) owner liability was based on detailed evidence regarding the "highly visible" on-site disposal of wastes generated from U.S.-owned equipment during World War II. 786 F. Supp. 471, 481-86 (E.D. Pa. 1992), *aff'd*, 29 F.3d 833 (3d Cir. 1994). CBY proffers nothing here that would come close to the showing made to support the finding of liability in *FMC*. CBY's remaining cases are inapposite, as they did not address section 9607(a)(2) liability.[6]

---

[6] *United States v. M/V Santa Clara I*, 887 F. Supp. 825 (D.S.C. 1995) (CBY Mot. at 17-18) involved a claim of *current* owner liability under CERCLA section 9607(a)(1), which, unlike section 9607(a)(2), does not incorporate the term "disposal." *See* 887 F. Supp. at 838 ("The crux of this case depends on the owner or operator liability of section 9607(a)(1)."); *compare* 42 U.S.C. § 9607(a)(1) (imposing liability on "the owner and operator of a vessel or facility"), *with id.* § 9607(a)(2). *Cadillac Fairview* addressed equitable allocation, not liability. *See Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 299 F.3d 1019, 1025 (9th Cir. 2002); CBY Mot. at 19.

### c. Black powder

The evidence also fails to establish CBY's claim that the United States disposed of "government furnished black powder drums" at the Site in February 1955." CBY SOF ¶ 133; CBY Mot. at 20. First, the cited documents do not refer to them as "government-furnished," and CBY cites no other evidence establishing that claim. Resp to CBY SOF ¶¶ 130-34. Unexcelled furnished some of the materials or components to perform its munitions supply contracts. U.S. Supp. SOF ¶ 358.

Second, although one document states that the drums were "taken to an isolated area and disposed of" in 1955, there is no evidence confirming the location of that "isolated area" and whether it was within or outside the Site's boundaries. Resp to CBY SOF ¶ 135. Mr. Zoch testified that the area was within the Site, but had no basis for this opinion other than his assumption that "everything else around [the Site] was pretty much occupied." *Id.* ¶ 137. He acknowledged, however, that he would "have to consult the aerial photography" in order to confirm if this was true in the mid-1950s. *Id.* In addition, he testified that no one has been able to identify any drums subsequently encountered during the cleanup as the same ones referred to in the historical documentation discussing disposal in an "isolated area," and that the drums encountered during cleanup did not contain black powder. *Id.* ¶ 138.

Most importantly, CBY cites no evidence that it encountered any black powder residue during its cleanup, whether inside of drums or elsewhere, or that it incurred any necessary response costs to address black powder contamination. *See* Resp. to

CBY SOFs ¶¶ 130-38.  Nor could CBY produce such evidence at trial, as black powder in fact was *not* identified as a constituent of concern and did not require any identified response actions by CBY or its contractors.  U.S. Supp. SOF ¶ 364.

### 2.    The occurrence of the July 1954 explosion is not a basis for finding the United States liable under section 9607(a)(2).

CBY also attempts to rely on the occurrence of the July 1954 explosion as a basis for finding the United States liable under section 9607(a)(2).  CBY Mot. at 20 (citing CBY SOF 118-21, 124).  However, the pertinent evidence is contradictory and the asserted "facts" are disputed.  While a July 22, 1954 document cited by CBY describes the building in which the explosion originated as having been used to store "rejected Government-owned M204A1 hand grenade fuzes," a second document, dated July 27, 1954, states that Unexcelled-owned grenade fuzes were in the building.  *See* Resp. to CBY SOF ¶¶ 118, 120.  The July 22 document is a telegram written on the day of the explosion by a government representative in New York who acknowledged that his message might contain incomplete information.  *Id.*  The July 27 document, on the other hand, was issued five days *after* the explosion, provided more detail and was based on information from an Unexcelled employee who had been on-Site at the time of the explosion.  *Id.*  Dr. Brigham therefore opined that the July 27 document should be given more weight as a historical source.  *Id.*

Specifically, the Unexcelled employee, referred to as Mr. Barlow, reported that

> [T]he three most experienced explosive men in the plant were directed by [Mr. Barlow] to Building O-19 in the burning area to take an

approximate count of the company rejected material in the building in order to get this material ready to be disposed of when the Ordnance Department disposed of its own rejected fuzes.

Resp. to CBY SOF 118, 120. To Dr. Brigham, this sentence "suggests that although both government-owned and company-owned fuzes were onsite, the fuzes in building O-19 that exploded were company-owned and Unexcelled employees 'mishandled' them." U.S. Supp. SOF ¶ 366. In addition, a second passage in the July 27 document states: "According to Mr. Barlow, building O-19 *contained company-rejected M204A1 hand grenade fuzes* in all states of manufacture with many loosely packed and wooden boxes [emphasis added]." *Id.* ¶ 367. Thus, as Dr. Brigham testified, the July 27 document clearly identifies the rejected fuzes in the building that exploded as "company-rejected material," and it nowhere identifies that building's contents as government-rejected, let alone "government-owned." *Id.* ¶ 368. In short, Dr. Brigham's opinions and the July 27 document contradict the factual basis for CBY's claim that the rejected fuzes in the building that exploded were "facilities" "owned by the United States" at which a "disposal" occurred during the time of such ownership.[7]

## B.  CBY Fails to Show that the United States Arranged for Disposal.

CBY contends that the United States is also liable under 42 U.S.C. § 9607(a)(3), which imposes liability on "any person who by contract, agreement, or otherwise

---

[7] Neither the building itself, nor the land on which it was located, can be deemed a facility "owned by the United States," since there is no evidence that the United States ever owned any land or buildings at the Site. *Supra* at 2-4.

arranged for disposal or treatment . . . of hazardous substances owned or possessed

by such person." *Id.* Here, too, CBY has not presented evidence meeting its burden.

### 1. Arranger liability requires "intentional steps to dispose" of a hazardous substance, not just "knowledge" of a disposal.

CBY initially appears to confuse the legal standard, citing a test adopted by the

Third Circuit in 2003 under which arranger liability could be established by

demonstrating ownership or possession of a material by the defendant, coupled with

either "the defendant's knowledge that the processing of that material can or will

result in the release of a hazardous waste," or "the defendant's control over the

production process." CBY Mot at 23 (citing *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*,

343 F.3d 669, 678-79 (3d Cir. 2003). But a subsequent Supreme Court case, also

noted by CBY, further clarified the standard. *Burlington N. & Santa Fe Ry. Co. v. United

States*, 556 U.S. 599 (2009). CERCLA does not specifically define what it means to

"arrang[e] for disposal," and the *Burlington* Court gave the phrase its "ordinary

meaning," holding that "an entity may qualify as an arranger . . . when it takes

*intentional steps to dispose* of a hazardous substance." *Id.* at 610-11 (emphasis added).

In *Burlington*, Shell Oil Company had sold certain chemicals to a distributor for

over twenty years with the knowledge that the chemicals would leak or otherwise spill

when transferred from tanker trucks to tanks. *Id.* at 603–04. Although Shell took

certain precautions to minimize spills of its chemicals during transfer, the operation

remained "sloppy" and the spills continued. *Id.* at 604. Nonetheless, the Court held

that Shell's "mere knowledge that spills and leaks continued to occur is insufficient grounds for concluding that Shell 'arranged for' the disposal . . . within the meaning of [42 U.S.C.] § 9607(a)(3)." *Id.* at 613. Thus, under *Burlington*, merely "knowing that some disposal may occur as a collateral consequence" of a legitimate transaction is insufficient to impose arranger liability. *Id.* at 612; *see, e.g.*, *United States v. Cornell-Dubilier Elec., Inc.*, Civil Action No. 12-5407 (JLL), 2014 WL 4978635, at *9 (D.N.J. Oct. 3, 2014) ("[M]ere knowledge that an entity's product will be disposed of is not sufficient to establish arranger liability.").

### 2. CBY's evidence does not establish that the United States "controlled the production and disposal" of hazardous substances at the Site.

Even if CBY's "control" standard had survived *Burlington*, CBY would have failed its burden. CBY relies primarily on: (1) "Ordnance Safety Manuals" issued by the United States Army in 1941, 1945 and 1951; (2) certain recommendations made to Unexcelled regarding its operational practices by a contemporaneous entity, the National Bureau for Industrial Protection; and (3) testimony by United States expert Mr. Ben Redmond. CBY Mot. at 25-26; CBY SOF ¶¶ 160-72. This evidence does not prove what CBY suggests, and the "facts" CBY assumes are in dispute.

### a.    Safety manuals

Dr. Brigham opined that of the three safety manuals, only the 1945 manual would have applied to the Site. U.S. Supp. SOF ¶ 369. The 1941 manual expressly defined the "establishments" to which it applied to be those "under the direct control

of the Chief of Ordnance," not privately-owned sites such as Unexcelled's.  Resp. to CBY SOF ¶ 162.  Moreover, Dr. Brigham found no documents indicating the presence at the Site of a military commanding officer, safety officer, or safety board, all of which were described in the 1941 manual as essential parts of the safety organization that should exist at establishments to which the manual applied.  *Id.*  The 1951 manual, like the 1941 manual, defined "establishment" to include only activity "under control of the Chief of Ordnance," *id.* ¶ 164, and Dr. Brigham opined that it likewise did not apply to the Site.  U.S. Supp. SOF ¶ 369.

Mr. Zoch testified that he had seen no document stating that this Site was under the direct control of the Chief of Ordnance, nor any letters or memos from the wartime period describing any application of the 1941 manual to the Site.  Resp. to CBY SOF ¶ 162.  Mr. Zoch recalled references to a military chief inspector being stationed at the Site, but not a military commanding officer, and had seen no references to a safety officer, safety board, or any military personnel being part of a safety organization at the Site.  *Id.*  He agreed that of the three manuals, only the 1945 manual made "express reference" to privately owned plants.  U.S. Supp. SOF ¶ 370.

Dr. Brigham further opined that relatively little munitions production occurred at the Site between May 3, 1945 and September 4, 1951—the period during which the 1945 manual would have applied—and that it ceased altogether for part of this period.  Resp. to CBY SOF ¶ 163.  Documents also indicate that all U.S.-owned equipment installed at the Site during WWII was removed shortly after the war, thus calling into

question whether the 1945 manual would have been used once such equipment was removed. U.S. Supp. SOF ¶ 346. Mr. Zoch agreed that the Site was "right at the end of production" when the 1945 manual was issued, production ceased shortly after July 1945, and there were no new munitions supply contracts until 1948. *Id.* ¶ 371.

Furthermore, the 1945 manual was not written specifically for the Cranbury Site, but as a general reference document. *Id.* Where courts have found government "control" over waste disposal to a degree giving rise to CERCLA liability, they typically have done so where the evidence shows that the government did not merely provide general guidance to a contractor, but took further measures to affirmatively prescribe or direct specific waste disposal practices or decisions at the site where response costs were incurred. In *AISLIC*, for example (cited in CBY Mot. at 25), the evidence at trial included contracts from the historical period of operations which "expressly stated" that the contractor "shall comply" with a Department of Defense safety manual, as well as other contracts that expressly incorporated the manual by reference. 2010 WL 2635768, at *16. The plaintiff also introduced detailed evidence of measures that government representatives took to ensure the operation's compliance with the safety manual's provisions on waste disposal, including the "hogging-out" practice that led to on-site perchlorate contamination. *Id.* at *17-18.[8]

---

[8] CBY cites *FMC*, 786 F. Supp. at 484-85, as an additional precedent for finding the United States liable as an arranger. CBY Mot. at 25. *FMC* was decided prior to *Burlington Northern* and, as CBY acknowledges, the *FMC* court's finding of arranger liability appears to have been based solely on evidence indicating that the government

Here, in contrast, Contract 1089 expressly provided that the contractor, Unexcelled, had "responsibility for the care and preservation of [the] facilities." U.S. Supp. SOF ¶ 372. Furthermore, the contract contained no language that incorporated the terms of any Ordnance Safety Manual or that otherwise addressed waste disposal. *Id.* ¶ 373. Nor has CBY identified any other Site-specific contracts or contract-related documents with such provisions, apart from the documents in 1954 to 1955 referring to the disposal of 400 drums in an "isolated area" that may or may not have been within the Site and has not been connected to CBY's incurrence of response costs. *Supra* Argument I.A.1.c. Other than that single disposal of drums, CBY expert Mr. Zoch testified that he had not seen any documentation, from the 1940s to 1954, of an instance in which United States military personnel specifically requested disposal of any wastes. U.S. Supp. SOF ¶ 374. He likewise had seen no documents describing application of an Ordnance Safety Manual at this Site. Resp. to CBY SOF ¶ 162.

Collectively, this evidence creates factual disputes regarding whether the 1941 or 1951 manuals applied to the Site, as well as whether the 1945 manual or any other evidence establishes that the United States "controlled" waste disposal at the Site.

---

"knew or should have known that disposal of hazardous substances was inherent in the manufacturing process" for rayon. CBY Mot. at 25; s*ee* 786 F. Supp. at 484-85. Thus, *FMC* is inconsistent with the Supreme Court's later clarification that arranger liability requires not just knowledge that a production process will involve waste disposal, but "intentional steps" to arrange for such disposal. 556 U.S. at 610-11.

### b.    National Bureau for Industrial Protection

CBY further points to "recommendations and guidance" that "were complied with by [Unexcelled]" as evidence of government control over waste disposal.  CBY Mot. at 25-26 (citing CBY SOF ¶¶ 169-71).  These recommendations were provided not by the United States, but by the National Bureau for Industrial Protection, an organization that CBY's own exhibit describes as "the voluntary contribution" to the war effort made by a group of nearly three hundred *private* insurance companies during WWII.  Resp to CBY SOF ¶ 168.  Moreover, the exhibit indicates that the bureau did not focus primarily on the Cranbury Site but rather provided consultation relating to war production plants nationwide.  *Id.*  CBY identifies no evidence that this bureau, staffed by private industry volunteers, acted as an agent of the United States when it made recommendations to Unexcelled, nor any evidence that Unexcelled was *required* (contractually or otherwise) to adopt the recommendations.  *Id.*

### c.    Mr. Redmond's testimony

Contrary to CBY's contention, the testimony of United States expert Mr. Ben Redmond does not bolster their case for arranger liability.  *See* CBY Mot. at 25, 26; CBY SOF ¶¶ 160-61, 165.  Mr. Redmond testified that in the context of operations to produce munitions for the military, he considers "guidance"—which may take the form of "engineering pamphlets, engineering manuals, Department of Defense manuals, and Department of Defense orders or instructions"—to be separate from the "procedures" for waste disposal.  U.S. Supp. SOF ¶ 375.  He

testified that the contractor "is responsible for developing their own procedures," and that there would have been no "government-mandated" waste disposal procedures at the Site, only procedures adopted and implemented by Unexcelled. *Id.* ¶ 376. He further testified that he had seen no examples of any government "guidance," in any of the forms he listed, that applied to the Cranbury Site's waste disposal operations in the historical period. *Id.* ¶ 377.[9] Thus, Mr. Redmond's testimony creates a material factual dispute as to whether Unexcelled, and not the United States, took "intentional steps to dispose of hazardous substances" by developing and implementing waste disposal procedures at the Site. *See* Resp. to CBY SOF ¶¶ 166-67.

### 3. CBY has not shown that the single documented disposal of drums by the United States occurred within the Site.

Finally, the only evidence CBY has identified of any "intentional step" by the United States to dispose of wastes is the disposal of drums in an "isolated area" in 1955. As discussed above, there is a genuine factual dispute concerning whether this disposal actually occurred within the Site where CBY alleges it has incurred CERCLA response costs. Accordingly, this evidence does not satisfy CBY's burden of proof. *See New Jersey Turnpike Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 105 (3d Cir. 1999).

---

[9] Mr. Redmond did not include historical opinions regarding WWII or Korean War era contracting in this report (rather, Dr. Brigham opined on such matters). However, he answered CBY's questions about munitions-related waste disposal guidance and procedures based on his "49 years of military and commercial experience" with munitions operations and cleanup. *Id.* ¶ 385.

### C.    Whether CBY Incurred "Necessary" Response Costs "Consistent with the NCP" Is Also in Dispute.

In addition to the above disputes concerning whether the United States is a liable party, there is a material factual dispute concerning whether CBY's response costs are "necessary" and "consistent with the national contingency plan [or NCP]." [10] Under CERCLA, the burden of proof on this issue depends on whether a governmental or private entity seeks to recover its incurred response costs.  Section 9607(a)(4)(A) provides that "the United States Government or a State or an Indian tribe" may recover "*all costs of removal or remedial action* incurred . . . *not inconsistent with* the national contingency plan [or NCP]."  42 U.S.C. §9607(a)(4)(A) (emphasis added). Under section 9607(a)(4)(B), "any other person" may recover "any other *necessary* costs of response incurred . . . *consistent with* the [NCP]").  *Id.* § 9607(a)(4)(B) (emphasis added).  CERCLA "thus differentiates between governmental and nongovernmental entities in allocating the burden of proof of whether response costs are consistent with the NCP."  *United States v. Northeastern Pharm. & Chem. Co., Inc. ("NEPACCO")*, 810 F.2d 726, 747 (8th Cir. 1986).

Consistent with the statutory text, courts in the Third Circuit long have treated evidence of NCP consistency as a necessary element of proof where a private party

---

[10] The NCP, promulgated by the United States Environmental Protection Agency ("EPA") pursuant to 42 U.S.C. § 9605, is "a set of regulations . . . that establishes procedures and standards for responding to releases of hazardous substances."  *County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1511 (10th Cir. 1991) (internal quotation and alterations omitted); *see generally* 40 C.F.R. Pt. 300.

seeks its response costs under CERCLA. *See Amland,* 711 F. Supp. at 794 ("[I]n private recovery actions, the burden of proof is on the plaintiff to demonstrate that its costs were consistent with the NCP."), *citing NEPACCO,* 810 F.2d at 747, *and Artesian Water Co. v. Government of New Castle Cty.,* 659 F. Supp. 1269, 1277 n.8 (D. Del. 1987), *aff'd,* 851 F.2d 643 (3d Cir. 1988); *see also County Line,* 933 F.2d at 1512 ("Proof of response costs incurred 'consistent with' the NCP is, therefore, an element of a prima facie private cost recovery action under CERCLA.").

"Congress plainly contemplated that the NCP would be a standard against which response actions [under CERCLA] would be judged appropriate or inappropriate in the first instance, not merely a limit on the amount of damages recoverable from liable parties." *Artesian Water Co.,* 659 F. Supp. at 1291-92. Accordingly, to prove that its costs were incurred "consistent with the NCP," CBY must show that the response actions at the Site, "when evaluated as a whole, [are] in substantial compliance with the applicable requirements in paragraphs (5) and (6) of [40 C.F.R. § 300.700], and result[] in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). CBY has not presented undisputed evidence making this showing.

As an initial matter, CBY is wrong in asserting that it can meet its burden merely by citing evidence that its response actions are being conducted in compliance with the State administrative consent order ("Order") that applies to the Site and with the approval of the New Jersey Department of Environmental Protection ("NJDEP"). CBY Mot. at 22; *see also* U.S. Mot. at 5-6 (factual background concerning

25

the Order).  CBY identifies no precedent in Third Circuit caselaw for applying such a presumption, and even if it would be appropriate in some cases, there are factual disputes concerning the nature and degree of NJDEP's involvement at this Site that preclude application of such a presumption here.  Moreover, evidence including the testimony of two of the United States' experts calls into question whether CBY has even attempted to follow a process consistent with the NCP, let alone succeeded. These factual disputes preclude summary judgment.

> **1.     Evidence of compliance with the state administrative consent order and of NJDEP approval does not, by itself, establish consistency with the NCP.**

CBY cites no Third Circuit caselaw to support its argument that a private party's response actions conducted under the oversight, and with the ultimate approval, of a state's environmental agency are presumptively consistent with the NCP.  CBY Mot. at 22.  Instead, it cites a trio of decisions from other circuits.  Two are readily distinguishable, as in those cases there was no actual dispute concerning NCP compliance .  *See NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000) (because defendant did not contest NCP compliance at the summary judgment stage, the issue was waived); *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 91 (1st Cir. 2008) (affirming entry of CERCLA consent decree over non-settlors' objections, and noting that the objecting parties did not challenge NCP compliance).

Although the Second Circuit has held (in third case CBY cites) that a private party's compliance with a state consent order established its compliance with the

NCP, *see Niagara Mohawk Power Corp. v. Chevron, U.S.A., Inc.*, 596 F.3d 112, 137 (2d Cir. 2010), courts in that circuit have declined, even after *Niagara Mohawk*, to grant summary judgment based on such a presumption where there are genuine factual disputes concerning NCP compliance.  For example, in *Town of Halfmoon v. General Elec. Co.*, 105 F. Supp. 3d 202 (N.D.N.Y. 2015), the court concluded that trial was needed to "determine whether the EPA and [the State] were sufficiently involved in the selection, implementation, and monitoring of [alternative drinking water] projects to create a presumption of compliance, and whether plaintiffs adequately considered alternative plans."  *Id.* at 222.

Moreover, courts in this District have found that private parties failed to demonstrate NCP consistency despite NJDEP's involvement in and approval of their cleanup activities.  In *Amland*, for example, the court held that the participation of state and local officials and NJDEP's involvement in standard-setting did not excuse the failure to comply with the NCP's requirement to provide an opportunity for public comment on remedial alternatives.  711 F. Supp. at 801; *see also Dexter v. Cosan Chem. Corp.*, No. 91-5436 (DRD), 1997 WL 557637, at *22-23 (D.N.J. Jan. 10, 1997).

Even assuming *arguendo* that a presumption of NCP consistency might appropriately be applied in other cases depending on the facts, any such presumption here is rebutted by testimony of the NJDEP case manager originally assigned to oversee CBY's cleanup, Mr. Greg Zalaskus.  Mr. Zaluskus testified at his deposition in

*Maxxam Group, Inc. v. United States*[11] that he "ha[s] very little to no knowledge of the NCP, and further stated, "I don't endorse CERCLA NCP . . . because we don't need to for sites under our jurisdiction." U.S. Supp. SOF ¶¶ 378-79. Mr. Zalaskus went on to confirm that at this Site specifically, he had taken no steps to ensure that CBY was following the NCP, had not consulted the NCP for his own preparation or for oversight of CBY, and had not even discussed the NCP with CBY:

> Q. Specifically for this site, have you looked to CERCLA or the NCP concerning the preparation for cleanup or the cleanup?
> A. No, not yet.
> Q. Might you?
> A. Possibly.
> Q. Have you worked with Cranbury Brick Yard or Cranbury Development Company or Maxxam to apply the NCP here?
> A. Not currently.
> . . .
> Q. Have you had discussions with Cranbury Brick Yard, Cranbury Development Company or Maxxam concerning the NCP?
> A. Not to date.

*Id.* ¶ 380.

As noted above, CBY cites no precedent within the Third Circuit for applying a presumption of NCP consistency based solely on the state's approval of a private party's response actions or the private party's compliance with a state administrative order. This Court should decline to do so here given Mr. Zalaskus' testimony.

---

[11] Case No. 2:05-cv-01834-DMC-MF, 2008 WL 305286 (D.N.J. Jan. 28, 2008) (prior litigation concerning this Site).

### 2. A presumption of NCP consistency is particularly inappropriate here because CBY's contractor has final decision-making authority.

Other testimony establishes that since 2012, Mr. Brian Blum of Langan has served as the Licensed Site Remediation Professional or "LSRP" for the Site. CBY SOF ¶ 318; *see also id.* ¶ 316; U.S. Supp. SOF ¶ 381. Mr. Blum is also a contractor for CBY providing environmental remediation services with respect to the Site, and has continued in that role while serving as LSRP. U.S. Supp. SOF ¶ 382. NJDEP's hiring guide for the LSRP program makes clear that the State "do[es] not have authority to oversee a contract between a responsible party and an LSRP." *Id.* ¶ 402.

In his capacity as LSRP, Mr. Blum, rather than an NJDEP case manager, "is authorized to act on behalf of NJDEP" and has been responsible for "ensur[ing] that investigation and remediation were done in compliance with New Jersey's rule and regulations governing sites in the remediation program." CBY SOF ¶¶ 317, 319. As the LSRP, Mr. Blum has made the determination that no further action is required with respect to 20 of the 26 identified Areas of Concern at the Site. *Id.* ¶ 321. Moreover, he testified that, as LSRP, he is authorized by NJDEP "to close out portions of the site as I s[ee] fit." U.S. Supp. SOF ¶ 383. Mr. Blum could not identify any type of cleanup-related determination for which he might be *without* authority to act independently and thus would require NJDEP's approval. *Id.* ¶ 384.

In short, because Mr. Blum has remained a contractor to CBY while serving in his LSRP capacity and exercising the powers and responsibilities described above, the

evidence establishes that, at least since 2012, this cleanup effectively has been overseen *by the company itself*.  Applying a "presumption" in CBY's favor under these circumstances would be directly contrary to the plain language of CERCLA, which as shown above expressly distinguishes government-implemented from privately-implemented cleanups with respect to the burden of proof of NCP consistency.

### 3.    Additional evidence shows that CBY substantially failed to comply with the NCP.

Two of the United States' experts, Mr. Redmond and Dr. McLane, evaluated CBY's approach to cleanup.  Mr. Redmond focused on CBY's investigation and cleanup of MEC, while Dr. McLane considered CBY's efforts with respect to "environmental" (i.e., non-MEC) contamination.  Both concluded that CBY has significantly failed to follow the CERCLA process or comply with the NCP.

Mr. Redmond, who has approximately 49 years of military and civilian experience conducting MEC removals, U.S. Supp. SOF ¶ 385, identified a number of serious flaws in CBY's approach and decision-making, including the following:

- CBY "w[as] from early on in the cleanup process focused on one alternative";

- Mr. Redmond disagreed with Mr. Zoch's opinion that the cleanup could be classified as an "emergency response" under CERCLA;

- Mr. Redmond saw no evidence of meaningful public involvement;

- CBY and its contractors failed to identify "applicable and relevant or appropriate requirements" or "ARARs," *see* 40 C.F.R. § 300.400(g);

- CBY failed to perform a valid risk assessment, instead misusing a risk model known as "MEC Hazard Assessment" that was never intended to be used as a replacement for the risk assessment process;

- CBY failed to perform a detailed analysis of MEC cleanup alternatives; and

- CBY failed to perform an adequate feasibility study, with the result that any subsequent proposed plan and final remedial decision also would be deficient.

U.S. Supp. SOF ¶ 386.

Mr. Redmond further opined that, had CBY followed the proper CERCLA process, it could have developed and implemented a remedy that would have adequately addressed the MEC to allow for future development, but at a substantially lower cost than what has resulted from CBY's cleanup process. *Id.* ¶ 387. Based on his MEC removal experience and expertise, Mr. Redmond conservatively estimated the cost of a hypothetical CERCLA-compliant MEC remedy for the Site to be a little under $19 million—roughly *one-third* of the amount CBY seeks to recover from the United States, which now totals more than $56 million. *Id.* ¶ 388; CBY SOF ¶ 33.

Furthermore, Dr. McLane has opined that CBY and its contractors also failed to follow the CERCLA process with respect to environmental (i.e., non-MEC) contamination. For example, as with MEC, CBY has failed to identify ARARS for environmental contaminants and has failed to perform a proper feasibility study that includes a detailed analysis of remedial alternatives. U.S. Supp. SOF ¶ 389. Although

31

CBY claims to have proposed to NJDEP and then incorporated a "Triad Approach" for investigation and remediation of the Site, CBY SOF ¶¶ 323-24, Dr. McLane testified that he is familiar with the concept, and that based on his observation of the record the concept has either been misunderstood or incorrectly applied at this Site. U.S. Supp. SOF ¶ 391. He noted that CBY "only appears to be addressing . . . MEC," not "the environmental contamination that might result from that MEC in the environment," and he "disagrees with this entire concept" as applied in this cleanup. *Id.* ¶ 392. As one illustration of this criticism, he explained that the groundwater sampling conducted by Langan has been too limited and deficient to support Langan's determination that there are no groundwater contaminants of concern and that no further action is required with respect to groundwater. *Id.* ¶ 393. He further explained his concern that CBY "select[ed] as a remedial approach to take highly contaminated soils and waste material of unknown volume, of unknown concentrations, of, in some cases, unknown constituents and to place them under [a] barrier," as well as his concern about groundwater—which according to Langan "likely discharges to . . . unnamed tributaries"—contacting the materials under the barrier. *Id.* ¶ 403; U.S. SOF ¶ 74; *see also* U.S. SOF ¶¶ 59, 62. For these and other reasons, Dr. McLane testified that CBY has not achieved a CERCLA-quality cleanup with respect to non-MEC contamination. U.S. Supp. SOF ¶ 394. In short, there are material factual disputes as to whether CBY substantially complied with the NCP.

## II.    CBY Is Not A Bona Fide Prospective Purchaser.

In its motion, CBY submits only a cursory argument for each of the eight elements it must satisfy in order to establish that it is a BFPP.  CBY Mot. at 28-36. For all the reasons stated in the United States' memorandum in support of its motion for summary judgment, CBY cannot show that it is a BFPP.  U.S. Mot. at 33-50.[12]  In particular, CBY did not exercise appropriate care at the Site, CBY caused at least one disposal after it purchased the Site, CBY is contractually and financially affiliated with Maxxam Group, Inc., a potentially liable party under CERCLA, and CBY failed to conduct all appropriate inquiries in accordance with generally accepted good commercial and customary standards and practices.  *Id.*

First, with regard to the "**appropriate care**" and "**no disposal**" elements, the United States acknowledges that

Redacted Pursuant to Local Rule 5.3.

were present at the Site prior to CBY's purchase.  Resp. to CBY SOF ¶¶ 189, 253, 241.

Redacted Pursuant to Local Rule 5.3.

---

[12] The United States incorporates by reference all arguments made in its opening memorandum, and responds below to particular issues raised in CBY's memorandum.

Redacted Pursuant to Local Rule 5.3.

U.S. Mot. at 36-37 (and U.S. SOF paragraphs cited); *see also Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*, 791 F. Supp. 2d 431, 500-01 (D.S.C. 2011), *aff'd,* 714 F.3d 161, 181 (4th Cir. 2013) (leaving already-present hazardous substances exposed to the elements and failing to investigate "clearly show" a failure to exercise appropriate care).

Redacted Pursuant to Local Rule 5.3.

U.S. Mot. at 40-41(and U.S. SOF paragraphs cited); 42 U.S.C. §§ 9601(29), 6903(3); *United States v. CDMG Realty Co.*, 96 F.3d 706, 719 (3d Cir. 1996).

Next, with respect to the "**no affiliation**" element, CBY does not dispute that it had a contractual and financial relationship with Maxxam.  *See* CBY Mot. at 36. Instead, CBY appears to argue that its relationship with Maxxam is not a disqualifying relationship because it purportedly arose after the sale of the property and was created at the time that title to the Site was transferred, and because the relationship was not designed to enable any party to avoid liability.  *See id.*

On its face, the affiliation element exempts only certain kinds of contractual relationships—those "created by the instruments by which title to the facility is conveyed or financed or by a contract for the sale of goods or services."  42 U.S.C.

§ 9601(40)(H)(i)(II).[13]  The statute does not exempt relationships formed after

purchase.  *See id.*[14]  None of the contracts between CBY and Maxxam convey title or

finance CBY's purchase of the Site because CBY purchased the Site from Cranbury

Development Corporation, not Maxxam.  U.S. SOF ¶¶ 14, 17.

Moreover, as the United States argued in its memorandum in support of

summary judgment,

Redacted Pursuant to Local Rule 5.3.

---

[13] CBY does not contend that that its relationship with Maxxam involved the sale of goods or services.

[14] Instead of statutory support for the proposition that relationships formed after purchase are exempted, CBY cites a 2011 internal enforcement discretion memo written by EPA "to assist EPA personnel in, on a site-specific basis, exercising the Agency's enforcement discretion regarding the affiliation language."  CBY Mot. at 36; EPA Enforcement Discretion Guidance, September 21, 2011 at 1.  The document explicitly states that it does not create substantive rights and that if a person's BFPP status is disputed, "the courts will determine whether parties in specific cases have satisfied the affiliation language" in the statute.  *See* 2011 Enforcement Discretion Guidance at 3.  Thus, the Guidance cannot provide an exemption that the statute does not itself provide.  In any event, CBY's relationship with Maxxam is not a "post-acquisition" relationship like those described in the Guidance.  *See id.* at 9.  The contracts between CBY and Maxxam were entered into just days after CBY obtained title to the property, and were negotiated prior to that date.  U.S. SOF ¶¶ 17, 18, 25, 27; *see also* U.S. Supp. SOF ¶ 397-398.

Redacted Pursuant to Local Rule 5.3.[15] [16]

Redacted Pursuant to Local Rule 5.3.

Generally, BFPPs do not lose their status simply by resolving response costs with another party, but the facts of this case make plain that CBY and Maxxam structured precisely the kind of prohibited transfer of liability that Congress intended to prevent through the "no affiliation" element of the BFPP defense. *Id.* ¶¶ 25-28. Thus, CBY cannot satisfy the "no affiliation" requirement. *See Ashley*, 791 F. Supp. 2d at 460-61, 502 (finding releases given with property purchase to be sufficient proof of a disqualifying relationship).

With respect to the "**all appropriate inquiries**" element, CBY cannot establish that it performed all appropriate inquiries regardless of which version of the ASTM Standard E1527 applies.[17] Like the 2005 version, the 1997 and 2000 versions also require that pre-purchase inquires be documented in a Phase I Environmental

---

[15] Redacted Pursuant to Local Rule 5.3.

[16] Redacted Pursuant to Local Rule 5.3.   U.S. Supp. SOF ¶ 399.

[17] The United States notes, however, that at the time of CBY's pre-purchase activities, EPA had called into the question the validity of ASTM Standard E1527-00 for purposes of the "all appropriate inquiry" element. *See* Resp. to CBY SOF ¶ 195.

Assessment.  Resp. to CBY SOF ¶ 197; U.S. Opp. Attachment B (ASTM Standard E1527-97) at Parts 6-11; *see also SPS Limited Partnership LLLP v. Sparrows Point, LLC*, Civil. No. JFM-14-589, 2017 WL 3917153, *12 (D. Md. Sept. 6, 2017) ("[C]onducting an [environmental site assessment] is a recognized way of establishing "all appropriate inquiry[.]").  The earlier ASTM Standard E1527 versions likewise require that BFPPs document interviews with present owners or occupants, reviews of historical information, searches for recorded liens against the property, and reviews of Federal, State, and local government databases.  Resp. to CBY SOF ¶ 197; U.S. Opp. Attachment B at Parts 6.2, and 6-11.[18]  Thus, just as AECOM's November 2005 Conceptual Remedial Action Work Plan ("November 2005 Work Plan") cannot satisfy the 2005 standard, it likewise cannot satisfy the 1997 or 2000 standards.  U.S. SOF ¶¶ 67-68.  The fact that NJDEP found the remedial approach in the November 2005 Work Plan an acceptable "conceptual" approach (CBY Mot. at 30) has nothing to do with whether the report satisfied ASTM Standard E1527 (any version).

In addition to the November 2005 Work Plan, CBY cites an August 18, 2005, Site Data Summary and Scoping Document, CBY SOF ¶ 204, and a March 27, 2006 Remedial Investigation Report, *id.* ¶ 196.  It is unclear whether CBY is contending

---

[18] For example, each ASTM Standard E1527 version requires that BFPPs review state databases of registered underground storage tanks.  *See* U.S. Mot. Attachment A at 14; Resp. to CBY SOF ¶ 197; U.S. Opp. Attachment B at Part 7.2.1.  It does not appear CBY did so.  *See* U.S. SOF ¶¶ 67-68.

that these documents constitute Phase I Environmental Site Assessments under ASTM Standard E1527 (any version), *see* CBY Mot. at 29-30, but they do not.

The August 2005 Site Data Summary and Scoping Document does not mention the ASTM Standard E1527, or include interviews with owners or operators, searches for recorded liens against the property, or reviews of Federal, State, and local government databases. Resp. to CBY SOF ¶ 204. The only review of historical information reported in the document is a review of aerial photography by a prior contractor, and the document concedes that NJDEP files have yet to be checked. *Id.* Indeed, it appears that the purpose of the document was to summarize prior investigations to date and recommend certain activities "to adequately identify potential issues associated with the Site that could require remedial action." *Id.*

The March 2006 Draft Remedial Investigation Report similarly makes no mention of the ASTM E1527 and states that its purpose is to

> provide[] highlights of the data and observations from previous consultants . . [,] a summary of the URS Corporation material and explosives of concern (MEC) investigation/remediation efforts through December of 2005, and the site investigation conducted by ENSR AECOM (ENSR) in the summer of 2005.

Resp. to CBY SOF ¶ 196. The report does not discuss interviews with owners or operators, review of historical information, or searches for liens, and documents that only limited review of state and federal government databases was performed. *Id.* In other words, this post-purchase report was intended to summarize past investigations rather than to comply with the ASTM Standard E1527's updating requirements.

Accordingly, none of the three reports identified by CBY as relevant to the "all appropriate inquiries" element satisfy the ASTM Standard E1527.

Moreover, CBY cannot simply rely on the fact that it hired a consultant to investigate the Site prior to purchase. *See* CBY Mot. 30 (citing *Ashley*, 791 F. Supp. 2d at 500). In *Ashley*, Ashely hired an environmental professional specifically for the purpose of conducting all appropriate inquiries on two parcels. *Ashley*, 791 F. Supp. 2d at 500. That environmental professional prepared a Phase I Environmental Site Assessment for each parcel and certified that its inquiries were in compliance with the relevant ASTM Standard E1527 versions. *Id.* Tellingly, CBY does not state that it hired IRG Environmental, LLC or that IRG Environmental hired AECOM Environmental Group to conduct all appropriate inquiries pursuant to ASTM Standard E1527 (any version). *See* CBY SOF ¶¶ 200, 202 (stating that CBY hired IRG Environmental "to perform due diligence activities at the Site" and IRG contracted with AECOM "for technical evaluation and due diligence support"). Also tellingly, as stated above, none of the documents CBY cites in support of its "all appropriate inquiries" argument make any mention of the ASTM Standard E1527. U.S. SOF ¶ 67; Resp. to CBY SOF ¶¶ 196, 204. Accordingly, CBY's conduct is not analogous to Ashley's, and it fails to satisfy ASTM Standard E1527 (any version).

Furthermore, according to the ASTM, Phase I reports have extremely short shelf lives. Indeed, all three potentially relevant ASTM Standard E1527 versions require that the Phase I Environmental Assessment be generated no more than 180

days from the purchase of the property unless appropriately updated with recent interviews, record reviews, and site reconnaissance.  *See* U.S. Mot. Attachment A at 10 (Part 4.6); Resp. to CBY SOF ¶ 197; U.S. Opp. Attachment B at Parts 4.6 and 4.7.3. Thus, CBY cannot rely on the alleged inquiries into the history and condition of the Site that they contend were done prior to CBY's involvement.  CBY SOF ¶¶ 185, 204.

Finally, although the United States did not move for summary judgment on the remaining BFPP elements, there is at least a question of fact regarding whether CBY has satisfied the "**continuing obligations**" elements.  *See* U.S. Mot. at 34 n.19 (citing 42 U.S.C. § 9601(40)(C), (E), (F)(i)); *see also* U.S. Supp. SOF ¶ 395-96.  CBY's expert Mr. Zoch could not recall any specific documentation that demonstrated CBY's fulfillment of these.  U.S. SOF ¶¶ 72-73.  Moreover, CBY cannot establish that it provided all legally required notices by establishing that no releases of hazardous substances requiring notice to EPA or a state environmental agency occurred since the party's acquisition.  *See* CBY Mot. at 31.  Redacted Pursuant to Local Rule 5.3  *See* CBY SOF ¶¶ 228-30; *see also* U.S. Mot. at 40-41.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should deny CBY's motion.

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Div.

40

Dated:  December 15, 2017        By:    /s/ Brian H. Lynk

BRIAN H. LYNK, D.C. Bar No. 459525
STEPHANIE J. TALBERT
HEATHER E. GANGE
Trial Attorney
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC  20044
Tel: (202) 514-6187
Fax: (202) 514-8865 (fax)
Email: brian.lynk@usdoj.gov